## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NRO BOSTON, LLC and ALICE INDELICATO, <br><br>                 Plaintiffs, <br> v. <br><br> KABBAGE, INC. and CELTIC BANK CORPORATION <br><br>                 Defendants. | Civil Action No.: 17-11976 |

### COMPLAINT AND DEMAND FOR A TRIAL BY JURY

Plaintiffs NRO Boston, LLC ("NRO") and Alice Indelicato (collectively "Plaintiffs"), by their attorneys, White and Williams LLP, as and for their Complaint and demand for a trial by jury, allege as follows:

### NATURE OF THE ACTION

1.     This is an action by a small Massachusetts business who was victimized by a "rent-a-bank" scheme used by Defendants Kabbage, Inc. ("Kabbage") and Celtic Bank Corporation ("Celtic Bank") to violate Massachusetts' criminal usury laws.

2.     Kabbage is a large sophisticated business that specializes in issuing loans far in excess of Massachusetts' maximum legal rate of 20%.

3.     In order to charge small businesses interest rates in excess of 20%, Kabbage entered into a criminal enterprise with Celtic Bank for the express purpose of evading the criminal usury laws.

4.     A Member FDIC bank is not subject to state usury laws because of federal preemption.

5.      A Member FDIC bank, however, is subject strict regulatory underwriting guidelines that make it difficult or impossible to provide same day approval of high-risk loans.

6.      Although Kabbage is able to approve high risk loans within minutes because it is not subject to stringent federal banking regulations, it is subject to individual state usury laws.

7.      A "rent-a-bank" scheme attempts to solve this problem in those states, like Massachusetts, that have criminally usury laws.

8.      Under this "rent-a-bank" scheme, Celtic Bank is identified as the lender on the loan documents.

9.      Celtic Bank's identification as the lender is essential to the scheme because, unlike Kabbage, Celtic Bank is exempt from Massachusetts' usury laws by virtue of its charter in a state that has no maximum interest rate for commercial loans.

10.     But Celtic Bank is not the "true" lender.

11.     Kabbage originates, underwrites and funds loans to Massachusetts' business at interest rates that violate Massachusetts' criminal usury laws.

12.     Although the loan funds are purportedly issued by Celtic Bank, the loans are then immediately assigned to Kabbage, who then funds and services the loans.  Kabbage also assumes full responsibility for all risk of loss.

13.     Celtic Bank's involvement in these loans is in name only and is paid a fixed percentage for the use of its name.

14.     Kabbage cannot directly loan money at these rates to Massachusetts' businesses so it pays Celtic Bank to use its charter to provide a cover for the illegal loan transactions.

15.     Celtic Bank is nothing more than a front for Kabbage's loan sharking business.

16.     This rent-a-bank scheme has been the subject of numerous enforcement actions by Attorney Generals in different states, including Massachusetts.

17.     Kabbage used this scheme to issue 29 loans at usurious interest rates to NRO over an approximately two-year period, each without notifying the Attorney General as required under Mass. Gen. Law c. 271, § 49.

18.     Defendant Kabbage with the assistance of Celtic Bank has systematically taken advantage of NRO for years, slowly devastating an otherwise profitable business that has employed dozens of Massachusetts residents for nearly a decade.

19.     Kabbage's co-founder and COO, Kathryn Petralia, openly acknowledged that Kabbage is the "true" lender in transactions involving Celtic Bank and also that Kabbage's loans are usurious in a joint webinar presented in partnership with the National Federation of Independent Business:

> Question 10:
>
> "What are the typical rates charged to applicants? We understand that it varies, but there is a range of cost."
>
> Answer:
>
> Our average effective APR, if you were to count it as a APR, would be in the low thirties, thirty percent. However, APR is often a misleading way of calculating the cost of borrowing, because it's really interesting, what you may not realize is if you have a twelve month loan that you pay off in two months, your cost, your APR, gets multiplied by six because the shorter term your loan, the higher your APR because of the way that APR is calculated.
>
> On average, our customers are paying just under five percent of the loan amount, if they hold the loan for thirty days, and they're paying just under thirteen percent of the loan amount if they hold the funds for six months. There are a lot of different ways that fees can be calculated across multiple providers, so it's really important that you understand all the various fees that could be assessed. Kabbage doesn't charge broker fees, or origination fees, or

monthly maintenance fees. Many times, those fees are not actually calculated or included in the APR.

Question 12:

"Are you a direct lender?"

Answer:

The answer is yes. We are not a marketplace lender. We do securitize the receivables that are generated, the loans that are generated, meaning we have investors in those loans that we make, **but Kabbage actually takes the risk of loss**. All of our loans are made in partnership with Celtic Bank, which is a Utah bank regulated by the FDIC. We work together with Celtic to manage customer relationships from the time they're originated all the way through the repayment of the loan.

https://www.kabbage.com/blog/ins-outs-online-lending-kabbage-co-founder-kathryn-petralia-webinar-transcript/ (emphasis added).

