# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NRO BOSTON, LLC and ALICE INDELICATO,<br><br>     Plaintiffs,<br><br>     v.<br><br>KABBAGE, INC. and CELTIC BANK CORPORATION,<br><br>     Defendants. | Civil Case No.: 17-cv-11976-GAO |

**MEMORANDUM IN SUPPORT OF DEFENDANTS KABBAGE INC. AND CELTIC BANK CORP.'S MOTION TO COMPEL ARBITRATION**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 2

    A.    Plaintiffs' Business Loan Agreements ................................................... 2

    B.    The Arbitration Provisions In The Business Loan Agreements ............................ 3

    C.    This Lawsuit ........................................................................................ 6

PROCEDURAL STANDARD ..................................................................................... 6

ARGUMENT .............................................................................................................. 7

I.      PLAINTIFFS AGREED TO ARBITRATE THEIR CLAIMS. ......................................... 7

    A.    Plaintiffs Entered Into Arbitration Agreements. .................................... 8

    B.    The Arbitrator Must Resolve Any Further Challenges To The Arbitration Provisions. ...................................................................................... 9

    C.    To The Extent This Court Considers Any Further Challenges To Arbitration, The Arbitration Agreements Cover This Dispute And Are Enforceable. ....................................................................................... 10

          1.    Plaintiffs' Claims Fall Within The Broad Scope Of The Arbitration Provisions. ................................................................................ 10

          2.    Both Celtic Bank And Kabbage Are Permitted To Enforce The Arbitration Provisions. ............................................................... 12

          3.    The Arbitration Provisions Are Enforceable. ........................... 14

II.    THE COURT SHOULD STAY THIS CASE PENDING ARBITRATION. ................... 14

CONCLUSION ........................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ajemian v. Yahoo!, Inc.*,
  987 N.E.2d 604 (Mass. App. Ct. 2013) ..................................................9

*American Express v. Italian Colors Rest.*,
  133 S. Ct. 2304 (2013)........................................................................7

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011).............................................................................7

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986)....................................................................7, 10, 11

*Awuah v. Coverall N. Am., Inc.*,
  554 F.3d 7 (1st Cir. 2009).................................................................10

*Bekele v. Lyft, Inc.*,
  199 F. Supp. 3d 284, 295-96 (D. Mass. 2016)....................................9

*Buckeye Check Cashing, Inc. v. Cardegna*,
  546 U.S. 440 (2006)..........................................................................14

*Commercial Union Assocs. v. Clayton*,
  863 P.2d 29 (Utah Ct. App. 1993) .....................................................9

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985)..........................................................................14

*Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*,
  638 F.3d 367 (1st Cir. 2011).......................................................6, 7, 11

*DIRECTV, Inc. v. Imburgia*,
  136 S. Ct. 463 (2015).........................................................................9

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995)...........................................................................9

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
  748 F.3d 1 (1st Cir. 2014)............................................................11, 13

*Greentree Fin. Corp. v. Randolph*,
  531 U.S. 79 (2001).............................................................................7

*Grigson v. Creative Artists Agency, LLC*,
  210 F.3d 524 (5th Cir. 2000) ............................................................13

*Hays v. Jefferson Capital Sys., LLC*,
   2017 WL 449590 (D. Mass. Feb. 2, 2017) ........................................................6, 12

*Hoefs v. CACV of Colorado, LLC*,
   365 F. Supp. 2d 69 (D. Mass. 2005) ...................................................................13

*Kindred Nursing Centers Ltd. P'ship v. Clark*,
   137 S. Ct. 1421 (2017) ....................................................................................1, 7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ...................................................................................................7

*Nazaruk v. eBay, Inc.*,
   2006 WL 2666429 (D. Utah Sept. 14, 2006), *aff'd,* 223 F. App'x 815 (10th
   Cir. 2007) ............................................................................................................8

*Rent-A-Center, West, Inc. v. Jackson*,
   561 U.S. 63 (2010) ..........................................................................................9, 10