20.     In reality, Defendant Kabbage is the commercial equivalent of a "payday lender."

21.     It preys on the weak and desperate and extorts unconscionable terms that are expressly prohibited by the criminal laws, civil statutes, and the strong public policy of this Commonwealth.

22.     Among other unconscionable business practices, Defendant Kabbage has knowingly and intentionally violated Mass. Gen. Law c. 271, § 49 by charging outrageous interest rates on loans that are several times the 20% maximum interest rate permitted under the criminal laws of this Commonwealth.

23.     A violation of this Commonwealth's criminal usury law is not a minor infraction; it is a felony punishable up to ten years in state prison.  It is also a felony to even possess the instrument.

24.     As the Attorney General of this Commonwealth has advised, the crime of usury is

offensive, detrimental and injurious to the life, health and general welfare of the borrowers and their families," in that it diverts a

4

large percent of the borrowers' incomes from "otherwise beneficial directions," and materially reduces their ability to obtain the social and economic benefits which their incomes would normally secure to them. Said activities breed strife and unrest *and cause the borrower in his extremity to go to others engaged in the same unlawful activities*, further depriving himself and his family of the necessities of life and resulting in emotional and mental distress affecting the borrower's performance as an employee and *adding to the relief rolls*. Said business is obnoxious and detrimental to retailers of goods who serve the borrowers and their families because the excessive interest reduces the sum available to pay for supplies furnished. *Because of these effects on many hundreds of persons the Counterclaim Defendants' activities are contrary to the good morals, public peace and general welfare of the people and contrary to the public policy of the Commonwealth*. The majority of the borrowers are humble citizens, ignorant of the law, and their legal rights against the Counterclaim Defendants are inadequate and ineffective. They have no means to defend themselves. There is thus presented, the bill alleges, "an intolerable situation" that cannot be remedied, except by relief in equity.

*Commonwealth v. Stratton Finance Co.*, 38 N.E.2d 640, 641-42 (Mass. 1941) (emphasis added).

25.     Every one of these concerns has materialized in this case.

## THE PARTIES

26.     Plaintiff NRO Boston, LLC is a Massachusetts corporation with its principal place of business located at 124-26 Charles Street, Boston, Massachusetts 02114.

27.     Plaintiff Alice Indelicato is an individual who resides at 3 Oakdale Boston, MA 02539.

28.     Defendant Kabbage is a limited liability company duly organized and existing under the laws of the State of Georgia, with its principal place of business located at 925B Peachtree Street NE, Suite 1688, Atlanta, GA 30309.

29.     Defendant Celtic Bank is an industrial bank chartered by the State of Utah and existing under the laws of the State of Utah, with its principal place of business located at 268 South State Street, Suite 300, Salt Lake City, Utah 84111.

## JURISDICTION AND VENUE

30.     Defendants Kabbage and Celtic Bank are subject to the personal jurisdiction of this Court under the Massachusetts Long-Arm Statute, G.L.c. 223A, § 3, because each of the transactions at issue arose from the Defendants' purposeful transaction of business within Massachusetts.  Defendants Kabbage and Celtic Bank are further subject to the personal jurisdiction of this Commonwealth because each directed their tortious conduct within this Commonwealth.  This Court also has subject matter jurisdiction over this matter under Mass. Gen. Law c. 271, § 49(c).

31. This Court has original jurisdiction over this action because it involves a federal question under 18 U.S.C. §§ 1961-62.

32.     This Court also has original jurisdiction over this action based upon 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

## FACTUAL BACKGROUND

33.     NRO is a clothing and sports retailer with locations in Beacon Hill, Martha's Vineyard, Nantucket and Wellesley.

34.     It is owned by Alice and Jason Indelicato, who are husband and wife, and have lived in Massachusetts their whole life.

35.     Beginning in January 2014, Defendant Kabbage began using a common instrument known as a "factoring agreement" in an effort to avoid Massachusetts' criminal laws.

36.     Kabbage entered into five such agreements between January 4, 2014 and April 11, 2014 (the "Kabbage Merchant Cash Agreements").

37.     While these Merchant Cash Agreements contain form language stating that they are not loans, that is exactly what they are.

38.     Factoring, otherwise known as "accounts receivable financing," is a form of financing whereby a business sells its receivables to a third-party financial company known as a "factor" at a discount to obtain cash.

39.     The sale of the receivables transfers ownership of the receivables to the factor, meaning that the factor owns all the rights and risks associated with owning the receivables, including the risk of nonpayment.

40.     A true factoring agreement is sale (not a loan), and thus, would not be subject to state usury laws.

41.     Over the years, factoring companies regularly changed their forms in response to adverse court decisions to try to make them look like "true" factoring agreements, although most remain disguised loans.

42.     Unlike the more sophisticated factoring agreements now being used by companies, like Kabbage, in their attempt to avoid the criminal usury laws, the Kabbage Merchant Cash Agreements hide nothing.