*Shearson/Am. Express, Inc. v. McMahon*,
   482 U.S. 220 (1987) ..............................................................................................7

*Sleeper Farms v. Agway, Inc.*,
   506 F.3d 98 (1st Cir. 2007) .................................................................................14

*Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*,
   526 F.3d 38 (1st Cir. 2008) .................................................................................13

**Statutes**

9 U.S.C. § 2 ................................................................................................................3, 7

9 U.S.C. § 3 ................................................................................................................1, 14

Mass. Gen. Law c. 93A, § 2 ..........................................................................................6

Mass. Gen. Law c. 271, § 49 .........................................................................................6

Defendants Celtic Bank Corporation ("Celtic Bank") and Kabbage Inc. ("Kabbage") respectfully ask this Court to enter an order compelling NRO Boston, LLC ("NRO") and Alice Indelicato (collectively, "Plaintiffs") to arbitrate all claims asserted in the Complaint.

## INTRODUCTION

Alice Indelicato is a co-owner of NRO, a clothing and sports retailer.  Beginning in May 2014, NRO obtained multiple business loans from Celtic Bank, a Utah-chartered industrial bank. Between May 2014 and April 2016, NRO received more than $600,000 in business loans from Celtic Bank.  Ms. Indelicato is a party to each of these loans.

Today, Plaintiffs have more than $109,000 past due on these loans, and they have not made loan payments for 15 months.  In a transparent attempt to have these loan agreements declared unenforceable and their debts extinguished, Plaintiffs filed this lawsuit based on the dubious theory that Kabbage, not Celtic Bank, originated these loans, which they believe makes the loans usurious under Massachusetts law.

The merits of this dispute, however, are for an arbitrator to resolve.  Each time Plaintiffs obtained one of the subject loans—25 times in total—they entered into a written "Business Loan Agreement" with Celtic Bank.  As the Complaint acknowledges, these agreements contain arbitration provisions.  *See* Compl. ¶¶ 121-122.  The broad arbitration provisions in Plaintiffs' loan agreements encompass all the claims Plaintiffs have asserted in this case.

Federal law requires that valid arbitration agreements be strictly enforced.  *See, e.g.*, 9 U.S.C. § 3; *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1428 (2017). Accordingly, this Court should compel Plaintiffs to arbitrate this dispute and stay this case pending the resolution of this arbitration motion.

## BACKGROUND

### A.      Plaintiffs' Business Loan Agreements

This case arises out of 25 business loans Plaintiffs obtained for a sports and clothing company.  *See* Compl. ¶¶ 17, 33; Hill Decl. ¶¶ 11, 16; Petersen Decl. ¶ 5.[1]  For each loan, Plaintiffs entered into a Business Loan Agreement (collectively, "Business Loan Agreements") with Celtic Bank.  *See* Compl. ¶ 106; Hill Decl., Exs. A at 1, B at 1; Petersen Decl. ¶ 7.  Each time NRO applied for a business loan, Alice Indelicato identified herself as NRO's owner.  *See* Hill Decl., Exs. A at 1, B at 1.  She is a party to each loan agreement.  *See* Hill Decl., Exs. A at § 1.2, B at § 1.11.

Plaintiffs requested these business loans using an online platform provided by Kabbage (the "Kabbage Platform").  *See* Hill Decl. ¶ 11.  The Kabbage Platform allows borrowers like NRO to apply for and obtain small business loans funded by Celtic Bank.  *See* Hill Decl. ¶ 3.  The Kabbage Platform walked Plaintiffs through a series of prompts to complete the loan transactions.  *See* Hill Decl. ¶ 17.  First, the Kabbage Platform prompted Plaintiffs to enter a loan amount, repayment term, and destination for the loan funds.  *See* Hill Decl. ¶ 18, Ex. F.  Next, Plaintiffs entered their bank account and routing numbers.  *See* Hill Decl. ¶ 19, Ex. G.  After confirming the amount of the loan requested, the Kabbage Platform provided Plaintiffs with a full copy of the Business Loan Agreement that governed NRO's loan.  *See* Hill Decl. ¶ 21, Ex. I.