43.     Under the agreements, Kabbage advances money to NRO, who in turn, is obligated to repay that money plus additional cost or interest over a six-month term.

44.     The required payments are referred to as "Minimum Monthly Transfers."

45.     Pursuant to Section 1.5 of the Kabbage Merchant Cash Agreements, a default includes NRO's failure "to make any transfer under this Agreement."

46.     A default further includes NRO's failure "to comply with or to perform any term, obligation, covenant, or condition under this Agreement" and NRO is obligation under Section

1.2 (x) "[t]o transfer <u>Proceeds</u> to us (in U.S. dollars) by the applicable Transfer Date" (emphasis in the original).

47.     Thus, while the Kabbage Merchant Cash Agreements purport to purchase NRO's future receivables and purport not to be loans, NRO bears all the risk of nonpayment, including the risk that there will be insufficient receivables to make the transfers.

48.     In the event of any one of these defaults, Defendant Kabbage is then permitted to immediately seize the business assets secured under the Security Agreement as well as the personal assets of Plaintiff Indelicato under the Personal Guarantee.

49.     Where the factor bears no risk of nonpayment, the transactions are nothing more than disguised loans.

50.     The form used in each of the five transactions was the same with the only difference being the amount advanced and the repayment terms.

51.     The interest rate for each of the Kabbage Merchant Cash Agreements is far in excess Massachusetts' criminal usury rate of 20%.

52.     In April 2014, Kabbage did away with using merchant cash advances as the front for its illegal loan sharking business in favor of new, albeit equally illegal scheme.

53.     On April 14, 2014, Kabbage sent the following e-mail to NRO:

> **Dear Alice,**
>
> Kabbage is excited to announce our new loan product! It is still the working capital line you depend on, but our new partnership with Celtic Bank now gives you access to a business line of credit.
>
> Quick facts about Kabbage loans:
>
> - Kabbage will be converting all existing merchant advances and working capital lines to loans and lines of credit.
> - You'll get the **same great terms** with the same personal service.

- **Your payment schedule and rates will NOT change.**
- **Kabbage is the same company** with the same focus on great service.
- Once your MCA has been converted you must read and agree to the new 'Kabbage Business Loan Agreement'.

These changes give us more flexibility, so look for new products, including longer payment terms, in the future!

If you have any questions, give us a call or send us an email!

Sincerely,
The Kabbage Team

54.    Kabbage's simple transformation of sold assets into a loan with no change in the terms or the rate shows that the Merchant Cash Agreements were loans in the first place.

## Kabbage "Rents" a Utah Bank to Violate State Usury Laws

55.    The new scheme began on March 20, 2014 when Kabbage entered into a "Program Management Agreement" ("PMA") with Celtic Bank.

56.    Pursuant to the PMA, Celtic Bank agreed to originate and fund business loans through the marketing efforts of Kabbage.

57.    In practice, Celtic Bank did not retain any interest in the Kabbage loans.

58.    The PMA is "rent-a-bank" scheme and is designed for one purpose; to allow third-party lenders like Kabbage to circumvent state usury laws.

59.    Because Celtic Bank is subject to the control, regulation and/or examination of the State of Utah, it is not subject to Massachusetts' criminal usury statute, but rather, is subject to Utah's usury laws.

60.    Utah has no maximum usury rate for commercial loans so it can legally originate and fund commercial loans to Massachusetts' businesses in excess of 20% without violating Massachusetts' criminal usury laws.

61.     Kabbage has no such protection and would be subject to Massachusetts criminal usury laws for any loans it originated and funded to Massachusetts' businesses.

62.     Thus, in order to circumvent Mass. Gen. Law c. 271, § 49, Kabbage conspired with Celtic Bank to enter into an arrangement whereby Celtic Bank is nothing more than a front for Kabbage's loan sharking business, the purpose and effect of which is to evade criminal and civil liability in Massachusetts for knowingly issuing loans to Massachusetts' businesses in excess of 20%.

63.     In fact, the Commonwealth of Massachusetts, by and through its Attorney General, brought an action to shut down a similar scheme where a lender located on tribal land and subject to tribal law (Western Sky) entered into an agreement to sell its loans to CashCall.

64.     On October 6, 2015, the Massachusetts' Attorney General filed a complaint in Suffolk Superior Court alleging that Western Sky and CashCall were victimizing Massachusetts consumers by unfairly and deceptively charging interest in excess of Massachusetts' usury laws.

65.     In response, Western Sky and CashCall asserted that they were not subject to the regulators' jurisdiction because the loans were provided through Western Sky, which was located on the Cheyenne River Indian Reservation in South Dakota, and therefore had tribal immunity from state and federal banking laws.  The defendants argued that the rates charged were permissible under tribal law.

66.     Their argument was rejected by the trial court.  After losing their jurisdictional arguments, the defendants settled the lawsuit with the Massachusetts Attorney General.

67.     The settlement included a permanent injunction where the lenders agreed to no longer do business in the Commonwealth and provide $17 million in refunds and loan modifications for their victims.