To complete each loan application, the Kabbage Platform required Plaintiffs to affirmatively "check" a box indicating that they "understand that [they have] the responsibility to

---

[1]      Plaintiffs also entered into five Merchant Cash Advance Agreements ("MCAs") with Kabbage between January and April 2014.  Compl. ¶¶ 35-36; Hill Decl. ¶ 15, Ex. C at 1.  The MCAs also contain an arbitration provision.  Hill Decl. ¶ 15, Ex. C at § 1.6.  In May 2014, Plaintiffs agreed to convert each of the MCAs into five Business Loan Agreements and accepted the terms of the agreements, all of which contain arbitration provisions.  Hill Decl. ¶ 16, Ex. D at § 1.6.

2

read [the Business Loan Agreement] and have had an opportunity to do so." *See* Hill Decl. ¶ 23, Ex. I.  In addition, the Kabbage Platform required Plaintiffs to expressly accept the terms of the Business Loan Agreement by selecting an "Accept" prompt that appeared below the Business Loan Agreement.  *See* Hill Decl. ¶ 24, Ex. I.  Plaintiffs were free to close out of the Kabbage Platform at any time before selecting "Accept" without incurring any fee or penalty.  *See* Hill Decl. ¶ 26.  Only after Plaintiffs acknowledged the terms of the Business Loan Agreement, acknowledged their responsibility to read those terms, and expressly accepted those terms did Celtic Bank fund the loans.  *See* Hill Decl. ¶¶ 14, 23-24.

After the loans were funded, Celtic Bank sold the loan receivables to Kabbage.  *See* Hill Decl. ¶ 14; Petersen Decl. ¶ 7.

**B.      The Arbitration Provisions In The Business Loan Agreements**

Each Business Loan Agreement contains a broad arbitration provision that is disclosed under bold headings titled "**CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE**" or "***Arbitration (Agreement to Arbitrate Claims)***."  Hill Decl. ¶ 32 & Ex. A at 5; *id.* Ex. B at § II. The 17 Business Loan Agreements entered into on or before August 11, 2015, contain one version of the arbitration provision.  *See* Hill Decl., Ex. A at § 1.6.  The eight Business Loan Agreements entered into after that date contain a slightly different version of the arbitration provision. *See* Hill Decl., Ex. B at § 2.

Both arbitration provisions are highly similar, and they provide that "[a]ll Claims shall be resolved through arbitration pursuant to this section rather than by litigation,"  Hill Decl. ¶ 33 & Ex. B at § 2.3, or that "any Claim . . . will be resolved by binding arbitration, " *id.* Ex. A at 5.  In bold, capitalized font, the Business Loan Agreements prominently explain the

"**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS**":

**IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

Hill Decl. ¶ 34 & Ex. A at 6; *id.* Ex. B at § 2.1 (containing identical provision).[2] As some of the

Business Loan Agreements separately make clear:

> Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited.  The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court.  Except as set forth below, the arbitrator's decision will be final and binding.  Other rights you or we would have in court may also not be available in arbitration.

Hill Decl. ¶ 35 & Ex. B at § 2.3.

A different section in the Business Loan Agreements, titled "**Broad Meaning of**

**'Claims'**", sets forth the categories of claims subject to arbitration.  The scope of claims subject

to arbitration has:

> the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding

---

[2]     Under the Business Loan Agreements, the parties also agreed to "WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF." Hill Decl., Ex. A at § 4.10; *id.* Ex. B at § 5.10 (containing identical provision).

4

> information obtained by us from, or reported by us to, credit
> reporting agencies or others, (vi) Claims between you and us or our
> parent corporations, wholly or majority owned subsidiaries,
> affiliates, predecessors, successors, assigns, agents, independent
> contractors, employees, officers, directors or representatives
> arising from any transaction between us pursuant to this
> Agreement and (vii) Claims regarding the validity, enforceability
> or scope of this Arbitration Provision or this Agreement including
> but not limited to whether a given claim or dispute is subject to
> arbitration.