68.     Following the settlement, the Undersecretary of the Office of Consumer Affairs and Business Regulation, John C. Chapman, commented that: "[a]ny businesses attempting to avoid the licensing and usury laws of the Commonwealth at the expense of Massachusetts consumers will not be tolerated.  This settlement is a victory for the thousands of Massachusetts consumers who took out Western Sky loans and serves as a warning to unlicensed lenders."

69.     The State of New York has also cracked down on this "rent-a-bank scheme" in obtaining similar results against Western Sky Financial, LLC, Cash Call, Inc. WS Funding, LLC and their owners.  *See* http://www.ag.ny.gov/press-release/ag-schneiderman-announces-settlement-western-sky-financial-and-cashcall-illegal-loans.

70.     So has the District of Columbia.  *See* http://oag.dc.gov/release/cashcall-agrees-provide-nearly-3-million-refunds-and-debt-forgiveness-district-consumers.

**Kabbage Falsely Advertises and Markets its Loan Program**

71.     Kabbage advertises that it offers lines of credit ranging from $2,000 to $150,000 with each draw on the line being a 6 or 12-month installment loan issued by Celtic Bank.

72.     Kabbage advertises that a "loan" is the specific amount of funds you draw at any given time.

73.     Unlike a conventional line of credit, Kabbage requires borrowers to enter into a new loan agreement every time money is drawn from the line of credit.

74.     Kabbage further advertises that "loans have a monthly fee for every month you have a balance. Every month, you'll pay back 1/6 of the total loan amount (for 6-month loans) or 1/12 of the loan amount for (12-month loans) plus a monthly fee." https://www.kabbage.com/help-center/

75.     The vast majority of NRO's loans had a 6-month term.

76.     Kabbage's loans front load the interest payments with 5.00% of the loan amount charged for each of the first two payments and 1.00% charged for each of the remaining four payments of the 6-month loans.

77.     Kabbage advertises that its loans do not have prepayment penalty fees and borrowers can save money and avoid monthly fees by paying off the loan early:



https://www.kabbage.com/what-it-costs/loan-rates-and-terms/

78.     The above representations are false and deceptive.

79.     Contrary to how Kabbage advertises and markets its loans, NRO did not pay off 1/6 or 1/12 of the loan amount each month depending on the term of the loan.

80.     Buried in the fine print of the loan agreements is the following language:

> **Applicant of Payments.**  Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loans first, then the second oldest loan, and so on.  With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal…

81.     NRO regularly paid off the loans early (which was required by Kabbage in order to draw additional monies), but this did not save NRO money as advertised and represented because with each new loan, NRO was paying the exorbitant front loaded interest payments without any money ever going to principal.

82.     In fact, NRO had no choice but to pay-off the loans early which is contrary to both the loan agreement and Kabbage's advertising materials.

83.     Kabbage actually artificially changed the minimum payment required by the loan agreements without NRO's consent for the purpose of paying off prior loans, thereby forcing NRO to enter into new loan agreements.

84.     For instance, on March 29, 2015, Kabbage emailed NRO to inform it that a minimum monthly payment of $25,490.67 is scheduled to be paid automatically on 4/4/2015.

85.     This payment was debited from NRO's account on April 7, 2015.

86.     Once the payment is made, Kabbage would advise NRO by email about the available line of credit that was now available.

87.     By taking large, unauthorized debits from NRO's account that did not reflect the minimum monthly payment due under the loan agreements, Kabbage forced NRO to enter into new loan agreements each month, thereby creating a never ending stream of usurious interest payments for Kabbage.

88.     Kabbage also would continue to automatically debit monthly interest charges for loans that had been paid off in full.  Thus, NRO did not save on monthly fees when loans were paid off early as Kabbage advertises and represents.

89.     Kabbage effectively called the loans early to force NRO to enter into new loans with new front loaded interest payments.

90.     Every payment made by Kabbage went to interest.

91.     Kabbage's COO clearly explained the effect that this practice has on the APR for the loans: "[Y]our APR, gets multiplied by six because the shorter term your loan, the higher your APR because of the way that APR is calculated."  https://www.kabbage.com/blog/ins-outs-online-lending-kabbage-co-founder-kathryn-petralia-webinar-transcript/

92.     Kabbage's unfair and deceptive practices have the purpose and effect of making an already usurious loan even more usurious.

93.     This did not save NRO money as Kabbage promised; it caused financial ruin.

**Kabbage Victimizes NRO using the Rent-a-Bank Scheme**

94.     Beginning on May 6, 2014, Kabbage entered into the first of 29 loans with Kabbage.  *See* Ex. A.

95.     Kabbage is a direct lender.

96.     Kabbage is not a marketplace lender.

97.     The loan agreements executed by NRO were all referred to as a "Kabbage Commercial Loan Agreement".

98.     Kabbage (not Celtic Bank) took the risk of loss on the loans.

99.     NRO at all times dealt exclusively with Kabbage.

100.    All of NRO's communications were with Kabbage.   NRO had absolutely no dealings of any kind with Celtic Bank on any of these 29 loan transactions.