Hill Decl. ¶ 36 & Ex. A at 6; *see also id.* Ex. B at § 2.2 (containing similar provision).

The Business Loan Agreements also provide that they will be governed by the Federal Arbitration Act ("FAA").  They further provide that Celtic Bank will pay most or all of the costs of arbitration.  *See* Hill Decl., Ex. A at 7 (Celtic Bank "will advance or reimburse filing fees and other costs or fees of arbitration); *id.* at Ex. B at § 2.3 (Plaintiffs are "responsible for paying your share of any initial arbitration fee (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought the Claim in court").  Arbitrations may occur before JAMS or the American Arbitration Association, whichever forum Plaintiffs select.  Hill Decl., Ex. A at 5; *see also id.* Ex. B at § 2.3 (containing similar provision).  Following the arbitrator's decision, any party has the right to appeal the decision to a three-arbitrator panel and then (to the limited extent permitted by the FAA) to a court.  Hill Decl., Ex. A at 7; *see also id.* Ex. B at § 2.3 (containing similar provision).

Most of the Business Loan Agreements gave Plaintiffs the right to opt out of the arbitration provisions.  *See* Hill Decl. ¶¶ 28, 16 & Ex. A at 6 (identifying 17 agreements with opt-out provisions).  To do so, Plaintiffs needed to provide written notice of their decision to opt out within 60 days after Celtic Bank approved the loan.  *See* Hill Decl. ¶ 28 & Ex. A at 6.  If Plaintiffs exercised their right to opt out, "neither you nor we will have the right to engage in arbitration."  *See* Hill Decl. ¶ 28 & Ex. A at 6 (bold text omitted).  However, despite having more

than 15 opportunities to do so, Plaintiffs never opted out of the arbitration provisions. *See* Hill Decl. ¶ 30.

### C.    This Lawsuit

Despite their contractual obligation to arbitrate any dispute they had involving the Business Loan Agreements, Plaintiffs instead filed suit in this Court.

Plaintiffs' primary allegation is that the business loans they received charge interest at a rate that exceeds the maximum interest rate permitted by Mass. Gen. Law c. 271, § 49. As Plaintiffs concede, "Celtic Bank is exempt from Massachusetts' usury laws." Compl. ¶ 9. Plaintiffs nevertheless claim that their loans are subject to Massachusetts usury laws because "Celtic Bank is not the 'true' lender"; instead, they claim that Kabbage "originates, underwrites and funds loans" like those made to Plaintiffs. Compl. ¶¶ 10-11.

Based on these allegations, Plaintiffs accuse Celtic Bank and Kabbage of violating RICO; Mass. Gen. Law c. 93A, § 2; and Mass. Gen. Law c. 271, § 49. *See* Compl. ¶¶ 130, 162, 181. A separate claim is asserted under the Lanham Act against Kabbage alone for allegedly engaging in false marketing. *See* Compl. ¶¶ 183-195.

### PROCEDURAL STANDARD

To compel arbitration under the FAA, a party must "demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'" *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011). Parties may rely on evidence outside of the pleadings, such as documents and declarations, to prove the existence of an arbitration agreement. *See Hays v. Jefferson Capital Sys., LLC*, 2017 WL 449590, at *1 (D. Mass. Feb. 2, 2017). Courts must presume that arbitration agreements are valid and enforceable and place the burden on the party opposing arbitration to prove that arbitration is not required.

*See Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987); *Greentree Fin.*

*Corp. v. Randolph*, 531 U.S. 79, 91 (2001) ("[T]he party resisting arbitration bears the burden of

proving that the claims at issue are unsuitable for arbitration.").