101.    Celtic Bank was the lender in name only.

102.    The "true" lender in all 29 loan transactions was Kabbage, which bore 100% of the risk of loss.

103.    All of the loans where Celtic Bank is identified as the lender were immediately purchased by, and assigned to, Kabbage.

104.    Contrary to the PMA, Kabbage originated and funded all 29 loans.

105.    The interest rate for each of the 29 loans was far in excess of Massachusetts' maximum legal rate of 20%.

106.    The terms of the loans were contained in the standard "Kabbage Business Loan Agreement."

107.    The loan agreements were all titled "Kabbage Business Loan Agreement," yet the lender was identified as Celtic Bank.

108.    All of the loans were done electronically and contained the following form language at the end of the agreements:

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner*: You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or any other document signed in connection with your account represents your signature on this Agreement.**

109.    Kabbage is subject to Massachusetts' criminal usury laws and never notified the Attorney General's Office of its intent to make loans greater than $6,000 with otherwise usurious interest rates pursuant to G.L. c. 271, §49.

110.    After paying Kabbage hundreds of thousands of dollars in principal and interest, NRO could no longer keep up with the usurious loan payments, at which time Kabbage began threatening NRO's owners to collect upon an unlawful debt.

### The Admitted Loans are a Per Se Violation of 93A

111.    Defendants issued NRO loans with interest rates in excess of 20%.

112.    In an attempt to evade the criminal laws of this Commonwealth, Defendants included a choice-of-law provision that purports to apply another state's law.

113.    Each of these agreements, however, was applied for, executed and transacted in Massachusetts.

114.    Each of the transactions involves a Massachusetts business and Massachusetts residents.

115.    Each of the transactions was fully funded in Massachusetts and repaid from revenues earned in and paid from Massachusetts.

116.    Each of the transactions was electronically debited from NRO's Massachusetts bank accounts.

117.    In addition to these central Massachusetts contacts, the criminal activity and financial harm was directed and felt wholly within Massachusetts.

118.    Furthermore, each of these loan transactions violated the strong public policy of this Commonwealth.

119.    Among other things, each of the Defendants' transactions violated Mass. Gen. L. ch. 271, § 49.  The title of the statute is Criminal Usury, which is a felony punishable up to ten years in state prison.  Moreover, this criminal statute is contained within Chapter 271 of Massachusetts General Laws, titled "Crimes Against Public Policy."

120.    As a matter of law, the choice-of-law provision is unenforceable because Defendants cannot contract around the criminal laws of this Commonwealth.  *See Cashcall, Inc. v. Mass. Div. of Banks,* 3 Mass. L. Rep. 5 (Mass. Super. Ct. 2015) (holding that Massachusetts criminal usury laws applied to out-of-state resident despite choice-of-law provision because "[a]ll of the loans were applied for, paid from, and collected from Massachusetts.").

121.    The forum selection and arbitration provisions are unenforceable for the same reasons.  These clauses are also unenforceable because the Legislature of this Commonwealth expressly conferred jurisdiction on this Court to declare these criminally usurious transactions void under Mass. Gen. L. ch. 271, § 49(c).

122.    The forum selection and arbitration provisions are also unenforceable because they are contained in instruments that are illegal to possess within this Commonwealth.  *See* Mass. Gen. L. ch. 271, § 49(b).

## DAMAGES

123.    As a direct and proximate cause of the financial strain resulting from this series of transactions with Kabbage, NRO was forced to enter into a series of criminally usurious loans with other high interest lenders in order to keep up with the oppressive monthly payments of the Kabbage loans.  *See* Ex. B.

124.    As a direct and proximate result of each of these loans, NRO's business assets have been frozen, its employees and owners have been harassed, and NRO has had to defend numerous lawsuits as a result of certain these attempts to collect upon an unlawful debt.

125.    As a direct and proximate result of each of these loans, NRO suffered indivisible injury through loss of goodwill, lost profits, and devaluation of its business.

126.    As a direct and proximate result of each of these loans, NRO suffered indivisible injury by having its other business loans being called in from legitimate banks, deterioration of its credit profile, and the inability to secure financing to obtain needed inventory and pay its vendors.

127.    As a direct and proximate result of each of these loans, Alice Indelicato has suffered indivisible injury through severe mental anguish and emotional distress.  In addition to being harassed by these unlawful actions, Alice Indelicato has had liens placed on her residential home and has her personal assets frozen.

128.    As a direct and proximate result of each of these loans, Alice Indelicato has also suffered an indivisible injury by having to drain all of her personal assets by providing personal and family loans to NRO in order to keep her family's only means of livelihood afloat.

## FIRST CAUSE OF ACTION

### (Mass. Gen. Law ch. 93A §§ 2 and 11)

129.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

130.    Mass. Gen. Laws c. 93A, § 2(a) makes it unlawful to engage in any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce in the Commonwealth.