## ARGUMENT

## I.     PLAINTIFFS AGREED TO ARBITRATE THEIR CLAIMS.

The FAA provides that arbitration agreements "shall be valid, irrevocable, and

enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract." 9 U.S.C. § 2. As the Supreme Court has explained, the FAA was enacted in response

to "widespread judicial hostility to arbitration agreements" and "reflect[s] both 'a liberal federal

policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of

contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citation

omitted); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 23 (1983)

(FAA enacted to ensure the "rapid and unobstructed enforcement of arbitration agreements").

The FAA reflects a strong federal policy in favor of arbitration, requiring courts to

"rigorously enforce agreements to arbitrate." *Shearson/Am. Express*, 482 U.S. at 226 (internal

quotation marks omitted). Where, as here, (i) there is a written arbitration agreement and (ii) the

dispute falls within the scope of that arbitration agreement, then "the FAA requires that the court

submit the dispute in question to arbitration." *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*,

638 F.3d 367, 376 (1st Cir. 2011). The underlying merits of the case are irrelevant to the

arbitration question, *see AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649

(1986), and "courts must place arbitration agreements on an equal footing with other contracts

and enforce them according to their terms." *Concepcion*, 563 U.S. at 333 (internal citation

omitted); *accord Kindred Nursing Centers*, 137 S. Ct. at 1428; *American Express v. Italian*

*Colors Rest.*, 133 S. Ct. 2304, 2311-12 (2013).

As demonstrated below, Plaintiffs' arbitration agreements were validly formed, plainly encompass Plaintiffs' claims, and are enforceable under the FAA and U.S. Supreme Court precedent.

### A.      Plaintiffs Entered Into Arbitration Agreements.

All of the Business Loan Agreements at issue included broad arbitration provisions that were prominently disclosed in bold font.  Not only were Plaintiffs presented copies of the Business Loan Agreements in the Kabbage Platform, but Plaintiffs were required to affirmatively acknowledge that they "underst[ood] that [they] ha[d] the responsibility to read [the Business Loan Agreement] and . . . had an opportunity to do so."  Hill Decl. ¶ 23, Ex. I.  The Kabbage Platform provided Plaintiffs the opportunity to print the entire Business Loan Agreement by selecting the "Print" icon located above the agreement.  Hill Decl. ¶ 22.  After acknowledging their responsibility to read the entire Business Loan Agreement, Plaintiffs expressly accepted the terms of that agreement, including the arbitration provision, by selecting the "Accept" prompt located below the Business Loan Agreement in the Kabbage Platform.  Hill Decl. ¶ 24, Ex. I.  Plaintiffs acknowledged and accepted the terms of the Business Loan Agreement, including the conspicuous arbitration clause, *at least 25 times.  See* Compl. ¶ 108; Hill Decl. ¶ 11, 16-25, Exs. A at § 1.6, B at § 2.  Although most of the Business Loan Agreements gave Plaintiffs the opportunity to opt out of arbitration, they never availed themselves of this opportunity.  Hill Decl. ¶¶ 28-30.

Under these circumstances—in which Plaintiffs acknowledged the existence of an agreement that contained an arbitration provision at least 25 times, and declined to opt out of those provisions despite having multiple opportunities to do so—Plaintiffs plainly entered into arbitration agreements under Utah law.  *Nazaruk v. eBay, Inc.*, 2006 WL 2666429, at *3 (D. Utah Sept. 14, 2006), *aff'd*, 223 F. App'x 815 (10th Cir. 2007) (enforcing forum selection

provision and finding parties entered into valid agreement when plaintiff "clicked on the 'I

Accept' button when registering with eBay"); *Commercial Union Assocs. v. Clayton*, 863 P.2d

29, 34 (Utah Ct. App. 1993) (party may be bound by a contract because they have indicated

"'their acceptance of the contract, or led the other party to so believe that they have accepted the

contract'").[3]   Massachusetts courts similarly recognize that "clickwrap" agreements like these

are enforceable.  *See Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 295-96 (D. Mass. 2016)

("Clickwrap agreements permit courts to infer that the user . . . has outwardly manifested consent

by clicking a box," and "because the user has 'signed' the contract by clicking 'I agree,' every

court to consider the issue has held clickwrap licenses enforceable." (internal quotation marks

omitted)); *Ajemian v. Yahoo!, Inc.*, 987 N.E.2d 604, 613 (Mass. App. Ct. 2013) (noting that

"forum selection clauses have almost uniformly been enforced in clickwrap agreements").