131.    It is an unfair and deceptive practice under Mass. Gen. Laws c. 93A, § 2(a) for a seller of a product to use advertisements which are untrue, misleading, deceptive, or fraudulent. This includes advertisements which create an over-all misleading impression through the failure to disclose material information.

132.    Kabbage engaged, directly or indirectly, in the business of making loans greater than $6,000 to Massachusetts businesses.

133.    Celtic Bank aided and abetted Kabbage in the business of making loans greater than $6,000 to Massachusetts businesses.

134.    In the course of making, servicing, or collecting on loans made to NRO, Kabbage engaged in and Celtic Bank aided and abetted Kabbage in deceptive business practices in violation of G.L. c. 93A, § 2(a).

135.    Kabbage's unfair or deceptive acts or practices include, but are not limited to, the following:

a)      Repeatedly or persistently making, servicing, or collecting, or attempting to collect, on loans issued to NRO without proper license or registration in violation of Massachusetts laws, including G.L. c. 93, § 24A and c. 140, §§ 96 through 114A;

b)      Unconscionably making, servicing, or collecting, or attempting to collect, on loans issued to NRO without appropriate evaluation of NRO's ability to repay these loans;

c)      Advertising the loans using false and misleading statements, including, among other things, stating that: (1) the loans were not usurious;

(2) businesses would save money and avoid fees by paying the loans off early, (3) businesses would not be charged any fees after the loans were paid off; (4) businesses would be charged a fixed monthly payment with 1/6 or 1/12 of that monthly payment going to principal depending upon whether it was a 6-month or 12-month loan; (5) deceptively disclosing and/or failing to disclose the interest rate; and (6) falsely and/or deceptively disclosing the relationship between Kabbage and Celtic Bank.

d)      Repeatedly or persistently charging and receiving illegal, usurious, and oppressive interest and fees;

e)      Repeatedly misrepresenting to NRO, expressly and by implication, that the rates of interest being charged on the loans was legal; and

f)      Repeatedly misrepresenting to NRO that Massachusetts law does not apply to the loans.

136.    Defendants conspired with and acted in concert with each other to violate Mass. Gen. L. ch. 271, § 49 and also 940 CMR 6.00 *et seq*.

137.    Without Celtic Bank's assistance, Kabbage would not have been able to enter into any of the 29 criminally usurious loan transactions with NRO.

138.    Kabbage knew or should have known that by making, servicing, or collecting, or attempting to collect on these loans, it engaged in unfair or deceptive acts or practices, in violation of G.L. c. 93A, §§ 2 and 11.

139.     Celtic Bank knew or should have known that by providing the assistance necessary for Kabbage to make, service, or collect, or attempt to collect on these loans, it engaged in unfair or deceptive acts or practices, in violation of G.L. c. 93A, §§ 2 and 11.

140.     Kabbage knew or should have known that its advertisements about the loans were false, misleading or deceptive.

141.     Celtic Bank knew or should have known that Kabbage's advertisements about the loans were false, misleading or deceptive.

142.     Defendants' violation of Mass. Gen. L. ch. 271, § 49 constitutes a per se violations of Mass. Gen. Law ch. 93A §§ 2 and 11.

143.     Defendants also violated Mass Gen. Law ch. 93A §§ 2 and 11 by including unconscionable and unfair provisions in connection with the loan agreements, which were contracts of adhesion.  Among these unconscionable and unfair provisions, Defendants required NRO to, among other things:

        a)     Waive the right to a jury trial;

        b)     Waive the right to participate in a class action;

        c)     Waive the right to seek legal redress in their home state;

        d)     Execute a Security Agreement giving Kabbage a UCC lien on all of its assets;

        e)     Execute a personal guarantee making the individual owner of the business personally liable for any default under the agreement; and

        e)     Waive claims for direct, consequential and punitive damages.

144.     Defendants' conduct was willful, unfair and unlawful.

145.     Kabbage willfully and knowingly violated Mass Gen. Law ch. 93A.

146.     Celtic Bank willfully and knowingly aided and abetted Kabbage's violation of Mass Gen. Law ch. 93A.

147.     Plaintiffs reasonably relied upon Kabbage's representations and those representations induced Plaintiffs to enter into the loans.

148.     As a direct and proximate result of each of these loans, NRO paid Kabbage interest in excess of the 20% maximum interest rate permitted by Massachusetts law.

149.     As a direct and proximate result of each of these loans, NRO suffered indivisible injury through loss of goodwill, lost profits, and devaluation of its business.

150.     As a direct and proximate result of each of these loans, NRO suffered indivisible injury by having its other business loans being called in from legitimate banks, deterioration of its credit profile, and the inability to secure financing to obtain needed inventory and pay its vendors.

151.     As a direct and proximate result of each of these loans, Alice Indelicato has suffered indivisible injury through severe mental anguish and emotional distress.