### B.    The Arbitrator Must Resolve Any Further Challenges To The Arbitration Provisions.

Because arbitration agreements exist, this Court's analysis should end, and any further

issues should be referred to an arbitrator—including any contention that the arbitration clauses

are unenforceable or that this dispute lies outside the scope of the arbitration agreements.  *See*

*Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 & n.1 (2010).

The arbitration provisions here confirm that an arbitrator, not a court, must decide any

remaining potential defenses to the enforceability or scope of the arbitration provisions.  At the

---

[3]      Plaintiffs' Business Loan Agreements include Utah choice-of-law provisions.  Hill Decl., Ex. A at § 4.6; *see also id.* Ex. B at § 5.6.  While the FAA exclusively governs the enforceability of the arbitration clauses, Utah law governs the determination of whether agreements to arbitrate exist. *See DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015) ("[T]he Federal Arbitration Act allows parties to an arbitration contract considerable latitude to choose what law governs some or all of its provisions."); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.").

outset, the arbitration provisions define the scope of any "Claim" that "will be resolved by arbitration" to include "Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration." *See* Hill Decl. ¶ 36 & Ex. A at 6; *see also id*. Ex. B at § 2.2 (containing materially identical provision).  Some of the arbitration provisions further reiterate that the arbitrator must resolve all "issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision."  Hill Decl., Ex. A at 6.

 "[W]here the parties have themselves 'clearly and unmistakably agreed' that the arbitrator should decide whether an issue is arbitrable, the Supreme Court has held that this issue is to be decided by the arbitrator."  *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 10 (1st Cir. 2009); *see also Rent-A-Center*, 561 U.S. at 68-69 & n.1; *AT&T Techs., Inc.*, 475 U.S. at 649. Consequently, because the arbitration agreements "clearly and unmistakably" delegate threshold questions of arbitrability to an arbitrator, this Court must refer any potential defenses to the enforcement of the arbitration agreements to the arbitrator, including any argument that this dispute lies outside the scope of the arbitration clauses.

**C.     To The Extent This Court Considers Any Further Challenges To Arbitration, The Arbitration Agreements Cover This Dispute And Are Enforceable.**

Even if this Court were empowered to determine whether this dispute falls within the arbitration provisions' broad scope or whether the agreement is enforceable, Plaintiffs would still be required to arbitrate their claims.

**1.     Plaintiffs' Claims Fall Within The Broad Scope Of The Arbitration Provisions.**

There can be no dispute that Plaintiffs' claims fall within the broad scope of the arbitration provisions.  "[W]here the contract contains an arbitration clause, there is a

presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT&T Techs., Inc.*, 475 U.S. at 650.  Given the presumption in favor of arbitrability, "'only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *Id.*  The burden of rebutting this presumption rests upon the party seeking to avoid arbitration, and any "ambiguities as to the scope of the arbitration clause itself" must be "resolved in favor of arbitration." *Dialysis Access Ctr.*, 638 F.3d at 379, 376.

The arbitration provisions here include a "**Broad Meaning of 'Claims'**" that are subject to arbitration.  Arbitrable claims include "any" claim

> arising from or relating to (i) this Agreement, (ii) any transactions
> effected pursuant to this Agreement, (iii) terms of or change or
> addition of terms to this Agreement, (iv) collection of your
> obligations arising from this Agreement, (v) advertisements,
> promotions or oral or written statements relating to this Agreement
> or any transactions between us pursuant to this Agreement, [and]
> (vi) Claims between you and us or our parent corporations, wholly
> or majority owned subsidiaries, affiliates, predecessors, successors,
> assigns, agents, independent contractors, employees, officers,
> directors or representatives arising from any transaction between
> us pursuant to this Agreement . . .