152.     As a direct and proximate result of each of these loans, Alice Indelicato has also suffered an indivisible injury by having to drain all of their personal assets by providing personal and family loans to NRO in order to keep their only means of livelihood afloat.

WHEREFORE, Plaintiffs seek an order from this Court:

a)     Voiding every loan made to NRO in violation of Massachusetts usury laws;

b)     Ordering Defendants to repay NRO all principal and  interest previously paid to Kabbage in connection with the criminally usurious loans;

    c)        Granting an injunction restraining Kabbage from enforcing any of its rights under the criminally usurious loans;

    d)        Awarding Plaintiffs direct and consequential damages as determined by the trial of fact, including prejudgment interest;

    e)        Awarding Plaintiffs double or treble damages;

    f)        Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

    g)        Granting such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

(Mass. Gen. L. ch. 271, § 49)

153.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

154.    Mass. Gen. Law c. 271, § 49 establishes that it is usurious in Massachusetts to hold a loan contract which requires an interest rate in excess of 20% per year, punishable by imprisonment up to 10 years and fines of up to $10,000.

155.    Mass. Gen. Law c. 271, § 49 does not apply to loans that are separately regulated (i.e., loans of $6,000 or less) or to any person who notifies the Attorney General of his intent to engage in otherwise prohibited transactions and maintains records of same.

156.    Kabbage was engaged, directly or indirectly, in the business of making loans greater than $6,000 to Massachusetts businesses, including NRO.

157.    Celtic Bank aided and abetted Kabbage in the business of making loans greater than $6,000 to Massachusetts businesses, including NRO.

158.    In the course of making, purchasing, or collecting on loans made to Massachusetts consumers, Kabbage repeatedly or persistently charged, contracted for, or received interest at rates that far exceeded 20 percent.

159.    In the course of making, purchasing, or collecting on loans made to Massachusetts consumers, Celtic Bank aided and abetted Kabbage in repeatedly or persistently charging, contracting for, or receiving interest at rates that far exceeded 20 percent.

160.    At all times relevant to this Complaint, Kabbage did not notify the Massachusetts Attorney General of their intent to engage in such usurious lending transactions.

161.    Celtic Bank knew or should have known that Kabbage did not notify the Massachusetts Attorney General of their intent to engage in such usurious lending transactions.

162.    By engaging in such conduct of directly or indirectly making usurious loans in the Commonwealth, Kabbage violated G.L. c. 271, § 49.

WHEREFORE, Plaintiffs seek an order from this Court:

a)   Declaring that each of the agreements entered into between NRO and Defendants constitutes a loan transaction, and thus, is void because each charges a criminally usurious interest rate in excess of 20%;

b)   Declaring that the choice-of-law, arbitration and forum selection provisions in each of the usurious loan transactions is void and unenforceable;

c)   Ordering Defendants to repay NRO all principal and interest previously paid by NRO to Defendants in connection with the criminally usurious loans, including prejudgment interest; and

d)   Granting such other and further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION

(Violation of 18 U.S.C. § 1962(c))

163.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

164.     Defendants Kabbage and Celtic Bank formed an association-in-fact enterprise (hereinafter referred to as the "KCB Enterprise") for the express purpose of carrying out a pattern of racketeering activity that targeted small business owners in need of short term cash.

165.     More specifically, the Defendants violated 18 U.S.C. § 1962(c) by devising a "rent-a-bank" scheme to hide the identity of the "true" lender in loan transactions with NRO and other Massachusetts small businesses so that they could charge usurious interest rates.

166.     Defendants each are persons under 18 U.S.C. § 1961(3) and § 1962(c) because they are individuals or entities capable of holding a legal or beneficial interest in property.

167.     Defendants formed the KCB Enterprise in or around March, 2014 for the common purpose of, among other things, originating and funding usurious loans to NRO and countless other small businesses.  Thus, the associated in fact organization qualifies as an enterprise within the meaning of § 1961(4) and § 1962(c).

168.     The KCB Enterprise exists separate and apart from the criminal activity of each individual Defendant.

169.     The KCB Enterprise is engaged in interstate commerce, as it is comprised of corporations located in different states, and has had business dealings with other as well as individual borrowers, such as NRO, who operate in states where neither Defendant resides.

170.    Defendants knowingly and intentionally used the KCB Enterprise to fund, issue, and collect on loans that charged interest rates far in excess of Massachusetts' maximum permissible interest rates for commercial loans.

171.    Defendants are associated with and serve various functions for the KCB Enterprise with Defendant Kabbage originating, underwriting and funding the illegal loan transactions and Celtic Bank provided the use of its charter for a fee absent which the KCB Enterprise could not operate.

172.    As detailed above, the KCB Enterprise operated through a pattern of racketeering which included, among other things, knowingly committing mail and wire fraud.

173.    Defendants' use of wires to defraud NRO and other small businesses is essential to the success of the Kabbage Enterprise, and includes, but is not limited to, exchanging documents necessary for the loans by and between Kabbage, the borrowers and Celtic Bank; the disbursement of funds and the payment of monies by and between Kabbage and the borrowers; and the payment of Celtic Bank's fee for each transaction.