Hill Decl. ¶ 36 & Ex. A at 6; *see also id.* Ex. B at § 2.2 (containing similar provision).  The use of language such as "arising from or relating to" demonstrates that the parties meant for the provisions to apply broadly.  *See Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 9 (1st Cir. 2014) ("[W]here arbitration clauses included broad language requiring arbitration of disputes 'arising out of or relating to' parties' contracts, courts have found arbitration appropriate on a variety of claims. . . .").

Plaintiffs' claims all fall within these broad provisions because they all "arise[] from . . . any transaction between us pursuant to this Agreement."  Hill Decl. ¶ 36 & Ex. A at 6;

11

*see also id.* Ex. B at § 2.2 (containing identical language).  For example, Plaintiffs' claims that

the Business Loan Agreements contain a usurious interest rate, *see, e.g.*, Compl. ¶¶ 135, 148,

158-59, 167, fall squarely within the requirement to arbitrate claims relating to "this Agreement,"

"any transactions effected pursuant to this Agreement," or the "terms of . . . this Agreement."

Hill Decl. ¶ 36 & Ex. A at 6; *see also id.* Ex. B at § 2.2 (containing identical language).

Similarly, Plaintiffs' claims challenging how the Business Loan Agreements were marketed and

advertised, *see, e.g.*, Compl. ¶¶ 135, 140, 185, arise out of "advertisements, promotions or oral or

written statements relating to this Agreement or any transactions between us pursuant to this

Agreement" that must be resolved by an arbitrator.  Hill Decl. ¶ 36 & Ex. A at 6; *see also id.* Ex.

B at § 2.2 (containing identical language).

### 2.      Both Celtic Bank And Kabbage Are Permitted To Enforce The Arbitration Provisions.

There can be no dispute that Plaintiffs must arbitrate their claims against the lender and

original party to the Business Loan Agreements, Celtic Bank.  And it makes no difference that

Celtic Bank originated the loans and subsequently sold the receivables to Kabbage:  both entities

are permitted to invoke the arbitration provisions.

The arbitration provisions provide that Plaintiffs must arbitrate not only their claims

against Celtic Bank, but also claims against Celtic Bank's "assigns" that arise "from any

transaction between us pursuant to this Agreement"—which in this case includes Kabbage.  Hill

Decl. ¶ 36 & Ex. A at 6; *see also id.* Ex. B at § 2.2 (containing identical language).  Courts have

widely held that similar provisions permit both the original signatory and its assignee to enforce

an arbitration agreement.  *See, e.g.*, *Hays*, 2017 WL 449590, at *1 n.1 (granting assignee's

motion to compel arbitration where agreement "includes in its definition of 'Claims'" disputes

12

"between the cardholder and [company]'s 'assigns.'"); *Hoefs v. CACV of Colorado, LLC*, 365 F. Supp. 2d 69, 74 (D. Mass. 2005) (holding claims against an assign were subject to arbitration).

The doctrine of equitable estoppel separately permits Kabbage to enforce the arbitration provisions. *See, e.g.*, *Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38, 46-47 (1st Cir. 2008); *see Grand Wireless*, 748 F.3d at 10 n.22 ("acknowledging that non-signatories may have rights under an arbitration contract" such that arbitration may be required "where all parties to the dispute did not sign the arbitration agreement"). As the First Circuit explained in *Sourcing Unlimited*, a signatory to an arbitration agreement must arbitrate claims asserted against a non-signatory "when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." 526 F.3d at 47 (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 145 (1st Cir. 2003)). There, the plaintiff was required to arbitrate claims that "either directly or indirectly invoke[d] the terms of the" agreement at issue in the case, including "statements that" were "allegedly made . . . in the course of negotiating" the agreement. *Id.*