174.    The above instances of federal wire fraud and mail fraud are part of a common scheme to defraud not only NRO, but numerous other small businesses in need of short term capital.

175.    Defendants knowingly and intentionally used the KCB Enterprise to prey upon these small businesses and their owners who are required to personally guarantee the illegal loans.

176.    Furthermore, Defendants knew that the debt owed by NRO and other small businesses that fell victim to Defendants' scheme was unlawful and that the interest rates charged were at least twice the legally enforceable rate.

177.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), NRO has suffered, and continues to suffer, substantial injury to his business and/or property as NRO was forced to pay usurious amounts of interest and has lost, and will continue to lose, customers, profits, goodwill, and business value.

WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly and severally, and seek an order from the Court:

a)    Granting an injunction against Defendants restraining them from enforcing any of their rights under the loans/agreements;

b)    Awarding Plaintiffs, threefold, their direct and consequential damages, including prejudgment interest, in an amount to be determined a trial;

c)    Awarding punitive damages;

d)    Awarding Plaintiffs attorney's fees and costs incurred in this action;

e)    Granting such other and further relief as this Court deem just and proper.

## FOURTH CAUSE OF ACTION

(Violation of 18 U.S.C. § 1962(d))

178.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

179.    Defendants conspired amongst themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c) by agreeing to conduct and participate in, directly and indirectly, the conduct of the affairs of the KCB Enterprise through a pattern of racketeering activity and unlawful debt collection.

180.    Defendants committed and caused to be committed a series of overt acts in furtherance of their conspiracy, including, but not limited to, those acts previously detailed in this Complaint.

181.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), NRO has suffered, and continues to suffer, substantial injury to his business and/or property as Plaintiffs were forced to pay usurious amounts of interest and has lost, and will continue to lose, customers, profits, goodwill, and business value.

WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly and severally, and seek an order from the Court:

a)    Granting an injunction against Defendants restraining them from enforcing any of their rights under the loans/agreements;

b)    Awarding Plaintiffs, threefold, their direct and consequential damages, including prejudgment interest, in an amount to be determined a trial;

c)    Awarding punitive damages;

d)    Awarding Plaintiffs attorney's fees and costs incurred in this action;

e)    Granting such other and further relief as this Court deem just and proper.

## FIFTH CAUSE OF ACTION

(Lanham Act/False Advertising)

182.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

183.    The false advertising provisions of the Lanham Act provide:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or

> false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

184.     Kabbage as part of its commercial advertising and promotion misrepresented the nature, characteristics and qualities of its loans.

185.     Kabbage's misrepresentations included, among other things, stating that: (1) the loans were not usurious; (2) businesses would save money and avoid fees by paying the loans off early, (3) businesses would not be charged any fees after the loans were paid off; (4) businesses would be charged a fixed monthly payment with 1/6 or 1/12 of that monthly payment going to principal depending upon whether it was a 6-month or 12-month loan; and (5) deceptively disclosing and/or failing to disclose the interest rate.

186.     Kabbage also falsely designated the origin of the loans in its commercial advertising and promotion as being a loan from Celtic Bank.

187.     Each of these representations was literally false.

188.     Kabbage knew that these representations were false at the time they were made.

189.     Kabbage's misrepresentations were material, in that they are likely to influence and actually did influence NRO's decision to enter into the loan agreements.

190.     Kabbages misrepresentations have the tendency to deceive small businesses in need of financing and actually deceived NRO.

191.     Kabbage placed its false and misleading advertising in interstate commercial both through its website and other forms of social media.

192.     As a direct and proximate result of each of these loans, NRO suffered indivisible injury through loss of goodwill, lost profits, reputational harm and devaluation of its business.

193.     As a direct and proximate result of each of these loans, NRO suffered indivisible injury by having its other business loans being called in from legitimate banks, deterioration of its credit profile, and the inability to secure financing to obtain needed inventory and pay its vendors.

194.     Alternatively, NRO seeks to disgorge the profits realized by Kabbage from the illegal loan transactions.

195.     Kabbage's conduct was done intentionally to defraud NRO and other small businesses, making this an "exceptional case" warranting the imposition of attorney's fees.

WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly and severally, and seek an order from the Court:

a)     Granting an injunction against Defendants restraining them from enforcing any of their rights under the loans/agreements;

b)     Awarding Plaintiffs attorney's fees and costs incurred in this action;

c)     Granting such other and further relief as this Court deem just and proper.

Dated:  October 12, 2017

WHITE AND WILLIAMS LLP

By:

Shane R. Heskin (BBO No. 665098)
heskins@whiteandwilliams.com
Rachel J. Eisenhaure (BBO No. 663876)
eisenhaurer@whiteandwilliams.com
101 Arch Street, Suite 1930
Boston, MA 02110
(617) 748-5200 or (215) 864-6329

*Attorneys for Plaintiffs*

30