Here, as in *Sourcing Unlimited*, Plaintiffs' claims all arise out of or relate to the Business Loan Agreements. As explained above, Plaintiffs' claims relate either to the legality of the Business Loan Agreements or alleged representations concerning those agreements. Therefore, there can be no legitimate dispute that the claims are "intertwined" with the Business Loan Agreements. *See id.*; *see also Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 527 (5th Cir. 2000) (reasoning that "'[w]hen each of a signatory's claims against a non-signatory makes reference to or presumes the existence of the written agreement . . . arbitration is appropriate'"). Accordingly, Plaintiffs must arbitrate their claims against Kabbage.

3.      **The Arbitration Provisions Are Enforceable.**

Although the Complaint offers a legal conclusion that Plaintiffs' arbitration agreements are unenforceable because they appear in agreements that allegedly violate Massachusetts' usury statute, *see* Compl. ¶¶ 121-22, the Supreme Court has already rejected this argument.  In *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), the plaintiffs claimed that an arbitration agreement was unenforceable when it appeared in an agreement that allegedly authorized the defendant to "charge[] usurious interest rates and . . . violated various Florida" laws, making the agreement "criminal on its face." 546 U.S. at 443.  The Supreme Court held that whether the contract is "'illegal and void under Florida law'" is "irrelevant" for determining whether the issue should be decided by an arbitrator in the first instance. *Id.* at 446.  Such an argument, the Supreme Court held, is "a challenge to the validity of the contract as a whole," and it "must go to the arbitrator."  *Id.* at 449.  Likewise here, Plaintiffs' contention that the arbitration agreements are invalid because they appear in loan agreements that allegedly violate Massachusetts' usury laws must be considered by an arbitrator in the first instance; it cannot be used to avoid arbitration entirely.  *See Sleeper Farms v. Agway, Inc.*, 506 F.3d 98, 103 (1st Cir. 2007) ("As a matter of federal law, the arbitration clause is unaffected even if the substance of the contract is otherwise void or voidable.").

II.      **THE COURT SHOULD STAY THIS CASE PENDING ARBITRATION.**

Once a court determines that a dispute falls within the scope of a valid written arbitration agreement, Section 3 of the FAA requires that further proceedings be stayed "until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (holding that the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts

14

*shall* direct the parties to proceed to arbitration"). Thus, the Court should stay Plaintiffs' claims

against Kabbage and Celtic Bank pending arbitration of Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, Kabbage and Celtic Bank respectfully request that the Court

enforce the arbitration agreements with Plaintiffs and stay this case pending arbitration.

Respectfully Submitted:

/s/   *Michael Maya*
MICHAEL MAYA (BBO# 672847)
ANDREW SOUKUP (pro hac vice)
JONATHAN L. CLOAR (pro hac vice)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C.
Tel.: + 1 (202) 662-6000
Fax: + 1 (202) 662-6291
Email: mmaya@cov.com
         asoukup@cov.com
         jcloar@cov.com

SONYA D. WINNER (pro hac vice)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Email: swinner@cov.com

*Attorneys for Celtic Bank Corporation*

/s/   *Christine Genaitis* [by permission]
CHRISTINE M. GENAITIS (BBO# 654253)
DENTONS US LLP
101 Federal Street, Suite 2750
Boston, MA 02110
Telephone: (617) 235-6819
Facsimile: (617) 235-6899
Email: christine.genaitis@dentons.com

NATHAN L. GARROWAY (pro hac vice
forthcoming)
JEFFREY A. ZACHMAN (pro hac vice
forthcoming)
DENTONS US LLP
303 Peachtree St. NE, Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com
         jeffrey.zachman@dentons.com

*Attorneys for Kabbage, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2017, the within document was
electronically filed with the Clerk of the Court using the CM/ECF system and will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF),
pursuant to Local Rule 5.4(C).

/s/   *Michael Maya*
Michael Maya