# Exhibit 805

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NRO BOSTON, LLC and ALICE INDELICATO, | |
| Plaintiffs, | Civil Case No.: 17-cv-11976-GAO |
| v. | **ORAL ARGUMENT REQUESTED** |
| KABBAGE, INC. and CELTIC BANK CORPORATION, | |
| Defendants. | |

**DEFENDANTS KABBAGE, INC. AND CELTIC BANK CORP.'S**
**MOTION TO COMPEL ARBITRATION**

Defendants Kabbage, Inc. and Celtic Bank Corp. ("Defendants"), by and through their undersigned counsel, move to compel arbitration of all claims in Plaintiffs' Complaint (Dkt. 1) pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* and the written arbitration agreements Plaintiffs entered.  Defendants also request that all proceedings on Plaintiffs' Complaint in this Court be stayed pending completion of any arbitration Plaintiffs may initiate against Defendants.

In support of this Motion, Defendants rely upon the accompanying Memorandum in Support, the Declaration of Eric Petersen, and the Declaration of Clint Hill and exhibits attached thereto.

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1(d), Defendants respectfully request that the Court hear oral argument on the Motion.  Defendants believe that a hearing will be helpful to the Court in deciding the issues raised in the Motion.

Dated: November 30, 2017

Respectfully Submitted:

/s/  *Michael Maya*
MICHAEL MAYA (BBO# 672847)
ANDREW SOUKUP (pro hac vice)
JONATHAN L. CLOAR (pro hac vice)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C.
Tel.: + 1 (202) 662-6000
Fax: + 1 (202) 662-6291
Email: mmaya@cov.com
       asoukup@cov.com
       jcloar@cov.com


SONYA D. WINNER (pro hac vice)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Email: swinner@cov.com

*Attorneys for Celtic Bank Corporation*

/s/  *Christine Genaitis* [by permission]
CHRISTINE M. GENAITIS (BBO# 654253)
DENTONS US LLP
101 Federal Street, Suite 2750
Boston, MA 02110
Telephone: (617) 235-6819
Facsimile: (617) 235-6899
Email: christine.genaitis@dentons.com


NATHAN L. GARROWAY (pro hac vice forthcoming)
JEFFREY A. ZACHMAN (pro hac vice forthcoming)
DENTONS US LLP
303 Peachtree St. NE, Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com
      jeffrey.zachman@dentons.com

*Attorneys for Kabbage, Inc.*

## CERTIFICATE OF SERVICE

    I hereby certify that on this 30th day of November, 2017, the within document was electronically filed with the Clerk of the Court using the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), pursuant to Local Rule 5.4(C).

/s/  *Michael Maya*
Michael Maya

## LOCAL RULE 7.1 CERTIFICATION

    I hereby certify that counsel for Defendants have met and conferred with counsel for Plaintiffs, and we have attempted in good faith to resolve or narrow the issues presented in this motion. Counsel for Plaintiffs have indicated that Plaintiffs do not agree to the relief requested herein and that Plaintiffs intend to oppose the motion.

/s/  *Michael Maya*
Michael Maya

DSP 805-2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| NRO BOSTON, LLC and ALICE INDELICATO, <br><br> Plaintiffs, <br><br> v. <br><br> KABBAGE, INC. and CELTIC BANK CORPORATION, <br><br> Defendants. | Civil Case No.: 17-11976 |

**DECLARATION OF ERIC PETERSEN IN SUPPORT OF**
**DEFENDANTS' MOTION TO COMPEL ARBITRATION**

I, Eric Petersen, declare as follows:

1.      I am the Chief Strategy Officer for Celtic Bank Corporation ("Celtic Bank").
Celtic Bank is a privately owned industrial bank chartered by the State of Utah.

2.      My responsibilities at Celtic Bank include formulating the strategic direction for
the Bank and overseeing some of the Bank's lending programs.  I have performed the strategic
responsibilities for Celtic Bank since 2006, and lending-related responsibilities since 2013.  The
facts in this declaration are based upon my own personal knowledge and the knowledge I have
acquired in the course of my duties with Celtic Bank. If called as a witness, I could and would
competently testify to the facts set forth herein.

3.      My responsibilities at Celtic Bank also include developing and overseeing Celtic
Bank's business relationships with other companies, including service providers such as
Kabbage, Inc. ("Kabbage"), who I understand is also a party to this action.  Celtic Bank employs
the services of Kabbage in connection with certain business loans made by Celtic Bank; those

services including soliciting loan applications, obtaining applicants' consent to the terms of each

loan agreement, maintaining certain business records relating to the loans, and servicing the

loans pursuant to instructions provided by Celtic Bank.

4.      I have reviewed the Complaint filed in this case by NRO Boston, LLC and Ms.

Indelicato ("Plaintiffs").  I also have reviewed the Declaration of Clint Hill and the exhibits

attached thereto.

5.      All of the Business Loan Agreements attached to the Declaration of Clint Hill as

Exhibits A, B, and D are loan agreements that Celtic Bank entered into with Plaintiffs under

standard terms it had in place for loans it made to borrowers like Plaintiffs.

6.      Kabbage maintains extensive records concerning the loans it services on behalf of

Celtic Bank, and in the ordinary course of its regularly conducted business, Celtic Bank also has

access to these electronic records related to each account and loan agreement.  These records are

made at or near the time of the events reflected in each record. Among other things, these records

enable Celtic Bank to identify the loan applicant, the amount of the loan, the account number,

and the date of the loan.  Celtic Bank relies on these electronic records in the ordinary course of

managing its business. I believe these records to be accurate and reliable.

7.      I have reviewed the information provided in Paragraphs 11-16 of the Declaration

of Clint Hill concerning the business loans made to NRO Boston, LLC and to which Ms.

Indelicato is also a party, and I have cross-referenced this information with Celtic Bank's own

records concerning those loans.  I believe that Celtic Bank's records confirm that Celtic Bank

funded each of the business loans attached as Exhibits A and B in the Declaration of Clint Hill

and that sometime after Celtic Bank funded each loan, it sold the receivable associated with each

loan to Kabbage.

DSP 805-4

Under 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 29, 2017 in Salt Lake City, Utah.

BY:   _____
ERIC PETERSEN

3

DSP 805-5

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NRO BOSTON, LLC and ALICE INDELICATO, | |
| Plaintiffs, | |
| v. | Civil Action No. 17-11976 |
| KABBAGE, INC. and CELTIC BANK CORPORATION, | |
| Defendants. | |

**DECLARATION OF CLINT HILL**

I, Clint Hill, pursuant to 28 U.S.C. § 1746, declare:

1.     My name is Clint Hill.  I am over the age of 18 years old.  I have personal knowledge of the matters set forth in this declaration and, if called upon, I will testify competently to them.

2.     I am Head of Solution Architecture for Kabbage, Inc. ("Kabbage").  I submit this declaration in support of Kabbage's and Celtic Bank Corporation's ("Celtic Bank") Motion to Compel Arbitration.

3.     Kabbage is a technology company that provides a software-as-a-service platform (the "Platform") to facilitate automated online underwriting for small businesses. Celtic Bank licenses the *Kabbage*® mark to offer loans to small businesses through the Kabbage Small Business Loan Program (the "Program"). Kabbage also performs contracted for marketing, servicing and collections activities on behalf of Celtic Bank under the licensed Kabbage mark and in accordance with the policies established by Celtic Bank for the Program.

4.      The Kabbage Platform allows small businesses like NRO Boston LLC ("NRO") to apply for commercial loans funded and originated by Celtic Bank.

5.      Once approved, small businesses can obtain loans through the Kabbage Program up to their credit limit.

6.      As Head of Solution Architecture, my responsibilities include providing research and support assistance for claims and litigation involving Kabbage.  The facts in this declaration are based upon my own personal knowledge, my personal review of Kabbage's business records pertinent to this matter, and the knowledge I have acquired in the course of my duties with Kabbage.  If called as a witness, I could and would competently testify to the facts set forth herein.

7.      My responsibilities also include designing and reviewing solutions around maintaining and compiling histories of account records and account agreements, and investigating account records and transaction histories.  I am familiar with the manner in which account records and account agreements are created and maintained.

8.      In the ordinary course of its regularly conducted business, Kabbage maintains electronic records related to each account.  These records are made at or near the time of the events reflected in each record.  Among other things, these records enable Kabbage to determine when an entity applies for a Celtic Bank Loan, what the terms of the loan agreement are, and other activity on this account.  Kabbage relies on these electronic records in the ordinary course of its business.  I believe these records to be accurate and reliable.

9.      All of the exhibits to this declaration are true and correct business records created and maintained in the course of regularly conducted business activity and as part of Kabbage's regular practice of maintaining such records.

DSP 805-7

10.     I have personally reviewed Kabbage's records pertaining to NRO's account and borrowing history through the Kabbage Platform and related Kabbage business records.  My statements in this declaration regarding Plaintiffs are based on my personal review of these business records.

11.     NRO entered into 25 Business Loan Agreements with Celtic Bank using the Kabbage Platform between May 2014 and May 2016.  Plaintiff Alice Indelicato ("Indelicato" and, together with NRO, "Plaintiffs") was party to each of the Business Loan Agreements.

12.     The 17 Business Loan Agreements Plaintiffs entered into on or before August 11, 2015 are substantially identical to each other.  Copies of these 17 Business Loan Agreements are attached as Exhibit A.

13.     The 8 Business Loan Agreements Plaintiffs entered into after August 11, 2015, are substantially identical to each other.  Copies of these 8 Business Loan Agreements are attached as Exhibit B.

14.     After Celtic Bank funded the loans, Celtic Bank sold to Kabbage the receivables associated with each loan.

15.     Plaintiffs also entered into 5 Merchant Cash Advance Agreements ("MCAs") between January and April 2014.  Copies of these 5 MCAs are attached as Exhibit C.  Each MCA contains an arbitration provision.

16.     In May 2014, Plaintiffs agreed to convert each of these MCAs into a Business Loan Agreement.  Copies of these 5 Business Loan Agreements are attached as Exhibit D. Plaintiffs received a disclosure regarding the conversion of the MCAs into Business Loan Agreements.  That disclosure is attached as Exhibit E.  Plaintiffs then accepted the terms of these 5 Business Loan Agreements, all of which contain an arbitration provision that is identical to the

DSP 805-8

arbitration provision included in the Business Loan Agreements Plaintiffs entered into on or before August 11, 2015 (and which are attached as Exhibit A). *See* Exhibit D.

**Plaintiffs' Use Of The Kabbage Platform**

17.     Each time Plaintiffs obtained a small business loan from Celtic Bank for each Business Loan Agreement reflected in Exhibits A and B, the Kabbage Platform walked Plaintiffs through a series of prompts to complete each loan transaction.

18.     First, the Kabbage Platform prompted Plaintiffs to select a loan amount and repayment term. A screenshot of that prompt is attached as Exhibit F.

19.     Second, the Kabbage Platform prompted Plaintiffs to enter bank account and routing numbers if Plaintiffs had not already done so for a previous loan. A screenshot of that prompt is attached as Exhibit G.

20.     Third, the Kabbage Platform prompted Plaintiffs to confirm the amount of loan funds requested. A screenshot of that prompt is attached as Exhibit H.

21.     Fourth, the Kabbage Platform provided Plaintiffs with a full copy of the "Kabbage Business Loan Agreement" that governed NRO's loan. A screenshot of that prompt is attached as Exhibit I.

22.     The Kabbage Platform provided Plaintiffs the opportunity to print the entirety of each Business Loan Agreement by selecting the "Print" icon located above the agreement.

23.     After presenting Plaintiffs with a copy of the Business Loan Agreement, the Kabbage Platform required Plaintiffs to affirmatively "check" a box indicated that they "understand that [they have] the responsibility to read [The Business Loan Agreement] and have had an opportunity to do so." Exhibit I.

DSP 805-9

24.     In addition, the Kabbage Platform required Plaintiffs to affirmatively accept the terms of the Business Loan Agreement by selecting the "Accept" prompt below the Business Loan Agreement.  *See* Exhibit I.

25.     Upon selecting the "Accept" prompt, the Kabbage Platform presented Plaintiffs a final notice indicating that the loan request had been submitted.  A screenshot of that prompt is attached as Exhibit J.

26.     Plaintiffs were free to close out of the Kabbage Platform at any time before selecting "Accept" without incurring any fee or penalty.

**The *Kabbage*® Small Business Loan Program**

27.     Each Kabbage Business Loan Agreement between Celtic Bank and Plaintiffs contains a broad arbitration provision.  The Business Loan Agreements dated on or before August 11, 2015 contain one version of the arbitration provision.  *See* Exhibit A.

28.     The Business Loan Agreements in Exhibit A each gave Plaintiffs the right to opt out of the arbitration provisions.  *See* Exhibit A at 6.  To do so, Plaintiffs needed to provide written notice of their decision to opt out within 60 days after Celtic Bank approved their loan. *See* Exhibit A at 6.  If Plaintiffs exercised their right to opt out, the Business Loan Agreements provided that "neither you nor we will have the right to engage in arbitration."  Exhibit A at 6 (bold text omitted).

29.     As part of Kabbage's regular activities in the ordinary course of business, if Kabbage receives a request to opt out of an arbitration provision, Kabbage would systematically record that request in the relevant account records.  These records are made at or about the time an opt-out request is received.  I am able to search Kabbage's electronic records to determine whether Kabbage received an opt-out request from Plaintiffs.

DSP 805-10

30.     I have found no record of an opt-out request from Plaintiffs exercising their right in the Business Loan Agreement to reject the arbitration provisions.  As part of Kabbage's regular activities in the ordinary course of business, Kabbage would have kept such a record if such a request had been made and received.

31.     The Business Loan Agreements Plaintiffs entered into after August 11, 2015 contain a slightly different version of the arbitration provision.  *See* Exhibit B.

32.     Both versions of the Business Loan Agreement, however, include a conspicuous disclosure under a bold heading titled "**CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE**" or "**Arbitration (Agreement to Arbitrate Claims)**."  Exhibits A & B.

33.     Both arbitration provisions are highly similar, and provide that "[a]ll Claims shall be resolved through arbitration pursuant to this section rather than by litigation,"  Exhibit B at § 2.3, or that "any Claim . . . will be resolved by binding arbitration," Exhibit A at 5.

34.     Further, in bold, capitalized font, the Business Loan Agreements prominently explain the "**SIGNIFICANCE OF ARBITRATION**" as follows:

> **IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

Exhibit A at 6; Exhibit B at § 2.1 (emphasis in original).

35.     Further, some of the Business Loan Agreements separately make clear:

DSP 805-11

> Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited.  The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court.  Except as set forth below, the arbitrator's decision will be final and binding.  Other rights you or we would have in court may also not be available in arbitration.

Exhibit B at § 2.3.

36.     A different section in the Business Loan Agreements, titled "**Broad Meaning of 'Claims'**", sets forth the categories of claims subject to arbitration.  Pursuant to this section, the scope of claims subject to arbitration has:

> the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

Exhibit A at 6; *see also* Exhibit B at § 2.2 (containing similar provision).

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 28, 2017

_____
Clint Hill

-7-

# EXHIBIT A

DSP 805-13

| | |
|---|---|
| **Loan Amount: $18,100.00** | **Date: May 12, 2014** |
| **Merchant Information** | **Lender: Celtic Bank** |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

**I. BUSINESS LOAN**

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based on the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $905.00 |

DSP 805-14

| | |
|---|---|
| Second Monthly Anniversary Date | $1,810.00 |
| Third Monthly Anniversary Date | $1,991.00 |
| Fourth Monthly Anniversary Date | $2,172.00 |
| Fifth Monthly Anniversary Date | $2,353.00 |
| Sixth Monthly Anniversary Date | $2,534.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
|---|---|
| First Payment Due Date | $3,921.67* |
| Second Payment Due Date | $3,921.67* |
| Third Payment Due Date | $3,197.67* |
| Fourth Payment Due Date | $3,197.67* |
| Fifth Payment Due Date | $3,197.67* |
| Sixth Payment Due Date | $3,197.65* |

\* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

1. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

2. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

3. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

4. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

5. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

6. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

7. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

8. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

9. To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

10. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

11. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

12. Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

13. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

14. Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

15. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual**

**Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Continued Cooperation provision. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization;** Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement, including any separate partial payments marked "paid in full," "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate exceeds or $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim,

dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected arbitration organization will not or cannot serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees,

incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, Bank will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

DSP 805-20

**Section 2.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the

DSP 805-21

duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

# IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY

COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS

Case 1:17-cv-11976-GAO   Document 42-43   Filed 09/23/19   Page 24 of 413

AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit"

button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and/or otherwise retain electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.4/29/2014

| | |
|---|---|
| **Loan Amount: $23,100.00** | **Date: Jun 11, 2014** |
| **Merchant Information** | **Lender: Celtic Bank** |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

**I. BUSINESS LOAN**

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based on the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,155.00 |

| | |
|---|---|
| Second Monthly Anniversary Date | $2,310.00 |
| Third Monthly Anniversary Date | $2,541.00 |
| Fourth Monthly Anniversary Date | $2,772.00 |
| Fifth Monthly Anniversary Date | $3,003.00 |
| Sixth Monthly Anniversary Date | $3,234.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
|---|---|
| First Payment Due Date | $5,005.00* |
| Second Payment Due Date | $5,005.00* |
| Third Payment Due Date | $4,081.00* |
| Fourth Payment Due Date | $4,081.00* |
| Fifth Payment Due Date | $4,081.00* |
| Sixth Payment Due Date | $4,081.00* |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

1. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

2. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

3. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

4. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

5. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

6. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

7. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

8. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

9. To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

10. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

11. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

12. Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

13. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

14. Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

15. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual**

**Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Continued Covenants (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization;** Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. We may accept partial payments marked "paid in full," "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim,

dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected arbitration organization cannot or will not serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide basis (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees,

incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, Bank will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

Case 1:17-cv-11976-GAO   Document 44-43   Filed 09/23/19   Page 33 of 413

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the

duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY

DSP 805-33

AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit"

button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print or otherwise retain electronic disclosures. You may request a copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.6/10/2014

**Loan Amount: $24,200.00**                                    **Date: Jul 14, 2014**
**Merchant Information**                          **Lender: Celtic Bank**
**Account Number: 27791**                              **Salt Lake City, Utah**
**Merchant: NRO Boston LLC**                      **Fees**
**Owner: alice indelicato**                       **Late Fee: Up to $100**
**Marketplaces: AuthorizeNET, Bigcommerce,**      **Returned Payment Fee: Up to $20**
**ACH, ACH, ACH, Twitter, GoogleAnalytics,**
**Intuit, ACH**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

### I. BUSINESS LOAN

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based upon the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
| --- | --- |
| First Monthly Anniversary Date | $1,210.00 |
| Second Monthly Anniversary Date | $2,420.00 |
| Third Monthly Anniversary Date | $2,662.00 |
| Fourth Monthly Anniversary Date | $2,904.00 |
| Fifth Monthly Anniversary Date | $3,146.00 |
| Sixth Monthly Anniversary Date | $3,388.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
| --- | --- |
| First Payment Due Date | $5,243.34* |
| Second Payment Due Date | $5,243.34* |
| Third Payment Due Date | $4,275.34* |
| Fourth Payment Due Date | $4,275.34* |
| Fifth Payment Due Date | $4,275.34* |
| Sixth Payment Due Date | $4,275.30* |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

1. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

2. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

3. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

4. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

5. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

6. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

7. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

8. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

9. To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

10. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

11. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

12. Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

13. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

14. Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

15. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

DSP 805-38

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization;** Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by

may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good faith. A check, money order, automatic payment, or payment from an account at a financial institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute

is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should

be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and herein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.6/18/2014

| | |
|---|---|
| **Loan Amount: $27,000.00** | **Date: Aug 11, 2014** |
| <u>Merchant Information</u> | <u>Lender:</u> Celtic Bank |
| **Account Number: 27791** | Salt Lake City, Utah |
| **Merchant: NRO Boston LLC** | <u>Fees</u> |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit, ACH** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

### I. BUSINESS LOAN

**Section 1.1.** *Business Loan.* <u>You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below.</u> You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

<u>**THIS IS A COMMERCIAL LOAN.** **YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**</u>

<u>Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.</u>

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding, based upon the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
| --- | --- |
| First Monthly Anniversary Date | $1,350.00 |
| Second Monthly Anniversary Date | $2,700.00 |
| Third Monthly Anniversary Date | $2,970.00 |
| Fourth Monthly Anniversary Date | $3,240.00 |
| Fifth Monthly Anniversary Date | $3,510.00 |
| Sixth Monthly Anniversary Date | $3,780.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
| --- | --- |
| First Payment Due Date | $5,850.00* |
| Second Payment Due Date | $5,850.00* |
| Third Payment Due Date | $4,770.00* |
| Fourth Payment Due Date | $4,770.00* |
| Fifth Payment Due Date | $4,770.00* |
| Sixth Payment Due Date | $4,770.00* |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. <u>Merchant's Contractual Covenants and Representations; Further Inquires.</u>**

**Covenants.** You agree:

(i)    Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii)    Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii)    To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv)    Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v)    With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi)    To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii)    To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii)    To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix)    To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x)    Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi)    Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii)    Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii)    Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv)    Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv)    To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the

DSP 805-49

Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. <u>Any separate payments that you make on or before a Payment Due Date will not affect this authorization.</u> You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. <u>Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.</u> We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial

payments marked "paid in full," "without recourse" or similar language. If you send such payment, we may assert it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases

to serve as an arbitration administrator, or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or

reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses, and unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the payment to any party other than Bank of any proceeds of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret

and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS

AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper

DSP 805-56

copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77087, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

**Loan Amount: $20,700.00**                       **Date: Sep 11, 2014**

| | |
|---|---|
| **Merchant Information** | **Lender:** Celtic Bank |
| **Account Number: 27791** |        Salt Lake City, Utah |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit, ACH** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

## I. BUSINESS LOAN

**Section 1.1.** *Business Loan.* You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding, based upon the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,035.00 |
| Second Monthly Anniversary Date | $2,070.00 |
| Third Monthly Anniversary Date | $2,277.00 |
| Fourth Monthly Anniversary Date | $2,484.00 |
| Fifth Monthly Anniversary Date | $2,691.00 |
| Sixth Monthly Anniversary Date | $2,898.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
|---|---|
| First Payment Due Date | $4,485.00* |
| Second Payment Due Date | $4,485.00* |
| Third Payment Due Date | $3,657.00* |
| Fourth Payment Due Date | $3,657.00* |
| Fifth Payment Due Date | $3,657.00* |
| Sixth Payment Due Date | $3,657.00* |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

(i)     Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii)    Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii)   To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv)    Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v)     With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi)    To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii)   To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii)  To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix)    To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x)     Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi)    Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii)   Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii)  Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv)   Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv)    To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the

Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. <u>Any separate payments that you make on or before a Payment Due Date will not affect this authorization.</u> You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. <u>Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.</u> We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial

payments marked "paid in full," "without recourse" or similar language. If you send us a payment, we may assent to it without losing any of our rights under this Agreement. All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to **Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases

to serve as an arbitration administrator, or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or

reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses (unless prohibited by law). The arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the sale, assignment, transfer, pledge, hypothecation or purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret

and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS

AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper

copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77087, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner*: You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

**DSP 805-68**

| | |
|---|---|
| **Loan Amount: $20,400.00** | **Date: Oct 12, 2014** |
| <u>Merchant Information</u> | <u>Lender:</u> Celtic Bank |
| Account Number: 27791 | Salt Lake City, Utah |
| Merchant: NRO Boston LLC | <u>Fees</u> |
| Owner: alice indelicato | Late Fee: Up to $100 |
| Marketplaces: AuthorizeNET, Bigcommerce, | Returned Payment Fee: Up to $20 |
| ACH, ACH, ACH, Twitter, GoogleAnalytics, | |
| Intuit, ACH | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

## I. BUSINESS LOAN

**Section 1.1.** *Business Loan.* <u>You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below.</u> You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

<u>**THIS IS A COMMERCIAL LOAN.** YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.</u>

<u>Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.</u>

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based upon the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,020.00 |
| Second Monthly Anniversary Date | $2,040.00 |
| Third Monthly Anniversary Date | $2,244.00 |
| Fourth Monthly Anniversary Date | $2,448.00 |
| Fifth Monthly Anniversary Date | $2,652.00 |
| Sixth Monthly Anniversary Date | $2,856.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $4,420.00* | 5.00 % |
| Second Payment Due Date | $4,420.00* | 5.00 % |
| Third Payment Due Date | $3,604.00* | 1% |
| Fourth Payment Due Date | $3,604.00* | 1% |
| Fifth Payment Due Date | $3,604.00* | 1% |
| Sixth Payment Due Date | $3,604.00* | 1% |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

(i) Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii) Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii) To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv) Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v) With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi) To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii) To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix) To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x) Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi) Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii) Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv) Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv) To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the

Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial

payments marked "paid in full," "without recourse" or similar language. If you send payment, we may assent it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases

in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or

reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the sale, assignment, conveyance, transfer, pledge, factoring or purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret

DSP 805-76

and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

# IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS

Case 1:17-cv-11578-CAO   Document 44-43   Filed 09/23/19   Page 79 of 413

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper

copy of any legally required disclosure by contacting us at <u>Kabbage Business Loan—Paper Disclosure Request, P.O Box 17087, Atlanta, GA 30357</u>. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner:*** **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

**Loan Amount: $23,800.00**                                    **Date: Nov 11, 2014**
<u>Merchant Information</u>                              <u>Lender:</u> Celtic Bank
Account Number: 27791                                    Salt Lake City, Utah
Merchant: NRO Boston LLC                          <u>Fees</u>
Owner: alice indelicato                                    Late Fee: Up to $100
Marketplaces: AuthorizeNET, Bigcommerce,    Returned Payment Fee: Up to $20
ACH, ACH, ACH, Twitter, GoogleAnalytics,
Intuit, ACH

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

### I. BUSINESS LOAN

**Section 1.1.** *Business Loan.* <u>You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below.</u> You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

<u>**THIS IS A COMMERCIAL LOAN.** YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.</u>

<u>Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.</u>

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based upon the original 4.9% amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,190.00 |
| Second Monthly Anniversary Date | $2,380.00 |
| Third Monthly Anniversary Date | $2,618.00 |
| Fourth Monthly Anniversary Date | $2,856.00 |
| Fifth Monthly Anniversary Date | $3,094.00 |
| Sixth Monthly Anniversary Date | $3,332.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $5,156.67* | 5.00 % |
| Second Payment Due Date | $5,156.67* | 5.00 % |
| Third Payment Due Date | $4,204.67* | 1% |
| Fourth Payment Due Date | $4,204.67* | 1% |
| Fifth Payment Due Date | $4,204.67* | 1% |
| Sixth Payment Due Date | $4,204.65* | 1% |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. <u>Merchant's Contractual Covenants and Representations; Further Inquires.</u>**

**Covenants.** You agree:

DSP 805-81

(i)    Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii)   Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii)  To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv)   Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v)    With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi)   To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii)  To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix)   To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x)    Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi)   Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii)  Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv)  Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv)   To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the

Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial

payments marked "paid in full," "without recourse" or similar language. If you send such a payment, we may assent it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases

to serve as an arbitration administrator, or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties) in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration

Case 1:17-cv-11776-CAC   Document 44-43   Filed 09/23/19   Page 86 of 413

organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or

reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the sale, assignment, or purchase of, or that grants a security interest in or the purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret

and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

# IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS

AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper

copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O Box 77087, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner*: You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

| | |
|---|---|
| **Loan Amount:** $21,600.00 | **Date:** Dec 12, 2014 |
| **Merchant Information** | **Lender:** Celtic Bank |
| **Account Number:** 27791 | Salt Lake City, Utah |
| **Merchant:** NRO Boston LLC | **Fees** |
| **Owner:** alice indelicato | **Late Fee:** Up to $100 |
| **Marketplaces:** AuthorizeNET, Bigcommerce, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit, ACH | **Returned Payment Fee:** Up to $20 |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

## I. BUSINESS LOAN

**Section 1.1.** *Business Loan.* You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of

your Loan remains outstanding based upon the original-loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,080.00 |
| Second Monthly Anniversary Date | $2,160.00 |
| Third Monthly Anniversary Date | $2,376.00 |
| Fourth Monthly Anniversary Date | $2,592.00 |
| Fifth Monthly Anniversary Date | $2,808.00 |
| Sixth Monthly Anniversary Date | $3,024.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $4,680.00* | 5.00 % |
| Second Payment Due Date | $4,680.00* | 5.00 % |
| Third Payment Due Date | $3,816.00* | 1% |
| Fourth Payment Due Date | $3,816.00* | 1% |
| Fifth Payment Due Date | $3,816.00* | 1% |
| Sixth Payment Due Date | $3,816.00* | 1% |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

(i)     Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii)    Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii)   To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv)    Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v)     With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi)    To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii)   To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii)  To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix)    To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x)     Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi)    Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii)   Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii)  Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv)   Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv)    To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the

Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization.** You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment; provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial

payments marked "paid in full," "without recourse" or similar language. If you send us a payment, we may assert it without losing any of our rights under this Agreement. **However, communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases

to serve as an arbitration administrator, or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration

Case 1:17-cv-11776-CAO   Document 44-43   Filed 09/23/19   Page 97 of 413

organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or

reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses (unless prohibited by law). The arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the sale, purchase, pledge of, loan against, or the sale or purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret

and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS

AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

---

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper

copy of any legally required disclosure by contacting us at <u>Kabbage Business Loan—Paper Disclosure Request P.O. Box 77082, Atlanta, GA 30357</u>. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

**Loan Amount: $24,600.00**
**Document Creation Date/Time: Jan 11, 2015 06:43 PM Eastern**

| | |
|---|---|
| **Merchant Information** | **Lender:** Celtic Bank |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee:** Up to $100 |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee:** Up to $20 |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit, ACH** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

**I. BUSINESS LOAN**

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

DSP 805-102

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your loan remains unpaid. You can avoid further interest than the amount we've anticipated below by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,230.00 |
| Second Monthly Anniversary Date | $2,460.00 |
| Third Monthly Anniversary Date | $2,706.00 |
| Fourth Monthly Anniversary Date | $2,952.00 |
| Fifth Monthly Anniversary Date | $3,198.00 |
| Sixth Monthly Anniversary Date | $3,444.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $5,330.00* | 5.00 % |
| Second Payment Due Date | $5,330.00* | 5.00 % |
| Third Payment Due Date | $4,346.00* | 1% |
| Fourth Payment Due Date | $4,346.00* | 1% |
| Fifth Payment Due Date | $4,346.00* | 1% |
| Sixth Payment Due Date | $4,346.00* | 1% |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

DSP 805-103

**Covenants.** You agree:

(i)     Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii)    Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii)   To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv)    Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v)     With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi)    To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii)   To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii)  To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix)    To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x)     Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi)    Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii)   Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii)  Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv)   Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv)    To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not

absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount, solder Company.)

Case 1:17-cv-21976-GAO  Document 44-43  Filed 09/23/19  Page 106 of 413

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all future payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

"Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitration or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. <u>[Reserved]</u>**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and otherwise by the FAA, even after termination of the relationship among the parties.

Case 1:17-cv-11976-GAO   Document 44-43   Filed 09/23/19   Page 111 of 413

**Section 3.7. <u>Transfer and Assignment.</u>** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. <u>Publicity.</u>** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. <u>Modifications; Amendments; Construction.</u>** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. <u>Notices.</u>** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357.</u> You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. <u>Waiver; Remedies.</u>** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. <u>D/B/A's.</u>** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. <u>Binding Effect.</u>** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. <u>Governing Law.</u> With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. <u>Term and Survival.</u>** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. <u>Severability.</u>** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. <u>Entire Agreement.</u>** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. <u>Jury Trial Waiver.</u>** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

---

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us as Kabbage Business Loan – Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner*: You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

DSP 805-112

**Loan Amount: $16,800.00**
**Document Creation Date/Time: Jan 20, 2015 12:41 PM Eastern**

| | |
|---|---|
| **Merchant Information** | **Lender:** Celtic Bank |
| **Account Number:** 27791 | **Salt Lake City, Utah** |
| **Merchant:** NRO Boston LLC | **Fees** |
| **Owner:** alice indelicato | **Late Fee:** Up to $100 |
| **Marketplaces:** AuthorizeNET, Bigcommerce, | **Returned Payment Fee:** Up to $20 |
| ACH, ACH, ACH, Twitter, GoogleAnalytics, | |
| Intuit, ACH | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

**I. BUSINESS LOAN**

**Section 1.1.** *Business Loan.* You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains unpaid. You can reduce the amount of Cost you will owe on this Loan by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $840.00 |
| Second Monthly Anniversary Date | $1,680.00 |
| Third Monthly Anniversary Date | $1,848.00 |
| Fourth Monthly Anniversary Date | $2,016.00 |
| Fifth Monthly Anniversary Date | $2,184.00 |
| Sixth Monthly Anniversary Date | $2,352.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $3,640.00* | 5.00 % |
| Second Payment Due Date | $3,640.00* | 5.00 % |
| Third Payment Due Date | $2,968.00* | 1% |
| Fourth Payment Due Date | $2,968.00* | 1% |
| Fifth Payment Due Date | $2,968.00* | 1% |
| Sixth Payment Due Date | $2,968.00* | 1% |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

DSP 805-114

**Covenants.** You agree:

(i) Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii) Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii) To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv) Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v) With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi) To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii) To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix) To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x) Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi) Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii) Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv) Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv) To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed in or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not

absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full" or with any accompanying "paid in full" language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** <u>**Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**</u>

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

"Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitration or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. <u>[Reserved]</u>**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and otherwise, by the 5-year after termination of the relationship between the parties.

**Section 3.7. <u>Transfer and Assignment.</u>** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. <u>Publicity.</u>** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. <u>Modifications; Amendments; Construction.</u>** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. <u>Notices.</u>** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357</u>. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. <u>Waiver; Remedies.</u>** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. <u>D/B/A's.</u>** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. <u>Binding Effect.</u>** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. <u>Governing Law.</u> With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. <u>Term and Survival.</u>** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. <u>Severability.</u>** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. <u>Entire Agreement.</u>** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. <u>Jury Trial Waiver.</u>** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

---

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

DSP 805-122

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan – Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

**Loan Amount: $25,200.00**
**Document Creation Date/Time: Feb 11, 2015 07:37 AM Eastern**

| Merchant Information | Lender: Celtic Bank |
|---|---|
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit, ACH** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

**I. BUSINESS LOAN**

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

> **THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan is outstanding as described in the Cost Schedule below. You may avoid Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,260.00 |
| Second Monthly Anniversary Date | $2,520.00 |
| Third Monthly Anniversary Date | $2,772.00 |
| Fourth Monthly Anniversary Date | $3,024.00 |
| Fifth Monthly Anniversary Date | $3,276.00 |
| Sixth Monthly Anniversary Date | $3,528.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $5,460.00* | 5.00 % |
| Second Payment Due Date | $5,460.00* | 5.00 % |
| Third Payment Due Date | $4,452.00* | 1% |
| Fourth Payment Due Date | $4,452.00* | 1% |
| Fifth Payment Due Date | $4,452.00* | 1% |
| Sixth Payment Due Date | $4,452.00* | 1% |

\* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

DSP 805-125

**Covenants.** You agree:

(i)    Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii)   Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii)  To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv)   Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v)    With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi)   To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii)  To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix)   To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x)    Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi)   Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii)  Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv)  Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv)   To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not

absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold or Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

DSP 805-127

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full" or with other "accord and satisfaction" language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** <u>**Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**</u>

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

"Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as arbitration administrator, you or we may substitute another arbitration or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt-out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

Case 1:17-cv-11976-GAO   Document 44-43   Filed 09/23/19   Page 132 of 413

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret or otherwise, by the 180-year after termination of the relationship between the parties.

Case 1:17-cv-11976-GAO Document 44-43 Filed 09/23/19 Page 133 of 413

**Section 3.7. <u>Transfer and Assignment.</u>** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. <u>Publicity.</u>** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. <u>Modifications; Amendments; Construction.</u>** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. <u>Notices.</u>** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357.</u> You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. <u>Waiver; Remedies.</u>** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. <u>D/B/A's.</u>** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. <u>Binding Effect.</u>** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. <u>Governing Law.</u> With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. <u>Term and Survival.</u>** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. <u>Severability.</u>** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. <u>Entire Agreement.</u>** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. <u>Jury Trial Waiver.</u>** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH
WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST
PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS
WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND
ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER
WITH THEIR ATTORNEYS.

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT
ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY
CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY
LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW
OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST
THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL
NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH
PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER
PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR
PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR
OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR
REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and
for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other
Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or
representative of Merchant or Owner, collectively and individually, for purposes of communications
between you and Bank regarding this Agreement and related commercial transactions. You agree that we
may contact you as provided in this paragraph. We may contact you for any lawful reason, including for
the collection of amounts owed to us and for the offering of products or services to Merchant in
compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed
unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or
telephone number (including wireless cellular telephone or ported landline telephone number) as you may
provide to us from time to time, even if you asked to have your number added to any state or federal do-
not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic
mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices
which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw
this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of
Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or
telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your
Account Summary is wrong, or if you need more information about an item on your Account Summary,
write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA
30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on
which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,
- The dollar amount of the suspected error,
- A description of the error, and
- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make
any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com
and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement
and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will
provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access,
view and retain electronic disclosures on our web site, you must have a computer with Internet access
and either a printer connected to your computer to print disclosures/notices or sufficient hard drive
space available to save the information. The minimum software requirements include browser software
that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit"
button on your application, you acknowledge that you are able to access our website

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan — Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

**DSP 805-134**

**Loan Amount: $23,100.00**
**Document Creation Date/Time: Mar 15, 2015 03:50 PM Eastern**

| | |
|---|---|
| **Merchant Information** | **Lender: Celtic Bank** |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, ACH, Twitter,** | |
| **GoogleAnalytics, Intuit** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

**I. BUSINESS LOAN**

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

DSP 805-135

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains unpaid. You can avoid paying additional Cost in the future by voluntarily repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,155.00 |
| Second Monthly Anniversary Date | $2,310.00 |
| Third Monthly Anniversary Date | $2,541.00 |
| Fourth Monthly Anniversary Date | $2,772.00 |
| Fifth Monthly Anniversary Date | $3,003.00 |
| Sixth Monthly Anniversary Date | $3,234.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $5,005.00* | 5.00 % |
| Second Payment Due Date | $5,005.00* | 5.00 % |
| Third Payment Due Date | $4,081.00* | 1% |
| Fourth Payment Due Date | $4,081.00* | 1% |
| Fifth Payment Due Date | $4,081.00* | 1% |
| Sixth Payment Due Date | $4,081.00* | 1% |

\* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

(i) Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii) Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii) To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv) Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v) With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi) To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii) To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix) To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x) Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi) Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii) Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv) Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv) To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed in or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not

absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

### Section 1.3. *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

DSP 805-138

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** <u>**Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**</u>

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

DSP 805-139

"Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1.** <u>Covenant Representation.</u> Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2.** <u>Business Information.</u> All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3.** <u>Reliance on Information.</u> Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4.** <u>Compliance.</u> Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5.** <u>Authorization.</u> Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6.** <u>Insurance.</u> Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7.** <u>Change in Name or Location.</u> Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8.** <u>Merchant Not Indebted to Bank.</u> Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. <u>Transfer and Assignment.</u>** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. <u>Publicity.</u>** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. <u>Modifications; Amendments; Construction.</u>** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. <u>Notices.</u>** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357</u>. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. <u>Waiver; Remedies.</u>** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. <u>D/B/A's.</u>** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. <u>Binding Effect.</u>** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. <u>Governing Law.</u> With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. <u>Term and Survival.</u>** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. <u>Severability.</u>** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. <u>Entire Agreement.</u>** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. <u>Jury Trial Waiver.</u>** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

---

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us as a Kabbage Business Loan – Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

DSP 805-145

**Loan Amount: $23,900.00**
**Document Creation Date/Time: Apr 11, 2015 10:45 AM Eastern**

| | |
|---|---|
| **Merchant Information** | **Lender:** Celtic Bank |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee:** Up to $100 |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee:** Up to $20 |
| **ACH, ACH, ACH, ACH, Twitter,** | |
| **GoogleAnalytics, Intuit** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

**I. BUSINESS LOAN**

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your [outstanding] [balance] under [this] Agreement remains unpaid. You can avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
| --- | --- |
| First Monthly Anniversary Date | $1,434.00 |
| Second Monthly Anniversary Date | $2,868.00 |
| Third Monthly Anniversary Date | $3,107.00 |
| Fourth Monthly Anniversary Date | $3,346.00 |
| Fifth Monthly Anniversary Date | $3,585.00 |
| Sixth Monthly Anniversary Date | $3,824.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
| --- | --- | --- |
| First Payment Due Date | $5,417.34* | 6.00 % |
| Second Payment Due Date | $5,417.34* | 6.00 % |
| Third Payment Due Date | $4,222.34* | 1% |
| Fourth Payment Due Date | $4,222.34* | 1% |
| Fifth Payment Due Date | $4,222.34* | 1% |
| Sixth Payment Due Date | $4,222.30* | 1% |

\* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

DSP 805-147

**Covenants.** You agree:

(i) Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii) Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii) To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv) Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v) With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi) To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii) To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix) To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x) Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi) Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii) Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv) Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv) To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not

**DSP 805-148**

absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid-in-full" or with other "accord and satisfaction" language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

DSP 805-150

"Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. <u>[Reserved]</u>**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret or otherwise, by the 18-year after termination of the relationship between the parties.

Case 1:17-cv-11976-GAO   Document 44-43   Filed 09/23/19   Page 155 of 413

**Section 3.7. <u>Transfer and Assignment.</u>** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. <u>Publicity.</u>** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. <u>Modifications; Amendments; Construction.</u>** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. <u>Notices.</u>** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357.</u> You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. <u>Waiver; Remedies.</u>** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. <u>D/B/A's.</u>** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. <u>Binding Effect.</u>** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. <u>Governing Law.</u> With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. <u>Term and Survival.</u>** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. <u>Severability.</u>** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. <u>Entire Agreement.</u>** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. <u>Jury Trial Waiver.</u>** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11.** <u>**Class Action Waiver.**</u> THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12.** <u>**Telephone Monitoring and Recording.**</u> To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13.** <u>**Communicating With You and Owner; Consent to Contact by Electronic and Other Means.**</u> For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14.** <u>**In case of Errors or Questions About Your Account Summary**</u> If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us as a Kabbage business loan – Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner***: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

DSP 805-156

**Loan Amount: $24,600.00**
**Document Creation Date/Time: May 12, 2015 09:11 AM Eastern**

| | |
|---|---|
| **Merchant Information** | **Lender:** Celtic Bank |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee:** Up to $100 |
| **Marketplaces: AuthorizeNET, Bigcommerce, ACH, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit** | **Returned Payment Fee:** Up to $20 |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

**I. BUSINESS LOAN**

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

DSP 805-157

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your loan remains unpaid based on the anticipated Cost schedule below. You may avoid the Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,476.00 |
| Second Monthly Anniversary Date | $2,952.00 |
| Third Monthly Anniversary Date | $3,198.00 |
| Fourth Monthly Anniversary Date | $3,444.00 |
| Fifth Monthly Anniversary Date | $3,690.00 |
| Sixth Monthly Anniversary Date | $3,936.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $5,576.00* | 6.00 % |
| Second Payment Due Date | $5,576.00* | 6.00 % |
| Third Payment Due Date | $4,346.00* | 1% |
| Fourth Payment Due Date | $4,346.00* | 1% |
| Fifth Payment Due Date | $4,346.00* | 1% |
| Sixth Payment Due Date | $4,346.00* | 1% |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

DSP 805-158

(i) Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii) Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii) To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv) Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v) With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi) To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii) To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix) To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x) Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi) Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii) Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv) Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv) To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed in or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not

absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

**DSP 805-160**

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full" (with or without "accounts") or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

"Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. <u>[Reserved]</u>**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and otherwise. (iv) this 3.6. is not after termination of the relationship between the parties.

**Section 3.7. <u>Transfer and Assignment.</u>** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. <u>Publicity.</u>** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. <u>Modifications; Amendments; Construction.</u>** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. <u>Notices.</u>** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357.</u> You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. <u>Waiver; Remedies.</u>** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. <u>D/B/A's.</u>** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. <u>Binding Effect.</u>** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. <u>Governing Law.</u> With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. <u>Term and Survival.</u>** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. <u>Severability.</u>** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. <u>Entire Agreement.</u>** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. <u>Jury Trial Waiver.</u>** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.


If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

DSP 805-166

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us as a Kabbage business loan – Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

DSP 805-167

**Loan Amount: $28,800.00**
**Document Creation Date/Time: Jun 11, 2015 10:23 AM Eastern**

| | |
|---|---|
| **Merchant Information** | **Lender: Celtic Bank** |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, ACH, Twitter,** | |
| **GoogleAnalytics, Intuit** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

**I. BUSINESS LOAN**

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,728.00 |
| Second Monthly Anniversary Date | $3,456.00 |
| Third Monthly Anniversary Date | $3,744.00 |
| Fourth Monthly Anniversary Date | $4,032.00 |
| Fifth Monthly Anniversary Date | $4,320.00 |
| Sixth Monthly Anniversary Date | $4,608.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $6,528.00* | 6.00 % |
| Second Payment Due Date | $6,528.00* | 6.00 % |
| Third Payment Due Date | $5,088.00* | 1% |
| Fourth Payment Due Date | $5,088.00* | 1% |
| Fifth Payment Due Date | $5,088.00* | 1% |
| Sixth Payment Due Date | $5,088.00* | 1% |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. <u>Merchant's Contractual Covenants and Representations; Further Inquires.</u>**

DSP 805-169

**Covenants.** You agree:

(i)   Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii)  Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii) To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv)  Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v)   With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi)  To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii) To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix)  To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x)   Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi)  Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii) Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv) Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv)  To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not

absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount, and/or Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

DSP 805-171

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full" or with other "accord and satisfaction" language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** <u>**Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**</u>

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

"Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as arbitration administrator you or we may substitute another arbitration organization...

Case 1:17-cv-11974-GAO Document 44-43 Filed 09/23/19 Page 174 of 413

organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

DSP 805-175

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and otherwise, for three (3) years after termination of the relationship between the parties.

Case 1:17-cv-11976-GAO   Document 44-43   Filed 09/23/19   Page 177 of 413

**Section 3.7. <u>Transfer and Assignment.</u>** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. <u>Publicity.</u>** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. <u>Modifications; Amendments; Construction.</u>** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. <u>Notices.</u>** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357</u>. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. <u>Waiver; Remedies.</u>** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. <u>D/B/A's.</u>** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. <u>Binding Effect.</u>** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. <u>Governing Law.</u> With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. <u>Term and Survival.</u>** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. <u>Severability.</u>** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. <u>Entire Agreement.</u>** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. <u>Jury Trial Waiver.</u>** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

DSP 805-176

CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11.** <u>**Class Action Waiver.**</u> THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12.** <u>**Telephone Monitoring and Recording.**</u> To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13.** <u>**Communicating With You and Owner; Consent to Contact by Electronic and Other Means.**</u> For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14.** <u>**In case of Errors or Questions About Your Account Summary**</u> If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,
- The dollar amount of the suspected error,
- A description of the error, and
- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

DSP 805-177

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan – Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner:*** **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

DSP 805-178

**Loan Amount: $25,700.00**
**Document Creation Date/Time: Jul 12, 2015 08:10 AM Eastern**

| | |
|---|---|
| **Merchant Information** | **Lender: Celtic Bank** |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, ACH, Twitter,** | |
| **GoogleAnalytics, Intuit** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

**I. BUSINESS LOAN**

**Section 1.1. *Business Loan*.** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

DSP 805-179

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains unpaid after the date of this Agreement until maturity. You may avoid Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,542.00 |
| Second Monthly Anniversary Date | $3,084.00 |
| Third Monthly Anniversary Date | $3,341.00 |
| Fourth Monthly Anniversary Date | $3,598.00 |
| Fifth Monthly Anniversary Date | $3,855.00 |
| Sixth Monthly Anniversary Date | $4,112.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $5,825.34* | 6.00 % |
| Second Payment Due Date | $5,825.34* | 6.00 % |
| Third Payment Due Date | $4,540.34* | 1% |
| Fourth Payment Due Date | $4,540.34* | 1% |
| Fifth Payment Due Date | $4,540.34* | 1% |
| Sixth Payment Due Date | $4,540.30* | 1% |

\* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

(i) Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii) Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii) To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv) Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v) With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi) To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii) To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix) To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x) Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi) Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii) Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv) Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv) To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not

absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full" or "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

"Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as arbitration administrator, you or we may substitute another arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement.</u> The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. <u>Covenant Representation.</u>** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. <u>Business Information.</u>** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. <u>Reliance on Information.</u>** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. <u>Compliance.</u>** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. <u>Authorization.</u>** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. <u>Insurance.</u>** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. <u>Change in Name or Location.</u>** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. <u>Merchant Not Indebted to Bank.</u>** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and otherwise. Cv. This Section shall survive termination of the relationship between the parties.

Case 1:17-cv-11976-GAO Document 44-43 Filed 09/23/19 Page 188 of 413

**Section 3.7. <u>Transfer and Assignment.</u>** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. <u>Publicity.</u>** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. <u>Modifications; Amendments; Construction.</u>** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. <u>Notices.</u>** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357</u>. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. <u>Waiver; Remedies.</u>** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. <u>D/B/A's.</u>** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. <u>Binding Effect.</u>** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. <u>Governing Law.</u> With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. <u>Term and Survival.</u>** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. <u>Severability.</u>** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. <u>Entire Agreement.</u>** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. <u>Jury Trial Waiver.</u>** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

---

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us as at Kabbage Business Loan – Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.7/23/2014

DSP 805-189

**Loan Amount: $30,400.00**
**Document Creation Date/Time: Aug 11, 2015 06:55 AM Eastern**

| | |
|---|---|
| **Merchant Information** | **Lender:** Celtic Bank |
| **Account Number:** 27791 | Salt Lake City, Utah |
| **Merchant:** NRO Boston LLC | **Fees** |
| **Owner:** alice indelicato | **Late Fee:** Up to $100 |
| **Marketplaces:** AuthorizeNET, Bigcommerce, | **Returned Payment Fee:** Up to $20 |
| ACH, ACH, ACH, ACH, Twitter, | |
| GoogleAnalytics, Intuit | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

If you have designated a Recipient above other than yourself, then you direct us to deliver the Loan Amount to the Recipient on your behalf for one or more purchases made by you from the Recipient. The Recipient is not a party to this agreement, and we are not a party to any purchase transaction between you and the Recipient. Consequently, any disputes or concerns you have regarding your purchases from or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases.

**I. BUSINESS LOAN**

**Section 1.1. _Business Loan._** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

DSP 805-190

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your loan remains outstanding as described above. You can avoid additional costs and fees by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,824.00 |
| Second Monthly Anniversary Date | $3,648.00 |
| Third Monthly Anniversary Date | $3,952.00 |
| Fourth Monthly Anniversary Date | $4,256.00 |
| Fifth Monthly Anniversary Date | $4,560.00 |
| Sixth Monthly Anniversary Date | $4,864.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $6,890.67* | 6.00 % |
| Second Payment Due Date | $6,890.67* | 6.00 % |
| Third Payment Due Date | $5,370.67* | 1% |
| Fourth Payment Due Date | $5,370.67* | 1% |
| Fifth Payment Due Date | $5,370.67* | 1% |
| Sixth Payment Due Date | $5,370.65* | 1% |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

DSP 805-191

**Covenants.** You agree:

(i)    Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

(ii)   Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iii)  To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

(iv)   Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(v)    With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vi)   To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(vii)  To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(viii) To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(ix)   To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

(x)    Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xi)   Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

(xii)  Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiii) Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

(xiv)  Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

(xv)   To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not

**DSP 805-192**

absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold or financed.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

**Alternative Payment.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

DSP 805-193

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full" or with other "accord and satisfaction" language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** <u>**Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**</u>

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** **Default.** You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

DSP 805-194

organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

DSP 805-196

**Section 2.9. <u>Owner.</u>** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. <u>Working Capital Funding.</u>** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. <u>Unencumbered Accounts Receivable.</u>** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. <u>Business Purpose.</u>** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. <u>Security Interest.</u>** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. <u>Financing Statements.</u>** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. <u>Remedies.</u>** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. <u>Protection of Information.</u>** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. <u>Confidentiality.</u>** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and otherwise, for three (3) years after termination of the relationship between the parties.

Case 1:17-cv-11976-GAO   Document 44-43   Filed 09/23/19   Page 199 of 413

**Section 3.7. <u>Transfer and Assignment.</u>** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. <u>Publicity.</u>** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. <u>Modifications; Amendments; Construction.</u>** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. <u>Notices.</u>** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357</u>. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. <u>Waiver; Remedies.</u>** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. <u>D/B/A's.</u>** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. <u>Binding Effect.</u>** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. <u>Governing Law.</u> With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. <u>Term and Survival.</u>** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. <u>Severability.</u>** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. <u>Entire Agreement.</u>** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. <u>Jury Trial Waiver.</u>** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH

Case 1:17-cv-11970-GAO   Document 44-45   Filed 09/23/19   Page 200 of 413

WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. <u>Class Action Waiver.</u>** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. <u>Telephone Monitoring and Recording.</u>** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. <u>Communicating With You and Owner; Consent to Contact by Electronic and Other Means.</u>** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14. <u>In case of Errors or Questions About Your Account Summary</u>** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: <u>Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357.</u> We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.


If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

---

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

DSP 805-199

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan – Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.

Rev.7/23/2014

# EXHIBIT B

# Kabbage Business Loan Agreement

| | |
|---|---|
| **Loan Amount: $26,500.00** | **Date: Sep 11, 2015 06:43 AM Eastern** |
| <u>**Merchant Information**</u> | **Lender:** Celtic Bank |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | <u>**Fees**</u> |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, ACH, Twitter,** | |
| **GoogleAnalytics, Intuit** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above. Celtic Bank, Merchant and Owner may be referred to as a "Party" or collectively as "Parties" herein.

☑ By checking this box <u>Merchant or Owner understand that it has the responsibility to read this Agreement and have had an opportunity to do so.</u>

☑ By checking this box <u>Merchant or Owner also agree that the parties included in this Agreement intend to authenticate this writing, agree to all its terms, and electronically sign this Agreement with the same force and effect as a manual signature.</u>

---

### Consent to Electronic Disclosure.

☑ **By checking this box** you confirm that you can access transaction information by visiting www.kabbage.com and logging in and You agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. Kabbage will provide electronic copies of periodic statements and Subsequent Disclosures on Kabbage's web site. To access, view and retain electronic disclosures on Kabbage's web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0 or higher. By clicking the "Submit" button on your application, you acknowledge that you are able to access Kabbage's website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting Kabbage at <u>Kabbage Business Loan-Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357.</u> You may also withdraw your consent to electronic disclosures by contacting Kabbage in the same manner. If you withdraw your consent to electronic disclosures, Kabbage may elect to terminate the relationship with you. You agree to provide Kabbage with your current e-mail address for notices. If your e-mail address changes, you must send Kabbage a notice of the new address by writing to Kabbage at least five days before the effective date of the change at Kabbage Email Address Change, P.O. Box 77081, Atlanta, GA 30357.

---

We are not a party to any purchase transaction between you and either a recipient of the proceeds of a Loan or a merchant accepting a payment card onto which the proceeds of a Loan was loaded (either, a "Recipient"). Consequently, any disputes or concerns you have regarding your purchases from/transactions with or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases or transactions.

<u>**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**</u>

## I. BUSINESS LOAN

**1.1. Business Loan.** <u>You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan to us or our order, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below.</u> You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the

marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate for the purpose of managing your business, servicing and financing. You agree to repay us in U.S. dollars.

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge, and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge, and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us within five (5) business days if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**1.2. Distribution of Proceeds.** Proceeds of the Loan can be distributed to you in one of four methods that you hereby elect:

    a. via automated clearing house in one-to-three business days to a business's checking account registered on your established Kabbage profile;

    b. to a PayPal Account registered on your established Kabbage profile;

    c. via a valid, non-expired debit card registered on your established Kabbage profile that is linked to business checking account, subject to a Debit Card Express Fee of $24.95 per disbursement that will be assessed to your account and payable in full in addition to your next Minimum Monthly Payment under Section 1.5 below; or

    d. onto a MasterCard-branded prepaid debit card issued under the Kabbage Card Program (the "Card"). You must elect and qualify to participate in the Kabbage Card Program and, if approved, disbursement of Loan proceeds via the Card will be subject to additional terms and conditions as set forth in the Kabbage Card Program Terms and Conditions by and among you, Kabbage and the Bank that issues the Card, which can be found at app.kabbage.com/CardRegistration/TermsAndConditions. In addition, participants in the Kabbage Card Program will be subject to additional terms and conditions imposed by Kabbage as set forth on Kabbage's website. Each disbursement via a transaction under the Kabbage Card Program will constitute a separate extension of credit, with each disbursement constituting a Loan for a separate six (6) month Term. Disbursements shall be, in the aggregate, limited to the total amount of the line of credit for which you are approved.

**1.3. Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**1.4. Cost.**
We will impose a Cost for each month or partial month that any portion of Loan proceeds remains outstanding. The portion of Loan proceeds deemed to be outstanding is the amount of proceeds disbursed: (i) through ACH, (ii) PayPal, (iii) via a debit card (iv), or via the MasterCard-branded prepaid debit card issued under the Kabbage Card Program. You may avoid additional Costs by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Costs at the same rate after maturity if any portion of the Loan remains unpaid.

**1.5. Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
| --- | --- |
| First Monthly Anniversary Date | $1,590.00 |
| Second Monthly Anniversary Date | $3,180.00 |
| Third Monthly Anniversary Date | $3,445.00 |
| Fourth Monthly Anniversary Date | $3,710.00 |
| Fifth Monthly Anniversary Date | $3,975.00 |

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
| --- | --- |
| Case Month, Annivorsaxy DAO | $16,940.00 |

Case 1:19-cv-01976-CAO   Document 44-43   Filed 09/23/19   Page 205 of 413

**1.6. Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee % |
| --- | --- | --- |
| First Payment Due Date | $6,006.67* | 6.00 % |
| Second Payment Due Date | $6,006.67* | 6.00 % |
| Third Payment Due Date | $4,681.67* | 1% |
| Fourth Payment Due Date | $4,681.67* | 1% |
| Fifth Payment Due Date | $4,681.67* | 1% |
| Sixth Monthly Anniversary Date | $4,681.65* | 1% |

   *Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**1.7. Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.12 (Payments) below.

   **Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**1.8. Application of Payments.** Payments received will be applied first to billed Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**1.9. Merchant's Contractual Covenants.** You agree:

   i. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

   ii. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

   iii. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

   iv. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

   v. With regard to information about any marketplace or other service provider that you provided to us

to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or the service provider changes, or to manage any event at your closed your account

vi. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

vii. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.12 below);

viii. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

ix. To make payments to us (in U.S. dollars) on the applicable "Payment Due Date";

x. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

xi. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

xii. Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

xiii. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

xiv. Not to terminate your authorization of scheduled debits in Section 1.12, stop payment on any debit authorized pursuant to Section 1.12, claim that a debit transaction pursuant to Section 1.12 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.12; and

xv. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**1.10. Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**1.11. Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants and Payment of Outstanding Loan Amounts.** Owner personally and unconditionally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above and Merchant's payment obligations herein. Specifically, Owner guarantees payments of all amounts owed by Merchant and that such payments will be made strictly in accordance with the terms of any and all Loans of Merchant. Owner's guarantee of payment hereunder is independent of the Merchant's obligation of payment and a separate Claim may be brought against the Owner to enforce this Loan, whether or not any Claim is made against Merchant. The liability of Owner hereunder is irrevocable, continuing, absolute and unconditional.

**1.12. Payments.**

i. Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment; provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under

this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as a result of unauthorized debits or payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

ii. Payment Failure. If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (A) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (B) debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full, (C) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (D) pursue any and all other remedies available to us.

iii. Account Maintenance. You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

iv. Terminating or Disputing Authorization; Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit, or claiming that a debit transaction pursuant to this Section 1.11 is unauthorized, is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

v. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

vi. Credit Card Transactions. We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

vii. Other Payments. You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: **Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357.** You may also call Customer Service to arrange payments by overnight delivery, telephone, or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

viii. Acceptance of Late and Partial Payments; Disputed Amounts. We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it as an accommodation to you without losing or waiving any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.

**1.13. Returned Payment Fee.** If a payment is rejected, returned or dishonored, for any reason, we may assess a Returned Payment Fee in the amount of $20, which fee will be in addition to any other Fees that may be due.

**1.14. Events of Default.** You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.12 or claim that a debit transaction pursuant to Section 1.12 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture, or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign, or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take, by foreclosure, seizure, repossession, receivership, or otherwise, any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner. Collectively, the preceding items (i) through (xiv) are "Events of Default."

**1.15. Our Rights upon Default.** Upon default, we may demand the immediate payment of all amounts owed us, suspend your ability to obtain further Payment Advances or Loans, and initiate a Claim against Merchant and Owner. We may also manually initiate one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.

**1.16. Attorneys' Fees and Collection Costs.** To the extent not prohibited by applicable law, Merchant or Owner shall pay us, on demand, any and all expenses, including, but not limited to, arbitration filing and other fees, collection costs, attorneys' fees, and all other expenses of a like or unlike nature, which may be expended by us to obtain or enforce payment obligations of Merchant or guarantee obligations of Owner.

**1.17. Limitation of Liability.** In no event shall our aggregate liability for any Claim arising under this Agreement (whether in contract, tort, warranty or otherwise) exceed the total of Fees paid by Merchant in the twelve (12) months preceding the date that the most recent Claim arose. Notwithstanding anything contained in this Agreement to the contrary, and except as expressly prohibited by applicable law, no Party to this Agreement shall be liable to another Party for any indirect, special, incidental, consequential, punitive, or exemplary damages of any kind (including without limitation, lost revenues, loss of profits, or loss of business), arising from this Agreement or relating to the obligations hereunder, even if advised of such potential damages.

**1.18. Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

## II. CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE

**2.1. SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO**

**ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN, OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

Case 1:1-cv-11876-GAO   Document 44-43   Filed 09/23/19   Page 209 of 413

**2.2. Broad Meaning of "Claims."** The term "Claims" in this Agreement is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement based upon contract, tort, fraud, statute, regulation, common law and equity, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of any obligation arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration section or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**2.3. Arbitration.** All Claims shall be resolved through arbitration pursuant to this section rather than by litigation. Claims will be decided by a neutral arbitrator. No Party will have the right to participate in a representative capacity or as a member of any class pertaining to any Claim subject to arbitration. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration. The arbitrator's authority is limited to Claims between the Parties to this Agreement. Claims may not be consolidated unless all Parties agree, in writing. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

Arbitration herein is governed by the Federal Arbitration Act ("FAA") and the selected arbitration organization's rules in effect when the Claim is filed. Before beginning arbitration, the Party making a Claim shall send a Notice of Claim to the other. Claims will be referred to either JAMS (www.jamsadr.com) or American Arbitration Association (www.adr.org) as selected by the party making the Claim. Claims may also be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the FAA, 9 U.S.C. §§ 1-16.

If a Claim is for $10,000 or less, Merchant or Owner may choose whether the arbitration will be conducted solely based on documents, through a telephonic hearing, or by an in-person hearing. The arbitrator will give a brief written explanation of the award. The arbitrator's award will be final and binding except for any appeal right provided for the FAA. A Party will have 30 days to appeal the award by notifying the arbitration organization and all Parties in writing. The organization will appoint a three-arbitrator panel to decide, anew, by majority vote based on written submissions, any aspect of the decision objected to. Judgment upon any award may be entered in any court having jurisdiction.

You will be responsible for paying your share of any initial arbitration fee (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought the Claim in court. We will be responsible for advancing any additional arbitration fees for an original Claim. We may seek reimbursement of any fees advanced as a cost or fee under Section 1.16 in the event we obtain an award against you or Owner. Any costs of an Appeal will be borne by each Party with no advancement from us and we will seek reimbursement of those fees under Section 1.16.

## III. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**3.1. Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, voluntary or involuntary bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**3.2. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**3.3. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such

**3.4. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**3.5. Compliance with Laws and Regulations.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**3.6. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**3.7. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**3.8. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**3.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**3.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**3.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**3.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## IV. ADDITIONAL TERMS

**4.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**4.2. Financing Statements.** Merchant understands and agrees that Bank may at any time file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend, or continue any interest granted in Section 4.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to affect the filing or continuation of any such filings.

**4.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate, and complete in all respects or if a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 1.11 of this Agreement is primary, direct, and unconditional, and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner. Merchant and Owner hereby waive any and all defenses to liability under this Agreement other than payment in full.

**4.4. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**4.5. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**4.6. Transfer and Assignment.** We reserve the right to sell, transfer, or assign all or any portion of our interest in this Agreement to another entity or person and Merchant and Owner hereby knowingly consent to such sale, transfer, or assignment. This Agreement, and the rights and obligations under this Agreement, may not be assigned by Merchant or Owner (including by operation of law) without our prior written consent and any purported assignment in violation of the foregoing shall be void ab initio.

**4.7. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## V. MISCELLANEOUS

**5.1. Modifications; Amendments; Construction.** No modification, amendment, or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected, such execution by all parties being an express prerequisite to enforceability. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**5.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known physical address or electronic mail address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357</u>. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**5.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**5.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**5.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**5.6. Governing Law Consent to Jurisdiction and Venue. With the exception of Section II above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Such laws will govern the legality, enforceability and interpretation of this Agreement. Merchant and Owner understand and agree that Bank is located in Utah and Loan is issued in Utah. Merchant and Owner agree that these laws apply no matter where Merchant or Owner lives, is domiciled, or made this Agreement.

**5.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**5.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**5.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**5.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**5.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**5.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**5.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 5.13 "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**5.14. In Case of Errors or Questions about Your Account Summary**

If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first

Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

**DSP 805-212**

## Kabbage Business Loan Agreement

**Loan Amount: $28,500.00**                                  **Date: Oct 12, 2015 06:48 AM Eastern**
**Merchant Information**                                      **Lender: Celtic Bank**
**Account Number: 27791**                                              **Salt Lake City, Utah**
**Merchant: NRO Boston LLC**                                 **Fees**
**Owner: alice indelicato**                                  **Late Fee: Up to $100**
**Marketplaces: AuthorizeNET, Bigcommerce,**                 **Returned Payment Fee: Up to $20**
**ACH, ACH, ACH, ACH, Twitter,**
**GoogleAnalytics, Intuit**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above. Celtic Bank, Merchant and Owner may be referred to as a "Party" or collectively as "Parties" herein.

☑ By checking this box <u>Merchant or Owner understand that it has the responsibility to read this Agreement and have had an opportunity to do so.</u>

☑ By checking this box <u>Merchant or Owner also agree that the parties included in this Agreement intend to authenticate this writing, agree to all its terms, and electronically sign this Agreement with the same force and effect as a manual signature.</u>

---

### Consent to Electronic Disclosure.

☑ **By checking this box** you confirm that you can access transaction information by visiting <u>www.kabbage.com</u> and logging in and You agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. Kabbage will provide electronic copies of periodic statements and Subsequent Disclosures on Kabbage's web site. To access, view and retain electronic disclosures on Kabbage's web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0 or higher. By clicking the "Submit" button on your application, you acknowledge that you are able to access Kabbage's website (<u>www.kabbage.com</u>) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting Kabbage at <u>Kabbage Business Loan-Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357.</u> You may also withdraw your consent to electronic disclosures by contacting Kabbage in the same manner. If you withdraw your consent to electronic disclosures, Kabbage may elect to terminate the relationship with you. You agree to provide Kabbage with your current e-mail address for notices. If your e-mail address changes, you must send Kabbage a notice of the new address by writing to Kabbage at least five days before the effective date of the change at Kabbage Email Address Change, P.O. Box 77081, Atlanta, GA 30357.

---

We are not a party to any purchase transaction between you and either a recipient of the proceeds of a Loan or a merchant accepting a payment card onto which the proceeds of a Loan was loaded (either, a "Recipient"). Consequently, any disputes or concerns you have regarding your purchases from/transactions with or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases or transactions.

<u>**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**</u>

## I. BUSINESS LOAN

**1.1. Business Loan.** <u>You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan to us or our order, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below.</u> You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the

DSP 805-213

marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate for the purpose of managing our business, giving and financing Your agree to repay us in U.S. dollars.

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge, and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge, and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us within five (5) business days if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**1.2. Distribution of Proceeds.** Proceeds of the Loan can be distributed to you in one of four methods that you hereby elect:

a. via automated clearing house in one-to-three business days to a business's checking account registered on your established Kabbage profile;

b. to a PayPal Account registered on your established Kabbage profile;

c. via a valid, non-expired debit card registered on your established Kabbage profile that is linked to business checking account, subject to a Debit Card Express Fee of $24.95 per disbursement that will be assessed to your account and payable in full in addition to your next Minimum Monthly Payment under Section 1.5 below; or

d. onto a MasterCard-branded prepaid debit card issued under the Kabbage Card Program (the "Card"). You must elect and qualify to participate in the Kabbage Card Program and, if approved, disbursement of Loan proceeds via the Card will be subject to additional terms and conditions as set forth in the Kabbage Card Program Terms and Conditions by and among you, Kabbage and the Bank that issues the Card, which can be found at app.kabbage.com/CardRegistration/TermsAndConditions. In addition, participants in the Kabbage Card Program will be subject to additional terms and conditions imposed by Kabbage as set forth on Kabbage's website. Each disbursement via a transaction under the Kabbage Card Program will constitute a separate extension of credit, with each disbursement constituting a Loan for a separate six (6) month Term. Disbursements shall be, in the aggregate, limited to the total amount of the line of credit for which you are approved.

**1.3. Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**1.4. Cost.**
We will impose a Cost for each month or partial month that any portion of Loan proceeds remains outstanding. The portion of Loan proceeds deemed to be outstanding is the amount of proceeds disbursed: (i) through ACH, (ii) PayPal, (iii) via a debit card (iv), or via the MasterCard-branded prepaid debit card issued under the Kabbage Card Program. You may avoid additional Costs by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Costs at the same rate after maturity if any portion of the Loan remains unpaid.

**1.5. Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
| --- | --- |
| First Monthly Anniversary Date | $1,710.00 |
| Second Monthly Anniversary Date | $3,420.00 |
| Third Monthly Anniversary Date | $3,705.00 |
| Fourth Monthly Anniversary Date | $3,990.00 |
| Fifth Monthly Anniversary Date | $4,275.00 |

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| Sixth Monthly Anniversary Date | $44,360.00 |

Case 1:19-cv-01976-GAO   Document 44-156   Filed 09/23/19   Page 216 of 413

**1.6. Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee % |
|---|---|---|
| First Payment Due Date | $6,460.00* | 6.00 % |
| Second Payment Due Date | $6,460.00* | 6.00 % |
| Third Payment Due Date | $5,035.00* | 1% |
| Fourth Payment Due Date | $5,035.00* | 1% |
| Fifth Payment Due Date | $5,035.00* | 1% |
| Sixth Monthly Anniversary Date | $5,035.00* | 1% |

*Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**1.7. Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.12 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**1.8. Application of Payments.** Payments received will be applied first to billed Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**1.9. Merchant's Contractual Covenants.** You agree:

i. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

ii. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

iii. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

iv. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

v. With regard to information about any marketplace or other service provider that you provided to us

to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or the service provider changes, or our management agreement or your rights in your account

vi. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

vii. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.12 below);

viii. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

ix. To make payments to us (in U.S. dollars) on the applicable "Payment Due Date";

x. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

xi. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

xii. Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

xiii. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

xiv. Not to terminate your authorization of scheduled debits in Section 1.12, stop payment on any debit authorized pursuant to Section 1.12, claim that a debit transaction pursuant to Section 1.12 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.12; and

xv. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**1.10. Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**1.11. Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants and Payment of Outstanding Loan Amounts.** Owner personally and unconditionally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above and Merchant's payment obligations herein. Specifically, Owner guarantees payments of all amounts owed by Merchant and that such payments will be made strictly in accordance with the terms of any and all Loans of Merchant. Owner's guarantee of payment hereunder is independent of the Merchant's obligation of payment and a separate Claim may be brought against the Owner to enforce this Loan, whether or not any Claim is made against Merchant. The liability of Owner hereunder is irrevocable, continuing, absolute and unconditional.

**1.12. Payments.**

i. Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment; provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under

DSP 805-216

this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as a result of transactions or unauthorized debits or payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

ii. Payment Failure. If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (A) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (B) debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full, (C) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (D) pursue any and all other remedies available to us.

iii. Account Maintenance. You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

iv. Terminating or Disputing Authorization; Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit, or claiming that a debit transaction pursuant to this Section 1.11 is unauthorized, is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

v. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

vi. Credit Card Transactions. We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

vii. Other Payments. You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: **Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357.** You may also call Customer Service to arrange payments by overnight delivery, telephone, or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

viii. Acceptance of Late and Partial Payments; Disputed Amounts. We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it as an accommodation to you without losing or waiving any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to** Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.

**1.13. Returned Payment Fee.** If a payment is rejected, returned or dishonored, for any reason, we may assess a Returned Payment Fee in the amount of $20, which fee will be in addition to any Late Fee that may be due.

**1.14. Events of Default.** You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.12 or claim that a debit transaction pursuant to Section 1.12 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture, or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign, or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take, by foreclosure, seizure, repossession, receivership, or otherwise, any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner. Collectively, the preceding items (i) through (xiv) are "Events of Default."

**1.15. Our Rights upon Default.** Upon default, we may demand the immediate payment of all amounts owed us, suspend your ability to obtain further Payment Advances or Loans, and initiate a Claim against Merchant and Owner. We may also manually initiate one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.

**1.16. Attorneys' Fees and Collection Costs.** To the extent not prohibited by applicable law, Merchant or Owner shall pay us, on demand, any and all expenses, including, but not limited to, arbitration filing and other fees, collection costs, attorneys' fees, and all other expenses of a like or unlike nature, which may be expended by us to obtain or enforce payment obligations of Merchant or guarantee obligations of Owner.

**1.17. Limitation of Liability.** In no event shall our aggregate liability for any Claim arising under this Agreement (whether in contract, tort, warranty or otherwise) exceed the total of Fees paid by Merchant in the twelve (12) months preceding the date that the most recent Claim arose. Notwithstanding anything contained in this Agreement to the contrary, and except as expressly prohibited by applicable law, no Party to this Agreement shall be liable to another Party for any indirect, special, incidental, consequential, punitive, or exemplary damages of any kind (including without limitation, lost revenues, loss of profits, or loss of business), arising from this Agreement or relating to the obligations hereunder, even if advised of such potential damages.

**1.18. Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**II. CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE**

**2.1. SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO**

DSP 805-218

ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN, OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Case 1:1-cv-11976-GAO Document 44-43 Filed 09/23/19 Page 220 of 413

**2.2. Broad Meaning of "Claims."** The term "Claims" in this Agreement is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement based upon contract, tort, fraud, statute, regulation, common law and equity, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of any obligation arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration section or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**2.3. Arbitration.** All Claims shall be resolved through arbitration pursuant to this section rather than by litigation. Claims will be decided by a neutral arbitrator. No Party will have the right to participate in a representative capacity or as a member of any class pertaining to any Claim subject to arbitration. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration. The arbitrator's authority is limited to Claims between the Parties to this Agreement. Claims may not be consolidated unless all Parties agree, in writing. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

Arbitration herein is governed by the Federal Arbitration Act ("FAA") and the selected arbitration organization's rules in effect when the Claim is filed. Before beginning arbitration, the Party making a Claim shall send a Notice of Claim to the other. Claims will be referred to either JAMS (www.jamsadr.com) or American Arbitration Association (www.adr.org) as selected by the party making the Claim. Claims may also be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the FAA, 9 U.S.C. §§ 1-16.

If a Claim is for $10,000 or less, Merchant or Owner may choose whether the arbitration will be conducted solely based on documents, through a telephonic hearing, or by an in-person hearing. The arbitrator will give a brief written explanation of the award. The arbitrator's award will be final and binding except for any appeal right provided for the FAA. A Party will have 30 days to appeal the award by notifying the arbitration organization and all Parties in writing. The organization will appoint a three-arbitrator panel to decide, anew, by majority vote based on written submissions, any aspect of the decision objected to. Judgment upon any award may be entered in any court having jurisdiction.

You will be responsible for paying your share of any initial arbitration fee (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought the Claim in court. We will be responsible for advancing any additional arbitration fees for an original Claim. We may seek reimbursement of any fees advanced as a cost or fee under Section 1.16 in the event we obtain an award against you or Owner. Any costs of an Appeal will be borne by each Party with no advancement from us and we will seek reimbursement of those fees under Section 1.16.

## III. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**3.1. Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, voluntary or involuntary bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**3.2. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**3.3. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such

information as Bank may request from time to time.

**3.4. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**3.5. Compliance with Laws and Regulations.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**3.6. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**3.7. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**3.8. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**3.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**3.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**3.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**3.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## IV. ADDITIONAL TERMS

**4.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**4.2. Financing Statements.** Merchant understands and agrees that Bank may at any time file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend, or continue any interest granted in Section 4.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to affect the filing or continuation of any such filings.

**4.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true or accurate and complete, or in the event of a breach by any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 1.11 of this Agreement is primary, direct, and unconditional, and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner. Merchant and Owner hereby waive any and all defenses to liability under this Agreement other than payment in full.

**4.4. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**4.5. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**4.6. Transfer and Assignment.** We reserve the right to sell, transfer, or assign all or any portion of our interest in this Agreement to another entity or person and Merchant and Owner hereby knowingly consent to such sale, transfer, or assignment. This Agreement, and the rights and obligations under this Agreement, may not be assigned by Merchant or Owner (including by operation of law) without our prior written consent and any purported assignment in violation of the foregoing shall be void ab initio.

**4.7. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## V. MISCELLANEOUS

**5.1. Modifications; Amendments; Construction.** No modification, amendment, or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected, such execution by all parties being an express prerequisite to enforceability. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**5.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known physical address or electronic mail address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357</u>. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**5.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**5.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**5.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**5.6. Governing Law Consent to Jurisdiction and Venue. With the exception of Section II above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Such laws will govern the legality, enforceability and interpretation of this Agreement. Merchant and Owner understand and agree that Bank is located in Utah and Loan is issued in Utah. Merchant and Owner agree that these laws apply no matter where Merchant or Owner lives, is domiciled, or made this Agreement.

**5.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**5.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**5.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**5.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**5.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**5.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**5.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 5.13 "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**5.14. In Case of Errors or Questions about Your Account Summary**

If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first

Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

**DSP 805-223**

## Kabbage Business Loan Agreement

**Loan Amount: $30,100.00**
**Merchant Information**
**Account Number: 27791**
**Merchant: NRO Boston LLC**
**Owner: alice indelicato**
**Marketplaces: AuthorizeNET, Bigcommerce, ACH, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit**
**Recipient: alice indelicato**

**Document Creation Date/Time: Nov 11, 2015 06:38 AM Eastern**
**Lender:** Celtic Bank Salt Lake City, Utah
**Fees**
**Late Fee: Up to $100**
**Returned Payment Fee: Up to $20**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above. Celtic Bank, Merchant and Owner may be referred to as a "Party" or collectively as "Parties" herein.

☑ By checking this box Merchant or Owner understand that it has the responsibility to read this Agreement and have had an opportunity to do so.

☑ By checking this box Merchant or Owner also agree that the parties included in this Agreement intend to authenticate this writing, agree to all its terms, and electronically sign this Agreement with the same force and effect as a manual signature.

---

*Consent to Electronic Disclosure.*

☑ **By checking this box** you confirm that you can access transaction information by visiting www.kabbage.com and logging in and You agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. Kabbage will provide electronic copies of periodic statements and Subsequent Disclosures on Kabbage's web site. To access, view and retain electronic disclosures on Kabbage's web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0 or higher. By clicking the "Submit" button on your application, you acknowledge that you are able to access Kabbage's website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting Kabbage at Kabbage Business Loan-Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting Kabbage in the same manner. If you withdraw your consent to electronic disclosures, Kabbage may elect to terminate the relationship with you. You agree to provide Kabbage with your current e-mail address for notices. If your e-mail address changes, you must send Kabbage a notice of the new address by writing to Kabbage at least five days before the effective date of the change at Kabbage Email Address Change, P.O. Box 77081, Atlanta, GA 30357.

---

We are not a party to any purchase transaction between you and either a recipient of the proceeds of a Loan or a merchant accepting a payment card onto which the proceeds of a Loan was loaded (either, a "Recipient"). Consequently, any disputes or concerns you have regarding your purchases from/transactions with or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases or transactions.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

## I. BUSINESS LOAN

**1.1. Business Loan.** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan to us or our order, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the

details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts (the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

<u>Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge, and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge, and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.</u>

You agree to notify us within five (5) business days if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**1.2 .Distribution of Proceeds.** Proceeds of the Loan can be distributed to you in one of four methods that you hereby elect:

a. via automated clearing house in one-to-three business days to a business's checking account registered on your established Kabbage profile;

b. to a PayPal Account registered on your established Kabbage profile;

c. via a valid, non-expired debit card registered on your established Kabbage profile that is linked to business checking account, **subject to a Debit Card Express Fee of $24.95 per disbursement** that will be assessed to your account and payable in full in addition to your next Minimum Monthly Payment under Section 1.5 below; or

d. onto a MasterCard-branded prepaid debit card issued under the Kabbage Card Program (the "Card"). You must elect and qualify to participate in the Kabbage Card Program and, if approved, disbursement of Loan proceeds via the Card will be subject to additional terms and conditions as set forth in the Kabbage Card Program Terms and Conditions by and among you, Kabbage and the Bank that issues the Card, which can be found at app.kabbage.com/CardRegistration/TermsAndConditions In addition, participants in the Kabbage Card Program will be subject to additional terms and conditions imposed by Kabbage as set forth on Kabbage' s website. Each disbursement via a transaction under the Kabbage Card Program will constitute a separate extension of credit, with each disbursement constituting a Loan for a separate six (6) month Term. Disbursements shall be, in the aggregate, limited to the total amount of the line of credit for which you are approved.

**1.3. Term.** This Loan has a twelve (12) month term. Monthly payments are due as set forth in the payment schedule below.

**1.4. Cost.**
We will impose a Cost for each month or partial month that any portion of Loan proceeds remains outstanding. The portion of Loan proceeds deemed to be outstanding is the amount of proceeds disbursed: (i) through ACH, (ii) PayPal, (iii) via a debit card (iv), or via the MasterCard-branded prepaid debit card issued under the Kabbage Card Program. You may avoid additional Costs by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Costs at the same rate after maturity if any portion of the Loan remains unpaid.

**Cost Schedule**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $1,128.75 |
| Second Monthly Anniversary Date | $2,257.50 |

| | $3,386.25 |
|---|---|

| | |
|---|---|
| Third Monthly Anniversary Date | $3,386.25 |
| Fourth Monthly Anniversary Date | |
| Fifth Monthly Anniversary Date | $5,643.75 |
| Sixth Monthly Anniversary Date | $6,772.50 |
| Seventh Monthly Anniversary Date | $7,073.50 |
| Eighth Monthly Anniversary Date | $7,374.50 |
| Ninth Monthly Anniversary Date | $7,675.50 |
| Tenth Monthly Anniversary Date | $7,976.50 |
| Eleventh Monthly Anniversary Date | $8,277.50 |
| Twelfth Monthly Anniversary Date | $8,578.50 |

**1.6. Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $3,637.09* | 3.75 % |
| Second Payment Due Date | $3,637.09* | 3.75 % |
| Third Payment Due Date | $3,637.09* | 3.75 % |
| Fourth Payment Due Date | $3,637.09* | 3.75 % |
| Fifth Payment Due Date | $3,637.09* | 3.75 % |
| Sixth Payment Due Date | $3,637.09* | 3.75 % |
| Seventh Payment Due Date | $2,809.34* | 1.00 % |
| Eighth Payment Due Date | $2,809.34* | 1.00 % |
| Ninth Payment Due Date | $2,809.34* | 1.00 % |
| Tenth Payment Due Date | $2,809.34* | 1.00 % |
| Eleventh Payment Due Date | $2,809.34* | 1.00 % |
| Twelfth Payment Due Date | $2,809.26* | 1.00 % |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**1.7. Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.12 (Payments) below.

    **Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- $10 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- $35 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- $100 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**1.8. Application of Payments.** Payments received will be applied first to billed Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment

due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**1.9. Merchant's Contractual Covenants.** You agree:

i. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

ii. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

iii. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

iv. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

v. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

vi. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

vii. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.12 below);

viii. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

ix. To make payments to us (in U.S. dollars) on the applicable "Payment Due Date"

x. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

xi. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

xii. Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

xiii. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

xiv. Not to terminate your authorization of scheduled debits in Section 1.12, stop payment on any debit authorized pursuant to Section 1.12, claim that a debit transaction pursuant to Section 1. 12 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.12; and

xv. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account. Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**1.10. Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**1.11. Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants and Payment of Outstanding Loan Amounts.** Owner personally and unconditionally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above and Merchant's payment obligations herein. Specifically, Owner guarantees payments of all amounts owed by Merchant and that such payments will be made strictly in accordance with the terms of any and all Loans of Merchant. Owner's guarantee of payment hereunder is independent of the Merchant's obligation of payment and a separate Claim may be brought against the Owner to enforce this Loan, whether or not any Claim is made against Merchant. **The liability of Owner hereunder is irrevocable, continuing, absolute and unconditional.**

**1.12. Payments.**

   i. Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment; provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

   ii. Payment Failure. If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (A) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (B) debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full, (C) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (D) pursue any and all other remedies available to us.

   iii. Account Maintenance. You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

   iv. Terminating or Disputing Authorization; Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit, or claiming that a debit transaction pursuant to this Section 1.11 is unauthorized, is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

   v. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

   vi. Credit Card Transactions. We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

   vii. Other Payments. You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: **Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357**. You may also call Customer Service to arrange payments by

overnight delivery, telephone, or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and possibly for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

viii. Acceptance of Late and Partial Payments; Disputed Amounts. We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it as an accommodation to you without losing or waiving any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**1.13. Returned Payment Fee.** If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**1.14. Events of Default.** You will be in default if any of the following happen:

i. you fail to make any payment under this Agreement when due;

ii. you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement;

iii. you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.12 or claim that a debit transaction pursuant to Section 1.12 is unauthorized;

iv. you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt;

v. any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished;

vi. a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held);

vii. you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture, or other combination without our prior written consent;

viii. you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign, or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same;

ix. any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading;

x. if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies;

xi. any creditor tries to take, by foreclosure, seizure, repossession, receivership, or otherwise, any of your property on or in which we have a lien or security interest;

xii. a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal;

xiii. an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within

xiv.  any of the events described in this default section occurs with respect to Owner.

Collectively, the preceding items (i) through (xiv) are "Events of Default."

**1.15. Our Rights upon Default.** Upon default, we may demand the immediate payment of all amounts owed us, suspend your ability to obtain further Payment Advances or Loans, and initiate a Claim against Merchant and Owner. We may also manually initiate one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.

**1.16. Attorneys' Fees and Collection Costs.** To the extent not prohibited by applicable law, Merchant or Owner shall pay us, on demand, any and all expenses, including, but not limited to, arbitration filing and other fees, collection costs, attorneys' fees, and all other expenses of a like or unlike nature, which may be expended by us to obtain or enforce payment obligations of Merchant or guarantee obligations of Owner.

**1.17. Limitation of Liability.** In no event shall our aggregate liability for any Claim arising under this Agreement (whether in contract, tort, warranty or otherwise) exceed the total of Fees paid by Merchant in the twelve (12) months preceding the date that the most recent Claim arose. Notwithstanding anything contained in this Agreement to the contrary, and except as expressly prohibited by applicable law, no Party to this Agreement shall be liable to another Party for any indirect, special, incidental, consequential, punitive, or exemplary damages of any kind (including without limitation, lost revenues, loss of profits, or loss of business), arising from this Agreement or relating to the obligations hereunder, even if advised of such potential damages.

**1.18. Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

## II. CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE

**2.1. SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

**2.2. Broad Meaning of "Claims."** The term "Claims" in this Agreement is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement based upon contract, tort, fraud, statute, regulation, common law and equity, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of any obligation arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration section or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**2.3. Arbitration.** All Claims shall be resolved through arbitration pursuant to this section rather than by litigation. Claims will be decided by a neutral arbitrator. **No Party will have the right to participate in a representative capacity or as a member of any class pertaining to any Claim subject to arbitration.** Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration. The arbitrator's authority is limited to Claims between the Parties to this Agreement. Claims may not be consolidated unless all Parties agree, in writing. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

**DSP 805-230**

Arbitration herein is governed by the Federal Arbitration Act ("FAA") and the selected arbitration organization's rules in effect when the Claim is filed. Before beginning arbitration, the Party making a Claim shall send a Notice of Claim to the other. Claims will be referred to either JAMS (www.jamsadr.com) or american arbitration association (www.adr.org) as selected by the party making the claim. claims may also be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the faa, 9 u.s.c. §§ 1-16.

If a Claim is for $10,000 or less, Merchant or Owner may choose whether the arbitration will be conducted solely based on documents, through a telephonic hearing, or by an in-person hearing. The arbitrator will give a brief written explanation of the award. The arbitrator's award will be final and binding except for any appeal right provided for the FAA. A Party will have 30 days to appeal the award by notifying the arbitration organization and all Parties in writing. The organization will appoint a three-arbitrator panel to decide, anew, by majority vote based on written submissions, any aspect of the decision objected to. Judgment upon any award may be entered in any court having jurisdiction.

You will be responsible for paying your share of any initial arbitration fee (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought the Claim in court. We will be responsible for advancing any additional arbitration fees for an original Claim. We may seek reimbursement of any fees advanced as a cost or fee under Section 1.16 in the event we obtain an award against you or Owner. Any costs of an Appeal will be borne by each Party with no advancement from us and we will seek reimbursement of those fees under Section 1.16.

## III. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**3.1. Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, voluntary or involuntary bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**3.2. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**3.3. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**3.4. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**3.5. Compliance with Laws and Regulations.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**3.6. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**3.7. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**3.8. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**3.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**3.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or

commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of a loan against or otherwise; purchase of credit against a Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**3.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**3.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## IV. ADDITIONAL TERMS

**4.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**4.2. Financing Statements.** Merchant understands and agrees that Bank may at any time file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend, or continue any interest granted in Section 4.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to affect the filing or continuation of any such filings.

**4.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 1.11 of this Agreement is primary, direct, and unconditional, and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner. Merchant and Owner hereby waive any and all defenses to liability under this Agreement other than payment in full.

**4.4. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**4.5. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**4.6. Transfer and Assignment.** We reserve the right to sell, transfer, or assign all or any portion of our interest in this Agreement to another entity, or person, and Merchant and Owner hereby knowingly consent to such sale, transfer, or assignment. This Agreement, and the rights and obligations under this Agreement, may not be assigned by Merchant or Owner (including by operation of law) without our prior written consent and any purported assignment in violation of the foregoing shall be void ab initio.

**4.7. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## V. MISCELLANEOUS

**5.1. Modifications; Amendments; Construction.** No modification, amendment, or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected, such execution by all parties being an express prerequisite to enforceability. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**5.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known physical address or electronic mail address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**5.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**5.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**5.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**5.6. Governing Law Consent to Jurisdiction and Venue. With the exception of Section II above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Such laws will govern the legality, enforceability and interpretation of this Agreement. Merchant and Owner understand and agree that Bank is located in Utah and Loan is issued in Utah. Merchant and Owner agree that these laws apply no matter where Merchant or Owner lives, is domiciled, or made this Agreement.

**5.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**5.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**5.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**5.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A

PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**5.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**5.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**5.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 5.13 "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**5.14. In Case of Errors or Questions about Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.


If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

## Kabbage Business Loan Agreement

**Loan Amount: $24,100.00**
**Merchant Information**
**Account Number: 27791**
**Merchant: NRO Boston LLC**
**Owner: alice indelicato**
**Marketplaces: AuthorizeNET, Bigcommerce,**
**ACH, ACH, ACH, ACH, Twitter,**
**GoogleAnalytics, Intuit**
**Recipient: alice indelicato**

**Document Creation Date/Time: Dec 12, 2015**
**10:12 AM Eastern**
**Lender: Celtic Bank Salt Lake City, Utah**
**Fees**
**Late Fee: Up to $100**
**Returned Payment Fee: Up to $20**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above. Celtic Bank, Merchant and Owner may be referred to as a "Party" or collectively as "Parties" herein.

☑ By checking this box Merchant or Owner understand that it has the responsibility to read this Agreement and have had an opportunity to do so.

☑ By checking this box Merchant or Owner also agree that the parties included in this Agreement intend to authenticate this writing, agree to all its terms, and electronically sign this Agreement with the same force and effect as a manual signature.

---

*Consent to Electronic Disclosure.*

☑ **By checking this box** you confirm that you can access transaction information by visiting www.kabbage.com and logging in and You agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. Kabbage will provide electronic copies of periodic statements and Subsequent Disclosures on Kabbage's web site. To access, view and retain electronic disclosures on Kabbage's web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0 or higher. By clicking the "Submit" button on your application, you acknowledge that you are able to access Kabbage's website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting Kabbage at Kabbage Business Loan-Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting Kabbage in the same manner. If you withdraw your consent to electronic disclosures, Kabbage may elect to terminate the relationship with you. You agree to provide Kabbage with your current e-mail address for notices. If your e-mail address changes, you must send Kabbage a notice of the new address by writing to Kabbage at least five days before the effective date of the change at Kabbage Email Address Change, P.O. Box 77081, Atlanta, GA 30357.

---

We are not a party to any purchase transaction between you and either a recipient of the proceeds of a Loan or a merchant accepting a payment card onto which the proceeds of a Loan was loaded (either, a "Recipient"). Consequently, any disputes or concerns you have regarding your purchases from/transactions with or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases or transactions.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

## I. BUSINESS LOAN

**1.1. Business Loan.** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan to us or our order, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the

details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts (details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

<u>Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge, and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge, and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.</u>

You agree to notify us within five (5) business days if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**1.2 .Distribution of Proceeds.** Proceeds of the Loan can be distributed to you in one of four methods that you hereby elect:

a. via automated clearing house in one-to-three business days to a business's checking account registered on your established Kabbage profile;

b. to a PayPal Account registered on your established Kabbage profile;

c. via a valid, non-expired debit card registered on your established Kabbage profile that is linked to business checking account, **subject to a Debit Card Express Fee of $24.95 per disbursement** that will be assessed to your account and payable in full in addition to your next Minimum Monthly Payment under Section 1.5 below; or

d. onto a MasterCard-branded prepaid debit card issued under the Kabbage Card Program (the "Card"). You must elect and qualify to participate in the Kabbage Card Program and, if approved, disbursement of Loan proceeds via the Card will be subject to additional terms and conditions as set forth in the Kabbage Card Program Terms and Conditions by and among you, Kabbage and the Bank that issues the Card, which can be found at app.kabbage.com/CardRegistration/TermsAndConditions In addition, participants in the Kabbage Card Program will be subject to additional terms and conditions imposed by Kabbage as set forth on Kabbage' s website. Each disbursement via a transaction under the Kabbage Card Program will constitute a separate extension of credit, with each disbursement constituting a Loan for a separate six (6) month Term. Disbursements shall be, in the aggregate, limited to the total amount of the line of credit for which you are approved.

**1.3. Term.** This Loan has a twelve (12) month term. Monthly payments are due as set forth in the payment schedule below.

**1.4. Cost.**
We will impose a Cost for each month or partial month that any portion of Loan proceeds remains outstanding. The portion of Loan proceeds deemed to be outstanding is the amount of proceeds disbursed: (i) through ACH, (ii) PayPal, (iii) via a debit card (iv), or via the MasterCard-branded prepaid debit card issued under the Kabbage Card Program. You may avoid additional Costs by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Costs at the same rate after maturity if any portion of the Loan remains unpaid.

**Cost Schedule**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $903.75 |
| Second Monthly Anniversary Date | $1,807.50 |

| | |
|---|---|
| Third Monthly Anniversary Date | $2,711.25 |
| Fourth Monthly Anniversary Date | $3,976.00 |
| Fifth Monthly Anniversary Date | $4,518.75 |
| Sixth Monthly Anniversary Date | $5,422.50 |
| Seventh Monthly Anniversary Date | $5,663.50 |
| Eighth Monthly Anniversary Date | $5,904.50 |
| Ninth Monthly Anniversary Date | $6,145.50 |
| Tenth Monthly Anniversary Date | $6,386.50 |
| Eleventh Monthly Anniversary Date | $6,627.50 |
| Twelfth Monthly Anniversary Date | $6,868.50 |

**1.6. Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $2,912.09* | 3.75 % |
| Second Payment Due Date | $2,912.09* | 3.75 % |
| Third Payment Due Date | $2,912.09* | 3.75 % |
| Fourth Payment Due Date | $2,912.09* | 3.75 % |
| Fifth Payment Due Date | $2,912.09* | 3.75 % |
| Sixth Payment Due Date | $2,912.09* | 3.75 % |
| Seventh Payment Due Date | $2,249.34* | 1.00 % |
| Eighth Payment Due Date | $2,249.34* | 1.00 % |
| Ninth Payment Due Date | $2,249.34* | 1.00 % |
| Tenth Payment Due Date | $2,249.34* | 1.00 % |
| Eleventh Payment Due Date | $2,249.34* | 1.00 % |
| Twelfth Payment Due Date | $2,249.26* | 1.00 % |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**1.7. Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.12 (Payments) below.

 **Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

 - $10 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

 - $35 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

 - $100 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**1.8. Application of Payments.** Payments received will be applied first to billed Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment

due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**1.9. Merchant's Contractual Covenants.** You agree:

i. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

ii. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

iii. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

iv. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

v. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

vi. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

vii. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.12 below);

viii. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

ix. To make payments to us (in U.S. dollars) on the applicable "Payment Due Date"

x. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

xi. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

xii. Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

xiii. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

xiv. Not to terminate your authorization of scheduled debits in Section 1.12, stop payment on any debit authorized pursuant to Section 1.12, claim that a debit transaction pursuant to Section 1. 12 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.12; and

xv. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account. Collectively, the preceding items (i) through (xv) are your <u>"Merchant Contractual Covenants"</u>.

**1.10. Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**1.11. Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants and Payment of Outstanding Loan Amounts.** Owner personally and unconditionally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above and Merchant's payment obligations herein. Specifically, Owner guarantees payments of all amounts owed by Merchant and that such payments will be made strictly in accordance with the terms of any and all Loans of Merchant. Owner's guarantee of payment hereunder is independent of the Merchant's obligation of payment and a separate Claim may be brought against the Owner to enforce this Loan, whether or not any Claim is made against Merchant. **The liability of Owner hereunder is irrevocable, continuing, absolute and unconditional.**

**1.12. Payments.**

i. Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment; provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

ii. Payment Failure. If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (A) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (B) debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full, (C) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (D) pursue any and all other remedies available to us.

iii. Account Maintenance. You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

iv. Terminating or Disputing Authorization; Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit, or claiming that a debit transaction pursuant to this Section 1.11 is unauthorized, is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

v. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

vi. Credit Card Transactions. We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

vii. Other Payments. You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: **Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357.** You may also call Customer Service to arrange payments by

overnight delivery, telephone, or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and posting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

viii. Acceptance of Late and Partial Payments; Disputed Amounts. We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it as an accommodation to you without losing or waiving any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**1.13. Returned Payment Fee.** If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**1.14. Events of Default.** You will be in default if any of the following happen:

i. you fail to make any payment under this Agreement when due;

ii. you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement;

iii. you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.12 or claim that a debit transaction pursuant to Section 1.12 is unauthorized;

iv. you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt;

v. any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished;

vi. a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held);

vii. you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture, or other combination without our prior written consent;

viii. you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign, or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same;

ix. any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading;

x. if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies;

xi. any creditor tries to take, by foreclosure, seizure, repossession, receivership, or otherwise, any of your property on or in which we have a lien or security interest;

xii. a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal;

xiii. an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within

DSP 805-240

thirty (30) days or stayed pending appeal; or

xiv.   any of the events described in this default section occurs with respect to Owner.

Collectively, the preceding items (i) through (xiv) are "Events of Default."

**1.15. Our Rights upon Default.** Upon default, we may demand the immediate payment of all amounts owed us, suspend your ability to obtain further Payment Advances or Loans, and initiate a Claim against Merchant and Owner. We may also mutually initiate one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.

**1.16. Attorneys' Fees and Collection Costs.** To the extent not prohibited by applicable law, Merchant or Owner shall pay us, on demand, any and all expenses, including, but not limited to, arbitration filing and other fees, collection costs, attorneys' fees, and all other expenses of a like or unlike nature, which may be expended by us to obtain or enforce payment obligations of Merchant or guarantee obligations of Owner.

**1.17. Limitation of Liability.** In no event shall our aggregate liability for any Claim arising under this Agreement (whether in contract, tort, warranty or otherwise) exceed the total of Fees paid by Merchant in the twelve (12) months preceding the date that the most recent Claim arose. Notwithstanding anything contained in this Agreement to the contrary, and except as expressly prohibited by applicable law, no Party to this Agreement shall be liable to another Party for any indirect, special, incidental, consequential, punitive, or exemplary damages of any kind (including without limitation, lost revenues, loss of profits, or loss of business), arising from this Agreement or relating to the obligations hereunder, even if advised of such potential damages.

**1.18. Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

## II. CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE

**2.1. SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

**2.2. Broad Meaning of "Claims."** The term "Claims" in this Agreement is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement based upon contract, tort, fraud, statute, regulation, common law and equity, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of any obligation arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration section or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**2.3. Arbitration.** All Claims shall be resolved through arbitration pursuant to this section rather than by litigation. Claims will be decided by a neutral arbitrator. **No Party will have the right to participate in a representative capacity or as a member of any class pertaining to any Claim subject to arbitration.** Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration. The arbitrator's authority is limited to Claims between the Parties to this Agreement. Claims may not be consolidated unless all Parties agree, in writing. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

Arbitration herein is governed by the Federal Arbitration Act ("FAA") and the selected arbitration organization's rules in effect when the Claim is filed. Before beginning arbitration, the Party making a Claim shall send a Notice of Claim to the other. Claims will be referred to either JAMS (www.jamsadr.com) or american arbitration association (www.adr.org) as selected by the party making the claim. claims may also be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the faa, 9 u.s.c. §§ 1-16.

If a Claim is for $10,000 or less, Merchant or Owner may choose whether the arbitration will be conducted solely based on documents, through a telephonic hearing, or by an in-person hearing. The arbitrator will give a brief written explanation of the award. The arbitrator's award will be final and binding except for any appeal right provided for the FAA. A Party will have 30 days to appeal the award by notifying the arbitration organization and all Parties in writing. The organization will appoint a three-arbitrator panel to decide, anew, by majority vote based on written submissions, any aspect of the decision objected to. Judgment upon any award may be entered in any court having jurisdiction.

You will be responsible for paying your share of any initial arbitration fee (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought the Claim in court. We will be responsible for advancing any additional arbitration fees for an original Claim. We may seek reimbursement of any fees advanced as a cost or fee under Section 1.16 in the event we obtain an award against you or Owner. Any costs of an Appeal will be borne by each Party with no advancement from us and we will seek reimbursement of those fees under Section 1.16.

## III. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**3.1. Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, voluntary or involuntary bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**3.2. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**3.3. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**3.4. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**3.5. Compliance with Laws and Regulations.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**3.6. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**3.7. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**3.8. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**3.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**3.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or

commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of a loan against or other recourse of credit against a Merchant or assume a future credit card or online sales with any party other than Bank.

**3.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**3.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## IV. ADDITIONAL TERMS

**4.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**4.2. Financing Statements.** Merchant understands and agrees that Bank may at any time file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend, or continue any interest granted in Section 4.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to affect the filing or continuation of any such filings.

**4.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 1.11 of this Agreement is primary, direct, and unconditional, and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner. Merchant and Owner hereby waive any and all defenses to liability under this Agreement other than payment in full.

**4.4. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**4.5. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**4.6. Transfer and Assignment.** We reserve the right to sell, transfer, or assign all or any portion of our interest in this Agreement to another entity, or person, and Merchant and Owner hereby knowingly consent to such sale, transfer, or assignment. This Agreement, and the rights and obligations under this Agreement, may not be assigned by Merchant or Owner (including by operation of law) without our prior written consent and any purported assignment in violation of the foregoing shall be void ab initio.

**4.7. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## V. MISCELLANEOUS

**5.1. Modifications; Amendments; Construction.** No modification, amendment, or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected, such execution by all parties being an express prerequisite to enforceability. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**5.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known physical address or electronic mail address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**5.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**5.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**5.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**5.6. Governing Law Consent to Jurisdiction and Venue. With the exception of Section II above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Such laws will govern the legality, enforceability and interpretation of this Agreement. Merchant and Owner understand and agree that Bank is located in Utah and Loan is issued in Utah. Merchant and Owner agree that these laws apply no matter where Merchant or Owner lives, is domiciled, or made this Agreement.

**5.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**5.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**5.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**5.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A

PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**5.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**5.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**5.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 5.13 "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**5.14. In Case of Errors or Questions about Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

## Kabbage Business Loan Agreement

**Loan Amount: $24,700.00**
**Merchant Information**
**Account Number: 27791**
**Merchant: NRO Boston LLC**
**Owner: alice indelicato**
**Marketplaces: AuthorizeNET, Bigcommerce, ACH, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit**
**Recipient: alice indelicato**

**Document Creation Date/Time: Jan 11, 2016 09:52 AM Eastern**
**Lender: Celtic Bank Salt Lake City, Utah**
**Fees**
**Late Fee: Up to $100**
**Returned Payment Fee: Up to $20**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above. Celtic Bank, Merchant and Owner may be referred to as a "Party" or collectively as "Parties" herein.

☑ By checking this box Merchant or Owner understand that it has the responsibility to read this Agreement and have had an opportunity to do so.

☑ By checking this box Merchant or Owner also agree that the parties included in this Agreement intend to authenticate this writing, agree to all its terms, and electronically sign this Agreement with the same force and effect as a manual signature.

---

*Consent to Electronic Disclosure.*

☑ **By checking this box** you confirm that you can access transaction information by visiting www.kabbage.com and logging in and You agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. Kabbage will provide electronic copies of periodic statements and Subsequent Disclosures on Kabbage's web site. To access, view and retain electronic disclosures on Kabbage's web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0 or higher. By clicking the "Submit" button on your application, you acknowledge that you are able to access Kabbage's website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting Kabbage at Kabbage Business Loan-Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting Kabbage in the same manner. If you withdraw your consent to electronic disclosures, Kabbage may elect to terminate the relationship with you. You agree to provide Kabbage with your current e-mail address for notices. If your e-mail address changes, you must send Kabbage a notice of the new address by writing to Kabbage at least five days before the effective date of the change at Kabbage Email Address Change, P.O. Box 77081, Atlanta, GA 30357.

---

We are not a party to any purchase transaction between you and either a recipient of the proceeds of a Loan or a merchant accepting a payment card onto which the proceeds of a Loan was loaded (either, a "Recipient"). Consequently, any disputes or concerns you have regarding your purchases from/transactions with or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases or transactions.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

## I. BUSINESS LOAN

**1.1. Business Loan.** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan to us or our order, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the

details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts (the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge, and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge, and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us within five (5) business days if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**1.2 .Distribution of Proceeds.** Proceeds of the Loan can be distributed to you in one of four methods that you hereby elect:

a. via automated clearing house in one-to-three business days to a business's checking account registered on your established Kabbage profile;

b. to a PayPal Account registered on your established Kabbage profile;

c. via a valid, non-expired debit card registered on your established Kabbage profile that is linked to business checking account, **subject to a Debit Card Express Fee of $24.95 per disbursement** that will be assessed to your account and payable in full in addition to your next Minimum Monthly Payment under Section 1.5 below; or

d. onto a MasterCard-branded prepaid debit card issued under the Kabbage Card Program (the "Card"). You must elect and qualify to participate in the Kabbage Card Program and, if approved, disbursement of Loan proceeds via the Card will be subject to additional terms and conditions as set forth in the Kabbage Card Program Terms and Conditions by and among you, Kabbage and the Bank that issues the Card, which can be found at app.kabbage.com/CardRegistration/TermsAndConditions In addition, participants in the Kabbage Card Program will be subject to additional terms and conditions imposed by Kabbage as set forth on Kabbage' s website. Each disbursement via a transaction under the Kabbage Card Program will constitute a separate extension of credit, with each disbursement constituting a Loan for a separate six (6) month Term. Disbursements shall be, in the aggregate, limited to the total amount of the line of credit for which you are approved.

**1.3. Term.** This Loan has a twelve (12) month term. Monthly payments are due as set forth in the payment schedule below.

**1.4. Cost.**
We will impose a Cost for each month or partial month that any portion of Loan proceeds remains outstanding. The portion of Loan proceeds deemed to be outstanding is the amount of proceeds disbursed: (i) through ACH, (ii) PayPal, (iii) via a debit card (iv), or via the MasterCard-branded prepaid debit card issued under the Kabbage Card Program. You may avoid additional Costs by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Costs at the same rate after maturity if any portion of the Loan remains unpaid.

**Cost Schedule**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $926.25 |
| Second Monthly Anniversary Date | $1,852.50 |

| | |
|---|---|
| Third Monthly Anniversary Date | $2,778.75 |
| Fourth Monthly Anniversary Date | |
| Fifth Monthly Anniversary Date | $4,631.25 |
| Sixth Monthly Anniversary Date | $5,557.50 |
| Seventh Monthly Anniversary Date | $5,804.50 |
| Eighth Monthly Anniversary Date | $6,051.50 |
| Ninth Monthly Anniversary Date | $6,298.50 |
| Tenth Monthly Anniversary Date | $6,545.50 |
| Eleventh Monthly Anniversary Date | $6,792.50 |
| Twelfth Monthly Anniversary Date | $7,039.50 |

**1.6. Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $2,984.59* | 3.75 % |
| Second Payment Due Date | $2,984.59* | 3.75 % |
| Third Payment Due Date | $2,984.59* | 3.75 % |
| Fourth Payment Due Date | $2,984.59* | 3.75 % |
| Fifth Payment Due Date | $2,984.59* | 3.75 % |
| Sixth Payment Due Date | $2,984.59* | 3.75 % |
| Seventh Payment Due Date | $2,305.34* | 1.00 % |
| Eighth Payment Due Date | $2,305.34* | 1.00 % |
| Ninth Payment Due Date | $2,305.34* | 1.00 % |
| Tenth Payment Due Date | $2,305.34* | 1.00 % |
| Eleventh Payment Due Date | $2,305.34* | 1.00 % |
| Twelfth Payment Due Date | $2,305.26* | 1.00 % |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**1.7. Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.12 (Payments) below.

   **Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- $10 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- $35 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- $100 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**1.8. Application of Payments.** Payments received will be applied first to billed Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment

due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**1.9. Merchant's Contractual Covenants.** You agree:

    i. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

    ii. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

    iii. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

    iv. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

    v. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

    vi. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

    vii. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.12 below);

    viii. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

    ix. To make payments to us (in U.S. dollars) on the applicable "Payment Due Date"

    x. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

    xi. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

    xii. Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

    xiii. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

    xiv. Not to terminate your authorization of scheduled debits in Section 1.12, stop payment on any debit authorized pursuant to Section 1.12, claim that a debit transaction pursuant to Section 1. 12 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.12; and

    xv. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account. Collectively, the preceding items (i) through (xv) are your <u>"Merchant Contractual Covenants"</u>.

**1.10. Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**1.11. Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants and Payment of Outstanding Loan Amounts.** Owner personally and unconditionally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above and Merchant's payment obligations herein. Specifically, Owner guarantees payments of all amounts owed by Merchant and that such payments will be made strictly in accordance with the terms of any and all Loans of Merchant. Owner's guarantee of payment hereunder is independent of the Merchant's obligation of payment and a separate Claim may be brought against the Owner to enforce this Loan, whether or not any Claim is made against Merchant. **The liability of Owner hereunder is irrevocable, continuing, absolute and unconditional.**

**1.12. Payments.**

i. Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment; provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

ii. Payment Failure. If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (A) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (B) debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full, (C) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (D) pursue any and all other remedies available to us.

iii. Account Maintenance. You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

iv. Terminating or Disputing Authorization; Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit, or claiming that a debit transaction pursuant to this Section 1.11 is unauthorized, is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

v. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

vi. Credit Card Transactions. We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

vii. Other Payments. You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: **Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357**. You may also call Customer Service to arrange payments by

DSP 805-250

overnight delivery, telephone, or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

viii. Acceptance of Late and Partial Payments; Disputed Amounts. We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it as an accommodation to you without losing or waiving any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**1.13. Returned Payment Fee.** If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**1.14. Events of Default.** You will be in default if any of the following happen:

i. you fail to make any payment under this Agreement when due;

ii. you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement;

iii. you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.12 or claim that a debit transaction pursuant to Section 1.12 is unauthorized;

iv. you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt;

v. any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished;

vi. a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held);

vii. you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture, or other combination without our prior written consent;

viii. you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign, or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same;

ix. any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading;

x. if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies;

xi. any creditor tries to take, by foreclosure, seizure, repossession, receivership, or otherwise, any of your property on or in which we have a lien or security interest;

xii. a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal;

xiii. an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within

xiv. any of the events described in this default section occurs with respect to Owner.

Collectively, the preceding items (i) through (xiv) are "Events of Default."

**1.15. Our Rights upon Default.** Upon default, we may demand the immediate payment of all amounts owed us, suspend your ability to obtain further Payment Advances or Loans, and initiate a Claim against Merchant and Owner. We may also demand to initiate one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.

**1.16. Attorneys' Fees and Collection Costs.** To the extent not prohibited by applicable law, Merchant or Owner shall pay us, on demand, any and all expenses, including, but not limited to, arbitration filing and other fees, collection costs, attorneys' fees, and all other expenses of a like or unlike nature, which may be expended by us to obtain or enforce payment obligations of Merchant or guarantee obligations of Owner.

**1.17. Limitation of Liability.** In no event shall our aggregate liability for any Claim arising under this Agreement (whether in contract, tort, warranty or otherwise) exceed the total of Fees paid by Merchant in the twelve (12) months preceding the date that the most recent Claim arose. Notwithstanding anything contained in this Agreement to the contrary, and except as expressly prohibited by applicable law, no Party to this Agreement shall be liable to another Party for any indirect, special, incidental, consequential, punitive, or exemplary damages of any kind (including without limitation, lost revenues, loss of profits, or loss of business), arising from this Agreement or relating to the obligations hereunder, even if advised of such potential damages.

**1.18. Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

## II. CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE

**2.1. SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

**2.2. Broad Meaning of "Claims."** The term "Claims" in this Agreement is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement based upon contract, tort, fraud, statute, regulation, common law and equity, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of any obligation arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration section or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**2.3. Arbitration.** All Claims shall be resolved through arbitration pursuant to this section rather than by litigation. Claims will be decided by a neutral arbitrator. **No Party will have the right to participate in a representative capacity or as a member of any class pertaining to any Claim subject to arbitration.** Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration. The arbitrator's authority is limited to Claims between the Parties to this Agreement. Claims may not be consolidated unless all Parties agree, in writing. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

Arbitration herein is governed by the Federal Arbitration Act ("FAA") and the selected arbitration organization's rules in effect when the Claim is filed. Before beginning arbitration, the Party making a Claim shall send a Notice of Claim to the other. Claims will be referred to either JAMS (www.jamsadr.com) or american arbitration association (www.adr.org) as selected by the party making the claim. claims may also be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the faa, 9 u.s.c. §§ 1-16.

If a Claim is for $10,000 or less, Merchant or Owner may choose whether the arbitration will be conducted solely based on documents, through a telephonic hearing, or by an in-person hearing. The arbitrator will give a brief written explanation of the award. The arbitrator's award will be final and binding except for any appeal right provided for the FAA. A Party will have 30 days to appeal the award by notifying the arbitration organization and all Parties in writing. The organization will appoint a three-arbitrator panel to decide, anew, by majority vote based on written submissions, any aspect of the decision objected to. Judgment upon any award may be entered in any court having jurisdiction.

You will be responsible for paying your share of any initial arbitration fee (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought the Claim in court. We will be responsible for advancing any additional arbitration fees for an original Claim. We may seek reimbursement of any fees advanced as a cost or fee under Section 1.16 in the event we obtain an award against you or Owner. Any costs of an Appeal will be borne by each Party with no advancement from us and we will seek reimbursement of those fees under Section 1.16.

## III. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**3.1. Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, voluntary or involuntary bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**3.2. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**3.3. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**3.4. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**3.5. Compliance with Laws and Regulations.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**3.6. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**3.7. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**3.8. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**3.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**3.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or

commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the discount or purchase of credit against a Merchant or any similar or future credit card or online sales with any party other than Bank.

**3.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**3.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## IV. ADDITIONAL TERMS

**4.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**4.2. Financing Statements.** Merchant understands and agrees that Bank may at any time file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend, or continue any interest granted in Section 4.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to affect the filing or continuation of any such filings.

**4.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 1.11 of this Agreement is primary, direct, and unconditional, and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner. Merchant and Owner hereby waive any and all defenses to liability under this Agreement other than payment in full.

**4.4. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**4.5. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**4.6. Transfer and Assignment.** We reserve the right to sell, transfer, or assign all or any portion of our interest in this Agreement to another entity, or person, and Merchant and Owner hereby knowingly consent to such sale, transfer, or assignment. This Agreement, and the rights and obligations under this Agreement, may not be assigned by Merchant or Owner (including by operation of law) without our prior written consent and any purported assignment in violation of the foregoing shall be void ab initio.

**4.7. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## V. MISCELLANEOUS

**5.1. Modifications; Amendments; Construction.** No modification, amendment, or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected, such execution by all parties being an express prerequisite to enforceability. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**5.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known physical address or electronic mail address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**5.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**5.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**5.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**5.6. Governing Law Consent to Jurisdiction and Venue. With the exception of Section II above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Such laws will govern the legality, enforceability and interpretation of this Agreement. Merchant and Owner understand and agree that Bank is located in Utah and Loan is issued in Utah. Merchant and Owner agree that these laws apply no matter where Merchant or Owner lives, is domiciled, or made this Agreement.

**5.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**5.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**5.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**5.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A

PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**5.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**5.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**5.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 5.13 "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**5.14. In Case of Errors or Questions about Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

## Kabbage Business Loan Agreement

**Loan Amount: $20,800.00**
**Merchant Information**
**Account Number: 27791**
**Merchant: NRO Boston LLC**
**Owner: alice indelicato**
**Marketplaces: AuthorizeNET, Bigcommerce, ACH, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit**
**Recipient: alice indelicato**

**Document Creation Date/Time: Feb 11, 2016 06:40 AM Eastern**
**Lender: Celtic Bank Salt Lake City, Utah**
**Fees**
**Late Fee: Up to $100**
**Returned Payment Fee: Up to $20**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above. Celtic Bank, Merchant and Owner may be referred to as a "Party" or collectively as "Parties" herein.

☑ By checking this box Merchant or Owner understand that it has the responsibility to read this Agreement and have had an opportunity to do so.

☑ By checking this box Merchant or Owner also agree that the parties included in this Agreement intend to authenticate this writing, agree to all its terms, and electronically sign this Agreement with the same force and effect as a manual signature.

---

*Consent to Electronic Disclosure.*

☑ **By checking this box** you confirm that you can access transaction information by visiting www.kabbage.com and logging in and You agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. Kabbage will provide electronic copies of periodic statements and Subsequent Disclosures on Kabbage's web site. To access, view and retain electronic disclosures on Kabbage's web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0 or higher. By clicking the "Submit" button on your application, you acknowledge that you are able to access Kabbage's website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting Kabbage at Kabbage Business Loan-Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting Kabbage in the same manner. If you withdraw your consent to electronic disclosures, Kabbage may elect to terminate the relationship with you. You agree to provide Kabbage with your current e-mail address for notices. If your e-mail address changes, you must send Kabbage a notice of the new address by writing to Kabbage at least five days before the effective date of the change at Kabbage Email Address Change, P.O. Box 77081, Atlanta, GA 30357.

---

We are not a party to any purchase transaction between you and either a recipient of the proceeds of a Loan or a merchant accepting a payment card onto which the proceeds of a Loan was loaded (either, a "Recipient"). Consequently, any disputes or concerns you have regarding your purchases from/transactions with or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases or transactions.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

## I. BUSINESS LOAN

**1.1. Business Loan.** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan to us or our order, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the

details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts (the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

<u>Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge, and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge, and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.</u>

You agree to notify us within five (5) business days if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**1.2 .Distribution of Proceeds.** Proceeds of the Loan can be distributed to you in one of four methods that you hereby elect:

a. via automated clearing house in one-to-three business days to a business's checking account registered on your established Kabbage profile;

b. to a PayPal Account registered on your established Kabbage profile;

c. via a valid, non-expired debit card registered on your established Kabbage profile that is linked to business checking account, **subject to a Debit Card Express Fee of $24.95 per disbursement** that will be assessed to your account and payable in full in addition to your next Minimum Monthly Payment under Section 1.5 below; or

d. onto a MasterCard-branded prepaid debit card issued under the Kabbage Card Program (the "Card"). You must elect and qualify to participate in the Kabbage Card Program and, if approved, disbursement of Loan proceeds via the Card will be subject to additional terms and conditions as set forth in the Kabbage Card Program Terms and Conditions by and among you, Kabbage and the Bank that issues the Card, which can be found at app.kabbage.com/CardRegistration/TermsAndConditions In addition, participants in the Kabbage Card Program will be subject to additional terms and conditions imposed by Kabbage as set forth on Kabbage' s website. Each disbursement via a transaction under the Kabbage Card Program will constitute a separate extension of credit, with each disbursement constituting a Loan for a separate six (6) month Term. Disbursements shall be, in the aggregate, limited to the total amount of the line of credit for which you are approved.

**1.3. Term.** This Loan has a twelve (12) month term. Monthly payments are due as set forth in the payment schedule below.

**1.4. Cost.**

We will impose a Cost for each month or partial month that any portion of Loan proceeds remains outstanding. The portion of Loan proceeds deemed to be outstanding is the amount of proceeds disbursed: (i) through ACH, (ii) PayPal, (iii) via a debit card (iv), or via the MasterCard-branded prepaid debit card issued under the Kabbage Card Program. You may avoid additional Costs by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Costs at the same rate after maturity if any portion of the Loan remains unpaid.

**Cost Schedule**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
| --- | --- |
| First Monthly Anniversary Date | $780.00 |
| Second Monthly Anniversary Date | $1,560.00 |

| | |
|---|---|
| Third Monthly Anniversary Date | $2,340.00 |
| Fourth Monthly Anniversary Date | |
| Fifth Monthly Anniversary Date | $3,900.00 |
| Sixth Monthly Anniversary Date | $4,680.00 |
| Seventh Monthly Anniversary Date | $4,888.00 |
| Eighth Monthly Anniversary Date | $5,096.00 |
| Ninth Monthly Anniversary Date | $5,304.00 |
| Tenth Monthly Anniversary Date | $5,512.00 |
| Eleventh Monthly Anniversary Date | $5,720.00 |
| Twelfth Monthly Anniversary Date | $5,928.00 |

**1.6. Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $2,513.34* | 3.75 % |
| Second Payment Due Date | $2,513.34* | 3.75 % |
| Third Payment Due Date | $2,513.34* | 3.75 % |
| Fourth Payment Due Date | $2,513.34* | 3.75 % |
| Fifth Payment Due Date | $2,513.34* | 3.75 % |
| Sixth Payment Due Date | $2,513.34* | 3.75 % |
| Seventh Payment Due Date | $1,941.34* | 1.00 % |
| Eighth Payment Due Date | $1,941.34* | 1.00 % |
| Ninth Payment Due Date | $1,941.34* | 1.00 % |
| Tenth Payment Due Date | $1,941.34* | 1.00 % |
| Eleventh Payment Due Date | $1,941.34* | 1.00 % |
| Twelfth Payment Due Date | $1,941.26* | 1.00 % |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**1.7. Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.12 (Payments) below.

   **Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

   - $10 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

   - $35 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

   - $100 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**1.8. Application of Payments.** Payments received will be applied first to billed Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment

DSP 805-259

due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

Case 1:17-cv-11976-GAO   Document 44-43   Filed 09/23/19   Page 261 of 413

**1.9. Merchant's Contractual Covenants.** You agree:

i. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

ii. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

iii. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

iv. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

v. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

vi. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

vii. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.12 below);

viii. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

ix. To make payments to us (in U.S. dollars) on the applicable "Payment Due Date"

x. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

xi. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

xii. Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

xiii. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

xiv. Not to terminate your authorization of scheduled debits in Section 1.12, stop payment on any debit authorized pursuant to Section 1.12, claim that a debit transaction pursuant to Section 1. 12 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.12; and

xv. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account. Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**1.10. Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**1.11. Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants and Payment of Outstanding Loan Amounts.** Owner personally and unconditionally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above and Merchant's payment obligations herein. Specifically, Owner guarantees payments of all amounts owed by Merchant and that such payments will be made strictly in accordance with the terms of any and all Loans of Merchant. Owner's guarantee of payment hereunder is independent of the Merchant's obligation of payment and a separate Claim may be brought against the Owner to enforce this Loan, whether or not any Claim is made against Merchant. **The liability of Owner hereunder is irrevocable, continuing, absolute and unconditional.**

**1.12. Payments.**

i. Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment; provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

ii. Payment Failure. If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (A) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (B) debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full, (C) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (D) pursue any and all other remedies available to us.

iii. Account Maintenance. You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

iv. Terminating or Disputing Authorization; Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit, or claiming that a debit transaction pursuant to this Section 1.11 is unauthorized, is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

v. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

vi. Credit Card Transactions. We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

vii. Other Payments. You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: **Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357**. You may also call Customer Service to arrange payments by

overnight delivery, telephone, or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

viii. Acceptance of Late and Partial Payments; Disputed Amounts. We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it as an accommodation to you without losing or waiving any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**1.13. Returned Payment Fee.** If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**1.14. Events of Default.** You will be in default if any of the following happen:

i. you fail to make any payment under this Agreement when due;

ii. you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement;

iii. you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.12 or claim that a debit transaction pursuant to Section 1.12 is unauthorized;

iv. you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt;

v. any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished;

vi. a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held);

vii. you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture, or other combination without our prior written consent;

viii. you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign, or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same;

ix. any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading;

x. if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies;

xi. any creditor tries to take, by foreclosure, seizure, repossession, receivership, or otherwise, any of your property on or in which we have a lien or security interest;

xii. a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal;

xiii. an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within

xiv.  any of the events described in this default section occurs with respect to Owner.

Collectively, the preceding items (i) through (xiv) are "Events of Default."

**1.15. Our Rights upon Default.** Upon default, we may demand the immediate payment of all amounts owed us, suspend your ability to obtain further Payment Advances or Loans, and initiate a Claim against Merchant and Owner. We may also <u>initiate one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.</u>

**1.16. Attorneys' Fees and Collection Costs.** To the extent not prohibited by applicable law, Merchant or Owner shall pay us, on demand, any and all expenses, including, but not limited to, arbitration filing and other fees, collection costs, attorneys' fees, and all other expenses of a like or unlike nature, which may be expended by us to obtain or enforce payment obligations of Merchant or guarantee obligations of Owner.

**1.17. Limitation of Liability.** In no event shall our aggregate liability for any Claim arising under this Agreement (whether in contract, tort, warranty or otherwise) exceed the total of Fees paid by Merchant in the twelve (12) months preceding the date that the most recent Claim arose. Notwithstanding anything contained in this Agreement to the contrary, and except as expressly prohibited by applicable law, no Party to this Agreement shall be liable to another Party for any indirect, special, incidental, consequential, punitive, or exemplary damages of any kind (including without limitation, lost revenues, loss of profits, or loss of business), arising from this Agreement or relating to the obligations hereunder, even if advised of such potential damages.

**1.18. Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**II. CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE**

**2.1. SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

**2.2. Broad Meaning of "Claims."** The term "Claims" in this Agreement is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement based upon contract, tort, fraud, statute, regulation, common law and equity, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of any obligation arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration section or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**2.3. Arbitration.** All Claims shall be resolved through arbitration pursuant to this section rather than by litigation. Claims will be decided by a neutral arbitrator. **No Party will have the right to participate in a representative capacity or as a member of any class pertaining to any Claim subject to arbitration.** Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration. The arbitrator's authority is limited to Claims between the Parties to this Agreement. Claims may not be consolidated unless all Parties agree, in writing. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

Arbitration herein is governed by the Federal Arbitration Act ("FAA") and the selected arbitration organization's rules in effect when the Claim is filed. Before beginning arbitration, the Party making a Claim shall send a Notice of Claim to the other. Claims will be referred to either JAMS (www.jamsadr.com) or american arbitration association (www.adr.org) as selected by the party making the claim. claims may also be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the faa, 9 u.s.c. §§ 1-16.

If a Claim is for $10,000 or less, Merchant or Owner may choose whether the arbitration will be conducted solely based on documents, through a telephonic hearing, or by an in-person hearing. The arbitrator will give a brief written explanation of the award. The arbitrator's award will be final and binding except for any appeal right provided for the FAA. A Party will have 30 days to appeal the award by notifying the arbitration organization and all Parties in writing. The organization will appoint a three-arbitrator panel to decide, anew, by majority vote based on written submissions, any aspect of the decision objected to. Judgment upon any award may be entered in any court having jurisdiction.

You will be responsible for paying your share of any initial arbitration fee (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought the Claim in court. We will be responsible for advancing any additional arbitration fees for an original Claim. We may seek reimbursement of any fees advanced as a cost or fee under Section 1.16 in the event we obtain an award against you or Owner. Any costs of an Appeal will be borne by each Party with no advancement from us and we will seek reimbursement of those fees under Section 1.16.

## III. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**3.1. Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, voluntary or involuntary bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**3.2. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**3.3. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**3.4. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**3.5. Compliance with Laws and Regulations.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**3.6. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**3.7. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**3.8. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**3.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**3.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or

commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of a loan against, or the advancement of credit against, a Merchant's accounts receivable, (b) use any credit card or online sales with any party other than Bank.

**3.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**3.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## IV. ADDITIONAL TERMS

**4.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**4.2. Financing Statements.** Merchant understands and agrees that Bank may at any time file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend, or continue any interest granted in Section 4.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to affect the filing or continuation of any such filings.

**4.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 1.11 of this Agreement is primary, direct, and unconditional, and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner. Merchant and Owner hereby waive any and all defenses to liability under this Agreement other than payment in full.

**4.4. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**4.5. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**4.6. Transfer and Assignment.** We reserve the right to sell, transfer, or assign all or any portion of our interest in this Agreement to another entity, or person, and Merchant and Owner hereby knowingly consent to such sale, transfer, or assignment. This Agreement, and the rights and obligations under this Agreement, may not be assigned by Merchant or Owner (including by operation of law) without our prior written consent and any purported assignment in violation of the foregoing shall be void ab initio.

**4.7. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## V. MISCELLANEOUS

**5.1. Modifications; Amendments; Construction.** No modification, amendment, or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected, such execution by all parties being an express prerequisite to enforceability. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**5.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known physical address or electronic mail address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**5.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**5.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**5.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**5.6. Governing Law Consent to Jurisdiction and Venue. With the exception of Section II above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Such laws will govern the legality, enforceability and interpretation of this Agreement. Merchant and Owner understand and agree that Bank is located in Utah and Loan is issued in Utah. Merchant and Owner agree that these laws apply no matter where Merchant or Owner lives, is domiciled, or made this Agreement.

**5.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**5.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**5.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**5.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A

PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**5.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**5.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**5.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 5.13 "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**5.14. In Case of Errors or Questions about Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

## Kabbage Business Loan Agreement

**Loan Amount: $13,500.00**
**Merchant Information**
**Account Number: 27791**
**Merchant: NRO Boston LLC**
**Owner: alice indelicato**
**Marketplaces: AuthorizeNET, Bigcommerce,**
**ACH, ACH, ACH, ACH, Twitter,**
**GoogleAnalytics, Intuit**
**Recipient: alice indelicato**

**Document Creation Date/Time: Mar 13, 2016**
**09:38 AM Eastern**
**Lender: Celtic Bank Salt Lake City, Utah**
**Fees**
**Late Fee: Up to $100**
**Returned Payment Fee: Up to $20**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above. Celtic Bank, Merchant and Owner may be referred to as a "Party" or collectively as "Parties" herein.

☑ By checking this box Merchant or Owner understand that it has the responsibility to read this Agreement and have had an opportunity to do so.

☑ By checking this box Merchant or Owner also agree that the parties included in this Agreement intend to authenticate this writing, agree to all its terms, and electronically sign this Agreement with the same force and effect as a manual signature.

---

*Consent to Electronic Disclosure.*

☑ **By checking this box** you confirm that you can access transaction information by visiting www.kabbage.com and logging in and You agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. Kabbage will provide electronic copies of periodic statements and Subsequent Disclosures on Kabbage's web site. To access, view and retain electronic disclosures on Kabbage's web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0 or higher. By clicking the "Submit" button on your application, you acknowledge that you are able to access Kabbage's website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting Kabbage at Kabbage Business Loan-Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting Kabbage in the same manner. If you withdraw your consent to electronic disclosures, Kabbage may elect to terminate the relationship with you. You agree to provide Kabbage with your current e-mail address for notices. If your e-mail address changes, you must send Kabbage a notice of the new address by writing to Kabbage at least five days before the effective date of the change at Kabbage Email Address Change, P.O. Box 77081, Atlanta, GA 30357.

---

We are not a party to any purchase transaction between you and either a recipient of the proceeds of a Loan or a merchant accepting a payment card onto which the proceeds of a Loan was loaded (either, a "Recipient"). Consequently, any disputes or concerns you have regarding your purchases from/transactions with or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases or transactions.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

## I. BUSINESS LOAN

**1.1. Business Loan.** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan to us or our order, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the

details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts (the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge, and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge, and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us within five (5) business days if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**1.2 .Distribution of Proceeds.** Proceeds of the Loan can be distributed to you in one of four methods that you hereby elect:

a.  via automated clearing house in one-to-three business days to a business's checking account registered on your established Kabbage profile;

b.  to a PayPal Account registered on your established Kabbage profile;

c.  via a valid, non-expired debit card registered on your established Kabbage profile that is linked to business checking account, **subject to a Debit Card Express Fee of $24.95 per disbursement** that will be assessed to your account and payable in full in addition to your next Minimum Monthly Payment under Section 1.5 below; or

d.  onto a MasterCard-branded prepaid debit card issued under the Kabbage Card Program (the "Card"). You must elect and qualify to participate in the Kabbage Card Program and, if approved, disbursement of Loan proceeds via the Card will be subject to additional terms and conditions as set forth in the Kabbage Card Program Terms and Conditions by and among you, Kabbage and the Bank that issues the Card, which can be found at app.kabbage.com/CardRegistration/TermsAndConditions In addition, participants in the Kabbage Card Program will be subject to additional terms and conditions imposed by Kabbage as set forth on Kabbage' s website. Each disbursement via a transaction under the Kabbage Card Program will constitute a separate extension of credit, with each disbursement constituting a Loan for a separate six (6) month Term. Disbursements shall be, in the aggregate, limited to the total amount of the line of credit for which you are approved.

**1.3. Term.** This Loan has a twelve (12) month term. Monthly payments are due as set forth in the payment schedule below.

**1.4. Cost.**
We will impose a Cost for each month or partial month that any portion of Loan proceeds remains outstanding. The portion of Loan proceeds deemed to be outstanding is the amount of proceeds disbursed: (i) through ACH, (ii) PayPal, (iii) via a debit card (iv), or via the MasterCard-branded prepaid debit card issued under the Kabbage Card Program. You may avoid additional Costs by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Costs at the same rate after maturity if any portion of the Loan remains unpaid.

**Cost Schedule**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
| --- | --- |
| First Monthly Anniversary Date | $506.25 |
| Second Monthly Anniversary Date | $1,012.50 |

DSP 805-269

| | |
|---|---|
| Third Monthly Anniversary Date | $1,518.75 |
| Fourth Monthly Anniversary Date | |
| Fifth Monthly Anniversary Date | $2,531.25 |
| Sixth Monthly Anniversary Date | $3,037.50 |
| Seventh Monthly Anniversary Date | $3,172.50 |
| Eighth Monthly Anniversary Date | $3,307.50 |
| Ninth Monthly Anniversary Date | $3,442.50 |
| Tenth Monthly Anniversary Date | $3,577.50 |
| Eleventh Monthly Anniversary Date | $3,712.50 |
| Twelfth Monthly Anniversary Date | $3,847.50 |

**1.6. Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $1,631.25* | 3.75 % |
| Second Payment Due Date | $1,631.25* | 3.75 % |
| Third Payment Due Date | $1,631.25* | 3.75 % |
| Fourth Payment Due Date | $1,631.25* | 3.75 % |
| Fifth Payment Due Date | $1,631.25* | 3.75 % |
| Sixth Payment Due Date | $1,631.25* | 3.75 % |
| Seventh Payment Due Date | $1,260.00* | 1.00 % |
| Eighth Payment Due Date | $1,260.00* | 1.00 % |
| Ninth Payment Due Date | $1,260.00* | 1.00 % |
| Tenth Payment Due Date | $1,260.00* | 1.00 % |
| Eleventh Payment Due Date | $1,260.00* | 1.00 % |
| Twelfth Payment Due Date | $1,260.00* | 1.00 % |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**1.7. Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.12 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- $10 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- $35 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- $100 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**1.8. Application of Payments.** Payments received will be applied first to billed Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment

DSP 805-270

due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**1.9. Merchant's Contractual Covenants.** You agree:

    i.  Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

    ii.  Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

    iii.  To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

    iv.  Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

    v.  With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

    vi.  To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

    vii.  To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.12 below);

    viii.  To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

    ix.  To make payments to us (in U.S. dollars) on the applicable "Payment Due Date"

    x.  Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

    xi.  Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

    xii.  Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

    xiii.  Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

    xiv.  Not to terminate your authorization of scheduled debits in Section 1.12, stop payment on any debit authorized pursuant to Section 1.12, claim that a debit transaction pursuant to Section 1.12 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.12; and

    xv.  To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account. Collectively, the preceding items (i) through (xv) are your <u>"Merchant Contractual Covenants"</u>.

**1.10. Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**1.11. Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants and Payment of Outstanding Loan Amounts.** Owner personally and unconditionally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above and Merchant's payment obligations herein. Specifically, Owner guarantees payments of all amounts owed by Merchant and that such payments will be made strictly in accordance with the terms of any and all Loans of Merchant. Owner's guarantee of payment hereunder is independent of the Merchant's obligation of payment and a separate Claim may be brought against the Owner to enforce this Loan, whether or not any Claim is made against Merchant. **The liability of Owner hereunder is irrevocable, continuing, absolute and unconditional.**

**1.12. Payments.**

i. Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment; provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

ii. Payment Failure. If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (A) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (B) debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full, (C) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (D) pursue any and all other remedies available to us.

iii. Account Maintenance. You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

iv. Terminating or Disputing Authorization; Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit, or claiming that a debit transaction pursuant to this Section 1.11 is unauthorized, is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

v. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

vi. Credit Card Transactions. We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

vii. Other Payments. You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: **Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357**. You may also call Customer Service to arrange payments by

overnight delivery, telephone, or other acceptable method. Payments made to any other address than as specified above may result in a delay in processing for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

viii. Acceptance of Late and Partial Payments; Disputed Amounts. We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it as an accommodation to you without losing or waiving any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**1.13. Returned Payment Fee.** If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**1.14. Events of Default.** You will be in default if any of the following happen:

i. you fail to make any payment under this Agreement when due;

ii. you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement;

iii. you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.12 or claim that a debit transaction pursuant to Section 1.12 is unauthorized;

iv. you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt;

v. any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished;

vi. a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held);

vii. you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture, or other combination without our prior written consent;

viii. you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign, or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same;

ix. any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading;

x. if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies;

xi. any creditor tries to take, by foreclosure, seizure, repossession, receivership, or otherwise, any of your property on or in which we have a lien or security interest;

xii. a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal;

xiii. an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within

thirty (30) days or stayed pending appeal; or

xiv.  any of the events described in this default section occurs with respect to Owner.

Collectively, the preceding items (i) through (xiv) are "Events of Default."

**1.15. Our Rights upon Default.** Upon default, we may demand the immediate payment of all amounts owed us, suspend your ability to obtain further Payment Advances or Loans, and initiate a Claim against Merchant and Owner. We may also mutually <u>initiate one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.</u>

**1.16. Attorneys' Fees and Collection Costs.** To the extent not prohibited by applicable law, Merchant or Owner shall pay us, on demand, any and all expenses, including, but not limited to, arbitration filing and other fees, collection costs, attorneys' fees, and all other expenses of a like or unlike nature, which may be expended by us to obtain or enforce payment obligations of Merchant or guarantee obligations of Owner.

**1.17. Limitation of Liability.** In no event shall our aggregate liability for any Claim arising under this Agreement (whether in contract, tort, warranty or otherwise) exceed the total of Fees paid by Merchant in the twelve (12) months preceding the date that the most recent Claim arose. Notwithstanding anything contained in this Agreement to the contrary, and except as expressly prohibited by applicable law, no Party to this Agreement shall be liable to another Party for any indirect, special, incidental, consequential, punitive, or exemplary damages of any kind (including without limitation, lost revenues, loss of profits, or loss of business), arising from this Agreement or relating to the obligations hereunder, even if advised of such potential damages.

**1.18. Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

## II. CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE

**2.1. SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

**2.2. Broad Meaning of "Claims."** The term "Claims" in this Agreement is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement based upon contract, tort, fraud, statute, regulation, common law and equity, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of any obligation arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration section or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**2.3. Arbitration.** All Claims shall be resolved through arbitration pursuant to this section rather than by litigation. Claims will be decided by a neutral arbitrator. **No Party will have the right to participate in a representative capacity or as a member of any class pertaining to any Claim subject to arbitration.** Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration. The arbitrator's authority is limited to Claims between the Parties to this Agreement. Claims may not be consolidated unless all Parties agree, in writing. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

Arbitration herein is governed by the Federal Arbitration Act ("FAA") and the selected arbitration organization's rules in effect when the Claim is filed. Before beginning arbitration, the Party making a Claim shall send a Notice of Claim to the other. Claims will be referred to either JAMS (www.jamsadr.com) or american arbitration association (www.adr.org) as selected by the party making the claim. claims may also be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the faa, 9 u.s.c. §§ 1-16.

If a Claim is for $10,000 or less, Merchant or Owner may choose whether the arbitration will be conducted solely based on documents, through a telephonic hearing, or by an in-person hearing. The arbitrator will give a brief written explanation of the award. The arbitrator's award will be final and binding except for any appeal right provided for the FAA. A Party will have 30 days to appeal the award by notifying the arbitration organization and all Parties in writing. The organization will appoint a three-arbitrator panel to decide, anew, by majority vote based on written submissions, any aspect of the decision objected to. Judgment upon any award may be entered in any court having jurisdiction.

You will be responsible for paying your share of any initial arbitration fee (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought the Claim in court. We will be responsible for advancing any additional arbitration fees for an original Claim. We may seek reimbursement of any fees advanced as a cost or fee under Section 1.16 in the event we obtain an award against you or Owner. Any costs of an Appeal will be borne by each Party with no advancement from us and we will seek reimbursement of those fees under Section 1.16.

### III. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**3.1. Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, voluntary or involuntary bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**3.2. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**3.3. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**3.4. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**3.5. Compliance with Laws and Regulations.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**3.6. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**3.7. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**3.8. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**3.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**3.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or

commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the disbursement of credit against, Merchant or a party receivable or future credit card or online sales with any party other than Bank.

**3.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**3.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## IV. ADDITIONAL TERMS

**4.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**4.2. Financing Statements.** Merchant understands and agrees that Bank may at any time file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend, or continue any interest granted in Section 4.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to affect the filing or continuation of any such filings.

**4.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 1.11 of this Agreement is primary, direct, and unconditional, and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner. Merchant and Owner hereby waive any and all defenses to liability under this Agreement other than payment in full.

**4.4. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**4.5. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**4.6. Transfer and Assignment.** We reserve the right to sell, transfer, or assign all or any portion of our interest in this Agreement to another entity, or person and a Merchant and Owner hereby knowingly consent to such sale, transfer, or assignment. This Agreement, and the rights and obligations under this Agreement, may not be assigned by Merchant or Owner (including by operation of law) without our prior written consent and any purported assignment in violation of the foregoing shall be void ab initio.

**4.7. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## V. MISCELLANEOUS

**5.1. Modifications; Amendments; Construction.** No modification, amendment, or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected, such execution by all parties being an express prerequisite to enforceability. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**5.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known physical address or electronic mail address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to <u>Kabbage, P.O. Box 77081, Atlanta, GA 30357.</u> You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**5.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**5.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**5.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**5.6. Governing Law Consent to Jurisdiction and Venue. With the exception of Section II above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Such laws will govern the legality, enforceability and interpretation of this Agreement. Merchant and Owner understand and agree that Bank is located in Utah and Loan is issued in Utah. Merchant and Owner agree that these laws apply no matter where Merchant or Owner lives, is domiciled, or made this Agreement.

**5.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**5.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**5.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**5.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A

PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**5.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**5.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**5.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 5.13 "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**5.14. In Case of Errors or Questions about Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

## Kabbage Business Loan Agreement

**Loan Amount: $13,800.00**
**Merchant Information**
**Account Number: 27791**
**Merchant: NRO Boston LLC**
**Owner: alice indelicato**
**Marketplaces: AuthorizeNET, Bigcommerce, ACH, ACH, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit**
**Recipient: alice indelicato**

**Document Creation Date/Time: Apr 28, 2016 08:28 AM Eastern**
**Lender:** Celtic Bank Salt Lake City, Utah
**Fees**
**Late Fee: Up to $100**
**Returned Payment Fee: Up to $20**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above. Celtic Bank, Merchant and Owner may be referred to as a "Party" or collectively as "Parties" herein.

☑ By checking this box Merchant or Owner understand that it has the responsibility to read this Agreement and have had an opportunity to do so.

☑ By checking this box Merchant or Owner also agree that the parties included in this Agreement intend to authenticate this writing, agree to all its terms, and electronically sign this Agreement with the same force and effect as a manual signature.

---

*Consent to Electronic Disclosure.*

☑ **By checking this box** you confirm that you can access transaction information by visiting www.kabbage.com and logging in and You agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. Kabbage will provide electronic copies of periodic statements and Subsequent Disclosures on Kabbage's web site. To access, view and retain electronic disclosures on Kabbage's web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0 or higher. By clicking the "Submit" button on your application, you acknowledge that you are able to access Kabbage's website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting Kabbage at Kabbage Business Loan-Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting Kabbage in the same manner. If you withdraw your consent to electronic disclosures, Kabbage may elect to terminate the relationship with you. You agree to provide Kabbage with your current e-mail address for notices. If your e-mail address changes, you must send Kabbage a notice of the new address by writing to Kabbage at least five days before the effective date of the change at Kabbage Email Address Change, P.O. Box 77081, Atlanta, GA 30357.

---

We are not a party to any purchase transaction between you and either a recipient of the proceeds of a Loan or a merchant accepting a payment card onto which the proceeds of a Loan was loaded (either, a "Recipient"). Consequently, any disputes or concerns you have regarding your purchases from/transactions with or the amounts you owe to the Recipient are to be solely resolved between you and the Recipient alone, and you understand and agree that (a) the Recipient's actions or omissions have no bearing on, and will not give rise to any defense under, your agreement with us, and (b) we will have no liability to you in connection with such purchases or transactions.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

## I. BUSINESS LOAN

**1.1. Business Loan.** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan to us or our order, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the

details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts (the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge, and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge, and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us within five (5) business days if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**1.2 .Distribution of Proceeds.** Proceeds of the Loan can be distributed to you in one of four methods that you hereby elect:

a. via automated clearing house in one-to-three business days to a business's checking account registered on your established Kabbage profile;

b. to a PayPal Account registered on your established Kabbage profile;

c. via a valid, non-expired debit card registered on your established Kabbage profile that is linked to business checking account, **subject to a Debit Card Express Fee of $24.95 per disbursement** that will be assessed to your account and payable in full in addition to your next Minimum Monthly Payment under Section 1.5 below; or

d. onto a MasterCard-branded prepaid debit card issued under the Kabbage Card Program (the "Card"). You must elect and qualify to participate in the Kabbage Card Program and, if approved, disbursement of Loan proceeds via the Card will be subject to additional terms and conditions as set forth in the Kabbage Card Program Terms and Conditions by and among you, Kabbage and the Bank that issues the Card, which can be found at app.kabbage.com/CardRegistration/TermsAndConditions In addition, participants in the Kabbage Card Program will be subject to additional terms and conditions imposed by Kabbage as set forth on Kabbage' s website. Each disbursement via a transaction under the Kabbage Card Program will constitute a separate extension of credit, with each disbursement constituting a Loan for a separate six (6) month Term. Disbursements shall be, in the aggregate, limited to the total amount of the line of credit for which you are approved.

**1.3. Term.** This Loan has a twelve (12) month term. Monthly payments are due as set forth in the payment schedule below.

**1.4. Cost.**
We will impose a Cost for each month or partial month that any portion of Loan proceeds remains outstanding. The portion of Loan proceeds deemed to be outstanding is the amount of proceeds disbursed: (i) through ACH, (ii) PayPal, (iii) via a debit card (iv), or via the MasterCard-branded prepaid debit card issued under the Kabbage Card Program. You may avoid additional Costs by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Costs at the same rate after maturity if any portion of the Loan remains unpaid.

**Cost Schedule**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $517.50 |
| Second Monthly Anniversary Date | $1,035.00 |

| | |
|---|---|
| Third Monthly Anniversary Date | $1,552.50 |
| Fifth Monthly Anniversary Date | $2,587.50 |
| Sixth Monthly Anniversary Date | $3,105.00 |
| Seventh Monthly Anniversary Date | $3,243.00 |
| Eighth Monthly Anniversary Date | $3,381.00 |
| Ninth Monthly Anniversary Date | $3,519.00 |
| Tenth Monthly Anniversary Date | $3,657.00 |
| Eleventh Monthly Anniversary Date | $3,795.00 |
| Twelfth Monthly Anniversary Date | $3,933.00 |

**1.6. Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: | Monthly Fee% |
|---|---|---|
| First Payment Due Date | $1,667.50* | 3.75 % |
| Second Payment Due Date | $1,667.50* | 3.75 % |
| Third Payment Due Date | $1,667.50* | 3.75 % |
| Fourth Payment Due Date | $1,667.50* | 3.75 % |
| Fifth Payment Due Date | $1,667.50* | 3.75 % |
| Sixth Payment Due Date | $1,667.50* | 3.75 % |
| Seventh Payment Due Date | $1,288.00* | 1.00 % |
| Eighth Payment Due Date | $1,288.00* | 1.00 % |
| Ninth Payment Due Date | $1,288.00* | 1.00 % |
| Tenth Payment Due Date | $1,288.00* | 1.00 % |
| Eleventh Payment Due Date | $1,288.00* | 1.00 % |
| Twelfth Payment Due Date | $1,288.00* | 1.00 % |

*Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. <u>Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.</u>

**1.7. Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) any billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.12 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- $10 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- $35 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- $100 if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**1.8. Application of Payments.** Payments received will be applied first to billed Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees, Returned Payment Fees, and Debit Card Express Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment

DSP 805-281

due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

Case 1:17-cv-11976-GAO   Document 44-43   Filed 09/23/19   Page 283 of 413

**1.9. Merchant's Contractual Covenants.** You agree:

i. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

ii. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

iii. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

iv. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

v. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

vi. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

vii. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.12 below);

viii. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

ix. To make payments to us (in U.S. dollars) on the applicable "Payment Due Date"

x. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

xi. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

xii. Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

xiii. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

xiv. Not to terminate your authorization of scheduled debits in Section 1.12, stop payment on any debit authorized pursuant to Section 1.12, claim that a debit transaction pursuant to Section 1. 12 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.12; and

xv. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account. Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**1.10. Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**1.11. Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants and Payment of Outstanding Loan Amounts.** Owner personally and unconditionally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above and Merchant's payment obligations herein. Specifically, Owner guarantees payments of all amounts owed by Merchant and that such payments will be made strictly in accordance with the terms of any and all Loans of Merchant. Owner's guarantee of payment hereunder is independent of the Merchant's obligation of payment and a separate Claim may be brought against the Owner to enforce this Loan, whether or not any Claim is made against Merchant. **The liability of Owner hereunder is irrevocable, continuing, absolute and unconditional.**

**1.12. Payments.**

i. Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment; provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

ii. Payment Failure. If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (A) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (B) debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full, (C) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (D) pursue any and all other remedies available to us.

iii. Account Maintenance. You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

iv. Terminating or Disputing Authorization; Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit, or claiming that a debit transaction pursuant to this Section 1.11 is unauthorized, is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner.

v. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

vi. Credit Card Transactions. We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

vii. Other Payments. You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: **Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357**. You may also call Customer Service to arrange payments by

overnight delivery, telephone, or other acceptable method. Payments made to any other address than as specified by us may subject you delay in processing and for anything for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

viii. Acceptance of Late and Partial Payments; Disputed Amounts. We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it as an accommodation to you without losing or waiving any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.</u>**

**1.13. Returned Payment Fee.** If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**1.14. Events of Default.** You will be in default if any of the following happen:

i. you fail to make any payment under this Agreement when due;

ii. you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement;

iii. you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.12 or claim that a debit transaction pursuant to Section 1.12 is unauthorized;

iv. you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt;

v. any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished;

vi. a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held);

vii. you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture, or other combination without our prior written consent;

viii. you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign, or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same;

ix. any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading;

x. if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies;

xi. any creditor tries to take, by foreclosure, seizure, repossession, receivership, or otherwise, any of your property on or in which we have a lien or security interest;

xii. a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal;

xiii. an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within

thirty (30) days or stayed pending appeal; or

xiv.   any of the events described in this default section occurs with respect to Owner.

Collectively, the preceding items (i) through (xiv) are "Events of Default."

**1.15. Our Rights upon Default.** Upon default, we may demand the immediate payment of all amounts owed us, suspend your ability to obtain further Payment Advances or Loans, and initiate a Claim against Merchant and Owner. We may also demand <u>initiate one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.</u>

**1.16. Attorneys' Fees and Collection Costs.** To the extent not prohibited by applicable law, Merchant or Owner shall pay us, on demand, any and all expenses, including, but not limited to, arbitration filing and other fees, collection costs, attorneys' fees, and all other expenses of a like or unlike nature, which may be expended by us to obtain or enforce payment obligations of Merchant or guarantee obligations of Owner.

**1.17. Limitation of Liability.** In no event shall our aggregate liability for any Claim arising under this Agreement (whether in contract, tort, warranty or otherwise) exceed the total of Fees paid by Merchant in the twelve (12) months preceding the date that the most recent Claim arose. Notwithstanding anything contained in this Agreement to the contrary, and except as expressly prohibited by applicable law, no Party to this Agreement shall be liable to another Party for any indirect, special, incidental, consequential, punitive, or exemplary damages of any kind (including without limitation, lost revenues, loss of profits, or loss of business), arising from this Agreement or relating to the obligations hereunder, even if advised of such potential damages.

**1.18. Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**II. CLAIMS RESOLUTION, AGREEMENT TO ARBITRATE**

**2.1. SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

**2.2. Broad Meaning of "Claims."** The term "Claims" in this Agreement is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement based upon contract, tort, fraud, statute, regulation, common law and equity, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of any obligation arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration section or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**2.3. Arbitration.** All Claims shall be resolved through arbitration pursuant to this section rather than by litigation. Claims will be decided by a neutral arbitrator. **No Party will have the right to participate in a representative capacity or as a member of any class pertaining to any Claim subject to arbitration.** Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration. The arbitrator's authority is limited to Claims between the Parties to this Agreement. Claims may not be consolidated unless all Parties agree, in writing. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

Arbitration herein is governed by the Federal Arbitration Act ("FAA") and the selected arbitration organization's rules in effect when the Claim is filed. Before beginning arbitration, the Party making a Claim shall send a Notice of Claim to the other. Claims will be referred to either JAMS (www.jamsadr.com) or american arbitration association (www.adr.org) as selected by the party making the claim. claims may also be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the faa, 9 u.s.c. §§ 1-16.

If a Claim is for $10,000 or less, Merchant or Owner may choose whether the arbitration will be conducted solely based on documents, through a telephonic hearing, or by an in-person hearing. The arbitrator will give a brief written explanation of the award. The arbitrator's award will be final and binding except for any appeal right provided for the FAA. A Party will have 30 days to appeal the award by notifying the arbitration organization and all Parties in writing. The organization will appoint a three-arbitrator panel to decide, anew, by majority vote based on written submissions, any aspect of the decision objected to. Judgment upon any award may be entered in any court having jurisdiction.

You will be responsible for paying your share of any initial arbitration fee (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought the Claim in court. We will be responsible for advancing any additional arbitration fees for an original Claim. We may seek reimbursement of any fees advanced as a cost or fee under Section 1.16 in the event we obtain an award against you or Owner. Any costs of an Appeal will be borne by each Party with no advancement from us and we will seek reimbursement of those fees under Section 1.16.

## III. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**3.1. Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, voluntary or involuntary bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**3.2. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**3.3. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**3.4. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**3.5. Compliance with Laws and Regulations.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**3.6. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**3.7. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**3.8. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**3.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**3.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or

commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of a loan against, or the discount or sale of credit against a Merchant's accounts receivable, or future credit card or online sales with any party other than Bank.

**3.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**3.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## IV. ADDITIONAL TERMS

**4.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**4.2. Financing Statements.** Merchant understands and agrees that Bank may at any time file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend, or continue any interest granted in Section 4.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to affect the filing or continuation of any such filings.

**4.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 1.11 of this Agreement is primary, direct, and unconditional, and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner. Merchant and Owner hereby waive any and all defenses to liability under this Agreement other than payment in full.

**4.4. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**4.5. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**4.6. Transfer and Assignment.** We reserve the right to sell, transfer, or assign all or any portion of our interest in this Agreement to another entity or person, and Merchant and Owner hereby knowingly consent to such sale, transfer, or assignment. This Agreement, and the rights and obligations under this Agreement, may not be assigned by Merchant or Owner (including by operation of law) without our prior written consent and any purported assignment in violation of the foregoing shall be void ab initio.

**4.7. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## V. MISCELLANEOUS

**5.1. Modifications; Amendments; Construction.** No modification, amendment, or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected, such execution by all parties being an express prerequisite to enforceability. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**5.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known physical address or electronic mail address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**5.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**5.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**5.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**5.6. Governing Law Consent to Jurisdiction and Venue. With the exception of Section II above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Such laws will govern the legality, enforceability and interpretation of this Agreement. Merchant and Owner understand and agree that Bank is located in Utah and Loan is issued in Utah. Merchant and Owner agree that these laws apply no matter where Merchant or Owner lives, is domiciled, or made this Agreement.

**5.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**5.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**5.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**5.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A

PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**5.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**5.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**5.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 5.13 "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**5.14. In Case of Errors or Questions about Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

# EXHIBIT C

DSP 805-290

## Kabbage Merchant Cash Advance Agreement

Advance Amount:   $30,000.00                                              Date:   01/04/2014

Merchant Information
Merchant:   NRO Boston LLC
Owner:   alice indelicato                          Fees
Marketplaces:   AuthorizeNET, ACH, ACH       Transfer Access Denied Fee: Up to $35

This Merchant Cash Advance Agreement ("Agreement") is made by and between **Kabbage, Inc.** ("we," "us," "our" or "Company") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

## I.  SALE AND PURCHASE OF FUTURE RECEIVABLES

**Section 1.1.**  *Sale and Purchase of Future Receivables*.  You agree to sell to us, and we agree to purchase from you, all of your right, title and interest in and to certain future receivables ("Future Receivables"), including the collected proceeds thereof ("Proceeds"), that arise from the obligations of your customers to pay you for goods and services sold or provided by you, which Future Receivables are to be paid into your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), or (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account").  You will provide us, at all times during this Agreement, with access to view the activity in your Business Payment Account, Bank Account, and marketplaces where you do business, and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future Receivables, your collection of Proceeds and your transfer to us of such Proceeds.  You further agree to (i) promptly and accurately reflect each sale of Future Receivables to us in your books and records, (ii) promptly collect upon such receivables and (iii) promptly transfer the collected Proceeds to us (in U.S. dollars) by the Transfer Date (as defined below). **Your obligation to transfer Proceeds to Company only extends to the transfer of proceeds of Future Receivables that are actually collected.  In this Agreement, references to "Proceeds" refer to proceeds of Future Receivables that are actually collected and references to "transfer" refer to the transfer of Proceeds to Company.**

**THIS IS A COMMERCIAL SALE TRANSACTION, <u>NOT</u> A LOAN, AND, WITHOUT LIMITING THE FOREGOING, YOU AGREE NOT TO USE ANY AMOUNT ADVANCED FOR PERSONAL OR HOUSEHOLD PURPOSES AND NOT TO DELIVER PROCEEDS TO US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that the agreement not to use any amount advanced for personal, family or household purposes means and not to deliver Proceeds to us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to any aspect of this commercial transaction.  Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, the use of any amount advanced or any delivery of Proceeds conforms to this section.  Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount advanced is, in fact used or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount advanced been disbursed for consumer purposes or Proceeds delivered from a consumer account.

You agree to notify us promptly if, with regard to any Business Payment Account or Bank Account, (i) the details of your account change, (ii) you open a new account or (iii) you close your account.  Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your future receivables that we will purchase, you agree to notify us promptly if (i) the details of your account change, (ii) you open a new account or (iii) you close your account.

**Purchase Price. We will pay a discounted purchase price for each Future Receivable sold to us. The amount of discount applied is your "Cost".** Your total Cost will be determined by the date(s) of transfer of Proceeds as set forth below. On the purchase date, we will deliver to you, via your specified Business Payment Account or Bank Account, the applicable purchase price ("Advance") for the specified amount of Future Receivables ("Specified Amount") that you sell to us. **The initial Cost will be calculated based upon the assumption that you will transfer to us Proceeds equal to the Specified Amount before the first monthly anniversary date of sale.** An additional Cost will be applied monthly on each monthly anniversary date of sale if you elect to extend the Transfer Date for certain Proceeds as provided below.

**Extending the Transfer Date; Sale of Additional Receivables.** You may extend the Transfer Date for certain Proceeds up to five (5) months so long as you make certain Minimum Monthly Transfers as specified below. Each month that you elect to delay the transfer of Proceeds, the total applicable Cost for a delayed Future Receivable will increase (and the applicable purchase price for the Future Receivable will decrease). You agree to sell to us additional Future Receivables in an amount equal to the difference between the amount previously paid for a delayed Future Receivable and the applicable adjusted purchase price for such delayed Future Receivable (additional Cost), by your next applicable Transfer Date. We may terminate your option to delay the transfer of Proceeds at any time without notice.

**Cost Schedule.** Costs are applied on each monthly anniversary date that any Proceeds remain untransferred.

| If the Proceeds of a Future Receivable are transferred before: | The applicable total Cost is: | And the Specified Amount of Future Receivables purchased/sold will increase by: |
|---|---|---|
| First Monthly Anniversary Date | 6 % | No increase |
| Second Monthly Anniversary Date | 12 % | $1,800.00 |
| Third Monthly Anniversary Date | 13 % | $2,100.00 |
| Fourth Monthly Anniversary Date | 14 % | $2,400.00 |
| Fifth Monthly Anniversary Date | 15 % | $2,700.00 |
| Sixth Monthly Anniversary Date | 16 % | $3,000.00 |

**Minimum Monthly Transfers.** With respect to each Advance, you agree to make a minimum monthly transfer of Proceeds ("Minimum Monthly Transfer") in the amounts specified below on each scheduled monthly transfer date ("Transfer Date"). Your monthly Transfer Date will be determined when we approve you as a seller and open an account for your business on our books. Your monthly Transfer Date will be the same date each month and will apply to all purchases that we make from you. For any particular Advance, the Minimum Monthly Transfer will be:

| Transfer Date | Minimum Monthly Transfer: |
|---|---|
| First Transfer Date | $6,800.00 |
| Second Transfer Date | $6,800.00 |
| Third Transfer Date | $5,300.00 |
| Fourth Transfer Date | $5,300.00 |
| Fifth Transfer Date | $5,300.00 |
| Sixth Transfer Date | The balance, if any, of proceeds remaining untransferred |

\* Or the balance of Proceeds remaining untransferred if less than the amount shown

You may at any time transfer more than the Minimum Monthly Transfer without penalty.

We will notify you, at least 10 calendar days in advance of each Transfer Date, of the aggregate amount of (i) all current Minimum Monthly Transfers for multiple Advances, plus (ii) any previous Minimum Monthly Transfers remaining, in whole or in part, un-transferred, plus (iii) accrued but unpaid fees (collectively, (i) through (iii) are your "Total Minimum Monthly Transfer"). If you fail to make a transfer of your Total Minimum Monthly Transfer amount on time, you agree that we may assess, as liquidated damages, a **Transfer Access Denied Fee** of **$35** for Total Minimum Monthly Transfers of $100 or more, or **$10** for Total Minimum Monthly Transfers of less than $100. This fee will be waived if (i) collections in the ordinary course are less than the Total Minimum Monthly Transfer amount and (ii) you are not otherwise in breach of this Agreement.

**Section 1.2.  *Merchant's Contractual Covenants and Representations; Further Inquires*.**

MerchantAdvanceAgreement

**Covenants.** You agree:

(i)   Not to use any amount advanced for personal or household purposes and not to deliver Proceeds from any consumer account;

(ii)   To promptly and accurately reflect each sale of Future Receivables to us in your books and records;

(iii)   Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iv)   To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future Receivables, your handling of Proceeds and your transfer to us of Proceeds;

(v)   Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(vi)   With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your future receivables that we will purchase, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vii) To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Advance for the processing of your sales transactions, or otherwise ensure that Proceeds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(viii) To maintain a minimum balance of Proceeds in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(ix)   To collect Future Receivables promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(x)   To transfer Proceeds to us (in U.S. dollars) by the applicable Transfer Date"

(xi)   Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xii) Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which Proceeds will be deposited and not to take any action to cause Future Receivables to be settled or transferred to any account other than the Accounts;

(xiii) Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiv)     Not to take any intentional action that would substantially impair or reduce your generation or collection of receivables adequate to satisfy your obligations under this Agreement without our prior written permission;

(xv) Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a transfer under Section 1.3; and

(xvi)     To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Merchant, Owner and Company acknowledge and agree that Merchant's going bankrupt or out of business (alone) does not constitute a breach of Merchant's Contractual Covenants or other provisions of this Agreement.  If, as the result of market forces, Merchant's business activity slows and Merchant's inventory of Future Receivables decrease, or if Merchant closes**

its business after adequate prior notice to Company and a good faith effort to fulfill Merchant's outstanding obligations under this Agreement, no breach of this Agreement shall be deemed to occur, provided that Merchant has not violated any of Merchant's Contractual Covenants or other provisions of this Agreement.  Company is purchasing Future Receivables and Company assumes the risk that Merchant's business may fail or be adversely affected by conditions outside the control of Merchant, provided that Merchant has not breached Merchant's Contractual Covenants or any other provision of this Agreement.

**Representations.**  You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.**  Merchant and Owner and authorize Company, its agents and representatives, and any credit reporting agency engaged by Company, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a cash advance or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Company.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.**  Owner personally guarantees the <u>performance</u> of all of the <u>covenants of Merchant</u> in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.**  *Transfers*.

**Automatic Transfer Authorization.  You authorize us to initiate, on each Transfer Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Transfer**; provided, however, that if a Transfer Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day.  Any separate transfers that you make on or before a Transfer Date will not affect this authorization.  You understand that your Total Minimum Monthly Transfer may vary from time to time but will in no event exceed the total Specified Amount outstanding.  We will not be liable for any Cost that you may incur if we are unable to debit your Total Minimum Monthly Transfer under this authorization.  We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit.  Advance or any transfers made directly by you under this Agreement.  Automated Clearing House transactions must comply with the provisions of U.S. law.

**Transfer Failure.**  <u>If a debit is rejected or if you otherwise fail to ensure delivery of any Total Minimum Monthly Transfer when due, you agree that we may</u> (i) terminate your option to extend the transfer of the Proceeds,  (ii) suspend all further automatic debits, in which case you will be responsible for making all further transfers directly and in a timely manner, (iii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for Proceeds and any other amounts due us* and (iv) pursue any and all other remedies available to us.

**Account Maintenance.**  You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient Proceeds to meet each Total Minimum Monthly Transfer obligation.  We may initiate a debit at any time on a Transfer Date, including <u>prior</u> to the time that we open for business on any business day.  Consequently, you understand that Proceeds must be available by the end of the business day <u>prior</u> to the applicable Transfer Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.**  You may terminate this automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Transfer Date, and your termination will be effective three (3) business days after the date your notice is received by us.  If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call.  <u>Terminating this automatic debit authorization, stopping payment on a scheduled debit or</u>

claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by us or by you, you will be responsible for making all further transfers directly and in a timely manner.

**Alternative Transfer.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept transfers from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account.. You agree that your obligation to transfer Proceeds under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All deliveries of Proceeds to us are final. You agree that if you transfer any funds in excess of the Specified Amount sold to us, including any sales of Future Receivables related to your Cost, we may apply any such excess to any outstanding Advance or other obligation you have with us or issue a check to you.

**Other Transfers.** You may make additional or alternative transfers at any time. Transfers by postal mail should be sent, postage paid, to the following address: **Kabbage MCA Transfers, P.O. Box 77073, Atlanta, GA 30357**. You may also call Customer Service to arrange transfers by overnight delivery, telephone or other acceptable method. Transfers made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All transfers must be made in good funds by check, money order, automatic transfer from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a Transfer. Transfers received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your Account may be delayed up to five (5) calendar days if a transfer (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one transfer, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Transfers; Disputed Amounts.** We may accept late or partial transfers without losing any of our rights under this Agreement. You agree not to send us partial transfers marked "paid in full," "without recourse" or similar language. If you send such a transfer, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the transfer constitutes "payment in full" of your transfer or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage MCA Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**

**Section 1.4.** *Fees.* In addition to applicable Costs, we may charge such fees and costs, if any, as provided herein for transfer access denied or default.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any transfer under this Agreement; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any advance, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such

guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.**  Upon default, we reserve the right to terminate your option to extend the transfer date for Proceeds and may demand the immediate transfer of any outstanding undelivered Proceeds (plus applicable fees and Cost(s)).

We may hire or pay someone else to help collect any amount that you or your customers may owe us.  If, upon notice to you, we terminate your role as collection agent for outstanding Future Receivables sold to us because of your default or otherwise, you agree to cooperate with us or any agent that we designate to collect such receivables from your customers by providing timely information and other reasonable assistance.  You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law.  This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post-judgment collection services.

**Notice of Default.**  You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

### Section 1.6. *Arbitration (Agreement to Arbitrate Claims)*.

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed).  Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration.  Streamlined arbitration procedures will be used if available.  If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator.  For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below.  (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act.  If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.)  An arbitration proceeding can decide only your or our Claims.  You cannot join other parties (or consolidate Claims).  Neither you nor we will be permitted to arbitrate claims on a class–wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS.  IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE–ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY**

**CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Advance, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Advance number. The right to opt-out granted here applies solely to this Arbitration Provision, and not to any other provision of this Agreement, or to any other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) your offer for sale and our acceptance for purchase of Future Receivables, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will

be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three–arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class–wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II.  REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1.   *Covenant Representation*.**  Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2.   *Business Information*.**  All information (financial and other) provided by or on behalf of Merchant to Company in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Company such information as Company may request from time to time.

**Section 2.3.   *Reliance on Information*.**  Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Company in connection with any decision that Company makes to purchase Future Receivables.

**Section 2.4.   *Compliance*.**  Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of receivables, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (*e.g.*, eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5.   *Authorization*.**  Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6.   *Insurance*.**  Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Company.

**Section 2.7.   *Change in Name or Location*.**  Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Company and shall not change its place of business.

**Section 2.8.   *Merchant Not Indebted to Company*.**  Neither Merchant nor Owner is a debtor of Company as of the date of this Agreement.

**Section 2.9.   *Owner*.**  Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10.   *Working Capital Funding*.**  Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Future Receivables, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Future Receivables or future credit card or online sales with any party other than Company.

**Section 2.11.   *Unencumbered Future Receivables*.**  Merchant has good, complete and marketable title to all Future Receivables, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the

DSP 805-298

transactions contemplated with, or adverse to the interests of, Company.

**Section 2.12.  *Business Purpose.***  Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.  Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III.  ADDITIONAL TERMS

**Section 3.1.  *Sale of Future Receivables; Protective Security Interest.***  Merchant and Company agree that each Advance paid by Company in exchange for Future Receivables evidences a purchase of a Specified Amount and is not intended to be, nor shall it be construed as, a loan or financial accommodation from Company to Merchant.  If a transaction between Company and Merchant is deemed a loan or financial accommodation, notwithstanding the intention of the parties, then Merchant grants to Company a continuing security interest, subject only to any prior security interest of the provider of any Business Payment Account or right of setoff of any bank with regard to any Bank Account, if any, in all Future Receivables sold to us.  Moreover, Merchant grants to Company, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Company, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire:  (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2.  *No Right to Repurchase.***  Merchant acknowledges and agrees that it has no right to repurchase from Company any Future Receivable sold to Company, and Company may not force Merchant to repurchase any Future Receivable.

**Section 3.3.  *Remedies.***  In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Company shall be entitled to all remedies available under law.  In the event that Merchant breaches a Merchant Contractual Covenant specified in clauses (vi), (vii) or (viii) of Section 1.2 of this Agreement, Merchant agrees that Company shall be entitled to damages equal to, but not limited to, un-transferred Proceeds pursuant to this Agreement.  Merchant hereby agrees that Company may automatically debit such damages from Merchant's Business Payment Account or Bank Account.  The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Company to proceed first against Merchant before recovering damages from Owner.

**Section 3.4.  *Financing Statements.***  Merchant understands and agrees that Company may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to evidence the sale of Merchant's Future Receivables or to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above.  Merchant agrees to cooperate with Company as may be necessary to accomplish said filing and authorizes Company to sign Merchant's name to effect the filing or continuation of any such filings.  Any UCC-1 financing statements that are filed may state that the sale of Future Receivables by Merchant to Company is intended as a true sale and not an assignment for security.

**Section 3.5.  *Protection of Information*.**  Except for Confidential Information (as defined below), Merchant and Owner each authorizes Company to disclose to any third party information concerning Merchant's and Owner's business conduct.  Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Company or any of its affiliates relating

to any (i) investigation undertaken by or on behalf of Company as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6.** *Confidentiality*. Merchant understands and agrees that the terms and conditions of the products and services offered by Company, including this Agreement and any other Company documentation (collectively, "Confidential Information") are proprietary and confidential information of Company. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7.** *Transfer and Assignment.* Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8.** *Publicity*. Merchant and Owner authorize Company to use its, his or her name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1.** *Modifications; Amendments*; *Construction.* No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2.** *Notices.* Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, Inc., P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of our purchase of additional Future Receivables and this Agreement**.

**Section 4.3.** *Waiver; Remedies.* No delay on the part of Company to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4.** *D/B/A's.* Merchant hereby acknowledges and agrees that Company may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Company and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5.** *Binding Effect.* This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Company and their respective successors and permitted assigns.

**Section 4.6.** *Governing Law.* **With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this**

**Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Georgia without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Georgia state or federal court sitting in Fulton County, at Company's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7.** *Term and Survival.* This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8.** *Severability.* In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9.** *Entire Agreement.* This Agreement contains the entire agreement and understanding among Merchant, Owner and Company and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10.** *Jury Trial Waiver.* THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11.** *Class Action Waiver.* THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12.** *Telephone Monitoring and Recording.* To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13.** *Communicating With You and Owner; Consent to Contact by Electronic and Other Means.* For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Company regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Company Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may have from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.</u> You may withdraw this express written consent at any time by contacting us at <u>Kabbage-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA  30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14.** *In case of Errors or Questions About Your Account Summary*

If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to:  Kabbage MCA Account Inquiries, P.O. Box 77081, Atlanta, GA  30357.  We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

⊙ Your name and email address,

⊙ The dollar amount of the suspected error,

⊙ A description of the error, and

⊙ An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about.  **You remain obligated to make any remaining Total Minimum Monthly Transfer while we investigate.**

---

*Consent to Electronic Disclosure.*  You can access transaction information by visiting www.kabbage.com and logging in.  By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically.  We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site.  To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information.  The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0.  By checking the "Submit" box on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures.  You may request a paper copy of any legally required disclosure by contacting us at Kabbage MCA Paper Disclosure Request, P.O. Box 77081, Atlanta, GA  30357.  You may also withdraw your consent to electronic disclosures by contacting us in the same manner.  If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you.  You agree to provide us with your current e-mail address for notices.  If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the change.

---

This writing and the obligations evidenced or secured hereby are subject to the security interest of Victory Park Management, LLC, as Collateral Agent.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*:  **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application, bill of sale or other document signed in connection with a sale and purchase of Future Receivables hereunder represents your signature on this Agreement.**

Rev.12/16/2013

## Kabbage Merchant Cash Advance Agreement

Advance Amount: $5,800.00                                        Date:   02/11/2014
Merchant Information
Merchant:   NRO Boston LLC
Owner:   alice indelicato
Marketplaces:   AuthorizeNET, Bigcommerce, ACH, ACH, ACH, Facebook, Twitter, GoogleAnalytics, Intuit

Fees
Transfer Access Denied Fee: Up to $35

This Merchant Cash Advance Agreement ("Agreement") is made by and between **Kabbage, Inc.** ("we," "us," "our" or "Company") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

## I.  SALE AND PURCHASE OF FUTURE RECEIVABLES

**Section 1.1.**  *Sale and Purchase of Future Receivables*.  You agree to sell to us, and we agree to purchase from you, all of your right, title and interest in and to certain future receivables ("Future Receivables"), including the collected proceeds thereof ("Proceeds"), that arise from the obligations of your customers to pay you for goods and services sold or provided by you, which Future Receivables are to be paid into your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), or (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account").  You will provide us, at all times during this Agreement, with access to view the activity in your Business Payment Account, Bank Account, and marketplaces where you do business, and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future Receivables, your collection of Proceeds and your transfer to us of such Proceeds.  You further agree to (i) promptly and accurately reflect each sale of Future Receivables to us in your books and records, (ii) promptly collect upon such receivables and (iii) promptly transfer the collected Proceeds to us (in U.S. dollars) by the Transfer Date (as defined below). **Your obligation to transfer Proceeds to Company only extends to the transfer of proceeds of Future Receivables that are actually collected.  In this Agreement, references to "Proceeds" refer to proceeds of Future Receivables that are actually collected and references to "transfer" refer to the transfer of Proceeds to Company.**

**THIS IS A COMMERCIAL SALE TRANSACTION, <u>NOT</u> A LOAN, AND, WITHOUT LIMITING THE FOREGOING, YOU AGREE NOT TO USE ANY AMOUNT ADVANCED FOR PERSONAL OR HOUSEHOLD PURPOSES AND NOT TO DELIVER PROCEEDS TO US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that the agreement not to use any amount advanced for personal, family or household purposes means and not to deliver Proceeds to us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to any aspect of this commercial transaction.  Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, the use of any amount advanced or any delivery of Proceeds conforms to this section.  Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount advanced is, in fact used or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount advanced been disbursed for consumer purposes or Proceeds delivered from a consumer account.

You agree to notify us promptly if, with regard to any Business Payment Account or Bank Account, (i) the details of your account change, (ii) you open a new account or (iii) you close your account.  Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your future receivables that we will purchase, you agree to

notify us promptly if (i) the details of your account change, (ii) you open a new account or (iii) you close your account.

**Purchase Price.  We will pay a discounted purchase price for each Future Receivable sold to us.  The amount of discount applied is your "Cost".**  Your total Cost will be determined by the date(s) of transfer of Proceeds as set forth below.  On the purchase date, we will deliver to you, via your specified Business Payment Account or Bank Account, the applicable purchase price ("Advance") for the specified amount of Future Receivables ("Specified Amount") that you sell to us.  **The initial Cost will be calculated based upon the assumption that you will transfer to us Proceeds equal to the Specified Amount before the first monthly anniversary date of sale.**  An additional Cost will be applied monthly on each monthly anniversary date of sale if you elect to extend the Transfer Date for certain Proceeds as provided below.

**Extending the Transfer Date; Sale of Additional Receivables.**  You may extend the Transfer Date for certain Proceeds up to five (5) months so long as you make certain Minimum Monthly Transfers as specified below.  Each month that you elect to delay the transfer of Proceeds, the total applicable Cost for a delayed Future Receivable will increase (and the applicable purchase price for the Future Receivable will decrease).  You agree to sell to us additional Future Receivables in an amount equal to the difference between the amount previously paid for a delayed Future Receivable and the applicable adjusted purchase price for such delayed Future Receivable (additional Cost), by your next applicable Transfer Date.  We may terminate your option to delay the transfer of Proceeds at any time without notice.

**Cost Schedule.**  Costs are applied on each monthly anniversary date that any Proceeds remain untransferred.

| If the Proceeds of a Future Receivable are transferred before: | The applicable total Cost is: | And the Specified Amount of Future Receivables purchased/sold will increase by: |
|---|---|---|
| First Monthly Anniversary Date | 6.00 % | No increase |
| Second Monthly Anniversary Date | 12.00 % | $348.00 |
| Third Monthly Anniversary Date | 13.00 % | $406.00 |
| Fourth Monthly Anniversary Date | 14.00 % | $464.00 |
| Fifth Monthly Anniversary Date | 15.00 % | $522.00 |
| Sixth Monthly Anniversary Date | 16.00 % | $580.00 |

**Minimum Monthly Transfers.**  With respect to each Advance, you agree to make a minimum monthly transfer of Proceeds ("Minimum Monthly Transfer") in the amounts specified below on each scheduled monthly transfer date ("Transfer Date").  Your monthly Transfer Date will be determined when we approve you as a seller and open an account for your business on our books.  Your monthly Transfer Date will be the same date each month and will apply to all purchases that we make from you.  For any particular Advance, the Minimum Monthly Transfer will be:

| Transfer Date | Minimum Monthly Transfer: |
|---|---|
| First Transfer Date | $1,314.67 |
| Second Transfer Date | $1,314.67 |
| Third Transfer Date | $1,024.67 |
| Fourth Transfer Date | $1,024.67 |
| Fifth Transfer Date | $1,024.67 |
| Sixth Transfer Date | The balance, if any, of proceeds remaining untransferred |

   *  Or the balance of Proceeds remaining untransferred if less than the amount shown

You may at any time transfer more than the Minimum Monthly Transfer without penalty.

We will notify you, at least 10 calendar days in advance of each Transfer Date, of the aggregate amount of (i) all current Minimum Monthly Transfers for multiple Advances, plus (ii) any previous Minimum Monthly Transfers remaining, in whole or in part, un-transferred, plus (iii) accrued but unpaid fees (collectively, (i) through (iii) are your "Total Minimum Monthly Transfer").  If you fail to make a transfer of your Total Minimum Monthly Transfer amount on time, you agree that we may assess, as liquidated damages, a **Transfer Access Denied Fee** of $35 for Total Minimum Monthly Transfers of $100 or more, or **$10** for Total Minimum Monthly Transfers of less than $100.  This fee will be waived if (i) collections in the ordinary course are less than the Total Minimum Monthly Transfer amount and (ii) you are not otherwise in breach of this Agreement.

**Section 1.2.   *Merchant's Contractual Covenants and Representations; Further Inquires*.**

**Covenants.** You agree:

(i)   Not to use any amount advanced for personal or household purposes and not to deliver Proceeds from any consumer account;

(ii)   To promptly and accurately reflect each sale of Future Receivables to us in your books and records;

(iii)   Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iv)   To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future Receivables, your handling of Proceeds and your transfer to us of Proceeds;

(v)   Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(vi)   With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your future receivables that we will purchase, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vii)To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Advance for the processing of your sales transactions, or otherwise ensure that Proceeds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(viii)To maintain a minimum balance of Proceeds in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(ix)   To collect Future Receivables promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(x)   To transfer Proceeds to us (in U.S. dollars) by the applicable Transfer Date"

(xi)   Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xii)Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which Proceeds will be deposited and not to take any action to cause Future Receivables to be settled or transferred to any account other than the Accounts;

(xiii)Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiv)   Not to take any intentional action that would substantially impair or reduce your generation or collection of receivables adequate to satisfy your obligations under this Agreement without our prior written permission;

(xv)Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a transfer under Section 1.3; and

(xvi)   To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Merchant, Owner and Company acknowledge and agree that Merchant's going bankrupt or out of business (alone) does not constitute a breach of Merchant's Contractual Covenants or other provisions of this Agreement.  If, as the result of market**

forces, Merchant's business activity slows and Merchant's inventory of Future Receivables decrease, or if Merchant closes its business after adequate prior notice to Company and a good faith effort to fulfill Merchant's outstanding obligations under this Agreement, no breach of this Agreement shall be deemed to occur, provided that Merchant has not violated any of Merchant's Contractual Covenants or other provisions of this Agreement.  Company is purchasing Future Receivables and Company assumes the risk that Merchant's business may fail or be adversely affected by conditions outside the control of Merchant, provided that Merchant has not breached Merchant's Contractual Covenants or any other provision of this Agreement.

**Representations.**  You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.**  Merchant and Owner authorize Company, its agents and representatives, and any credit reporting agency engaged by Company, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a cash advance or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Company.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.**  Owner personally guarantees the <u>performance</u> of all of the <u>covenants of Merchant</u> in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Transfers*.

**Automatic Transfer Authorization.  You authorize us to initiate, on each Transfer Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Transfer**; provided, however, that if a Transfer Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day.  Any separate transfers that you make on or before a Transfer Date will not affect this authorization.  You understand that your Total Minimum Monthly Transfer may vary from time to time but will in no event exceed the total Specified Amount outstanding.  We will not be liable for any Cost that you may incur if we are unable to debit your Total Minimum Monthly Transfer under this authorization.  We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit.  Advance or any transfers made directly by you under this Agreement.  Automated Clearing House transactions must comply with the provisions of U.S. law.

**Transfer Failure.**  <u>If a debit is rejected or if you otherwise fail to ensure delivery of any Total Minimum Monthly Transfer when due,</u> <u>you agree that we may</u> (i) terminate your option to extend the transfer of the Proceeds,  (ii) suspend all further automatic debits, in which case you will be responsible for making all further transfers directly and in a timely manner, (iii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for Proceeds and any other amounts due us* and (iv) pursue any and all other remedies available to us.

**Account Maintenance.**  You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient Proceeds to meet each Total Minimum Monthly Transfer obligation.  We may initiate a debit at any time on a Transfer Date, including <u>prior</u> to the time that we open for business on any business day.  Consequently, you understand that Proceeds must be available by the end of the business day <u>prior</u> to the applicable Transfer Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.**  You may terminate this automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Transfer Date, and your termination will be effective

three (3) business days after the date your notice is received by us.  If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call.  Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us.  We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records.  Following the date of any termination of automatic debits by us or by you, you will be responsible for making all further transfers directly and in a timely manner.

**Alternative Transfer.**  If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.**  We do not accept transfers from consumer accounts.  If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account..  You agree that your obligation to transfer Proceeds under this Agreement is not related to any consumer transaction.  There can be no ground for any refund or return.  All deliveries of Proceeds to us are final.  You agree that if you transfer any funds in excess of the Specified Amount sold to us, including any sales of Future Receivables related to your Cost, we may apply any such excess to any outstanding Advance or other obligation you have with us or issue a check to you.

**Other Transfers.**  You may make additional or alternative transfers at any time.  Transfers by postal mail should be sent, postage paid, to the following address: **Kabbage MCA Transfers, P.O. Box 77073, Atlanta, GA  30357.**  You may also call Customer Service to arrange transfers by overnight delivery, telephone or other acceptable method.  Transfers made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible.  All transfers must be made in good funds by check, money order, automatic transfer from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars.  You are solely responsible for any costs associated with a Transfer.  Transfers received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your Account may be delayed up to five (5) calendar days if a transfer (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one transfer, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Transfers; Disputed Amounts.**  We may accept late or partial transfers without losing any of our rights under this Agreement.  You agree not to send us partial transfers marked "paid in full," "without recourse" or similar language.  If you send such a transfer, we may accept it without losing any of our rights under this Agreement.  **All written communications concerning disputed amounts, including any check or other  instrument that indicates that the transfer constitutes "payment in full" of your transfer or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage MCA Dispute Resolution, P.O. Box 77081, Atlanta, GA  30357.**

**Section 1.4.  Fees.**  In addition to applicable Costs, we may charge such fees and costs, if any, as provided herein for transfer access denied or default.

**Section 1.5.  Default.**  You will be in default if any of the following happen:  (i) you fail to make any transfer under this Agreement; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any advance, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back

of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.**   Upon default, we reserve the right to terminate your option to extend the transfer date for Proceeds and may demand the immediate transfer of any outstanding undelivered Proceeds (plus applicable fees and Cost(s)).

We may hire or pay someone else to help collect any amount that you or your customers may owe us.  If, upon notice to you, we terminate your role as collection agent for outstanding Future Receivables sold to us because of your default or otherwise, you agree to cooperate with us or any agent that we designate to collect such receivables from your customers by providing timely information and other reasonable assistance.  You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law.  This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post-judgment collection services.

**Notice of Default.**   You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

### Section 1.6. *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed).  Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration.  Streamlined arbitration procedures will be used if available.  If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator.  For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below.  (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act.  If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.)  An arbitration proceeding can decide only your or our Claims.  You cannot join other parties (or consolidate Claims).  Neither you nor we will be permitted to arbitrate claims on a class–wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS.  IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN**

PRE–ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN.  OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.  Except as set forth below, the arbitrator's decision will be final and binding.  Only a court may decide the validity of items (iii) and (iv) above.  If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void.  You or we can appeal any such holding.  If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force.  An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision.  The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court.  An arbitrator may decide any Claim upon the submission of documents alone.  A party may request a telephonic hearing if permitted by applicable rules.  The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged.  Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration**.  **You may opt-out of this Arbitration Provision.  If you do so, neither you nor we will have the right to engage in arbitration.**  Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement.  To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Advance, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA  30357; ATTN: Arbitration.  In your letter, you must give us the following information: Name, Address and Advance number.  The right to opt-out granted here applies solely to this Arbitration Provision, and not to any other provision of this Agreement, or to any other agreement with us.  In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."**  The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) your offer for sale and our acceptance for purchase of Future Receivables, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.**  For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at:  (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1–800–352–5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1–800–778–7879.  If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration.  Any physical arbitration hearing will be held in the federal judicial district selected by Merchant.  No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration.  Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses.  Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration.  The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner.  For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above.  The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds.  Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.**  <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, as amended, notwithstanding any other governing law provision in this Agreement.</u>  The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law.  Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction.  The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three–arbitrator panel administered by the selected arbitration administrator.  The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.**  This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement.  If any portion of this Arbitration Provision (other than the provisions prohibiting class–wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision.  If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II.  REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1.  *Covenant Representation*.**  Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2.  *Business Information*.**  All information (financial and other) provided by or on behalf of Merchant to Company in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects.  Merchant shall furnish Company such information as Company may request from time to time.

**Section 2.3.  *Reliance on Information*.**  Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Company in connection with any decision that Company makes to purchase Future Receivables.

**Section 2.4.  *Compliance*.**  Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of receivables, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (*e.g.*, eBay) applicable to Merchant's business.  Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5.  *Authorization*.**  Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6.  *Insurance*.**  Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Company.

**Section 2.7.  *Change in Name or Location*.**  Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Company and shall not change its place of business.

**Section 2.8.  *Merchant Not Indebted to Company*.**  Neither Merchant nor Owner is a debtor of Company as of the date of this Agreement.

**Section 2.9.  *Owner.***  Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10.  *Working Capital Funding*.**  Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Future Receivables, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Future Receivables or future credit card or online sales with any party other than Company.

**Section 2.11.  *Unencumbered Future Receivables.***  Merchant has good, complete and marketable title to all Future Receivables, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests,

equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Company.

**Section 2.12.  *Business Purpose.***  Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.  Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III.  ADDITIONAL TERMS

**Section 3.1.  *Sale of Future Receivables; Protective Security Interest.***  Merchant and Company agree that each Advance paid by Company in exchange for Future Receivables evidences a purchase of a Specified Amount and is not intended to be, nor shall it be construed as, a loan or financial accommodation from Company to Merchant.  If a transaction between Company and Merchant is deemed a loan or financial accommodation, notwithstanding the intention of the parties, then Merchant grants to Company a continuing security interest, subject only to any prior security interest of the provider of any Business Payment Account or right of setoff of any bank with regard to any Bank Account, if any, in all Future Receivables sold to us.  Moreover, Merchant grants to Company, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Company, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire:  (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2.  *No Right to Repurchase.***  Merchant acknowledges and agrees that it has no right to repurchase from Company any Future Receivable sold to Company, and Company may not force Merchant to repurchase any Future Receivable.

**Section 3.3.  *Remedies.***  In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Company shall be entitled to all remedies available under law.  In the event that Merchant breaches a Merchant Contractual Covenant specified in clauses (vi), (vii) or (viii) of Section 1.2 of this Agreement, Merchant agrees that Company shall be entitled to damages equal to, but not limited to, un-transferred Proceeds pursuant to this Agreement.  Merchant hereby agrees that Company may automatically debit such damages from Merchant's Business Payment Account or Bank Account.  The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Company to proceed first against Merchant before recovering damages from Owner.

**Section 3.4.  *Financing Statements.***  Merchant understands and agrees that Company may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to evidence the sale of Merchant's Future Receivables or to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above.  Merchant agrees to cooperate with Company as may be necessary to accomplish said filing and authorizes Company to sign Merchant's name to effect the filing or continuation of any such filings.  Any UCC-1 financing statements that are filed may state that the sale of Future Receivables by Merchant to Company is intended as a true sale and not an assignment for security.

**Section 3.5.  *Protection of Information*.***  Except for Confidential Information (as defined below), Merchant and Owner each authorizes Company to disclose to any third party information concerning Merchant's and Owner's business conduct.  Merchant and

Owner hereby waive to the maximum extent permitted by law any claim for damages against Company or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Company as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6.   *Confidentiality***.  Merchant understands and agrees that the terms and conditions of the products and services offered by Company, including this Agreement and any other Company documentation (collectively, "Confidential Information") are proprietary and confidential information of Company.  Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6.  The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7.   *Transfer and Assignment***.  Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person.  Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you.  Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8.   *Publicity***.  Merchant and Owner authorize Company to use its, his or her name in a listing of clients and in advertising and marketing materials.

## IV.  MISCELLANEOUS

**Section 4.1.   *Modifications; Amendments*; *Construction.***  No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected.  The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement.  For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2.   *Notices***.  Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically.  Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail.  Notice to you will be sent to your last known address in our records.  Notice to any of you will be deemed notice to all of you.  Notice to us may be sent to Kabbage, Inc., P.O. Box 77081, Atlanta, GA  30357.  You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding.  You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court.  **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us.  You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction.  This indemnity will survive termination of our purchase of additional Future Receivables and this Agreement**.

**Section 4.3.   *Waiver; Remedies***.  No delay on the part of Company to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right.  The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4.   *D/B/A's***.  Merchant hereby acknowledges and agrees that Company may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Company and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5.   *Binding Effect***.  This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Company and their respective successors and permitted assigns.

**Section 4.6.**  *Governing Law.*  **With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Georgia without regard to internal principles of conflict of laws.**  Merchant hereby submits to the jurisdiction of any Georgia state or federal court sitting in Fulton County, at Company's choice.  Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7.**  *Term and Survival.*  This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8.**  *Severability.*  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9.**  *Entire Agreement.*  This Agreement contains the entire agreement and understanding among Merchant, Owner and Company and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10.**  *Jury Trial Waiver.*  THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY.  THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11.**  *Class Action Waiver.*  THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY.  TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT:  (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12.**  *Telephone Monitoring and Recording.*  To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13.**  *Communicating With You and Owner; Consent to Contact by Electronic and Other Means.*  For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Company regarding this Agreement and related commercial transactions.  You agree that we may contact you as provided in this paragraph.  We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Company Privacy Policy in effect from time to time.  No such contact will be deemed unsolicited.  <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may have from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone</u>.  You may withdraw this express written consent at any time by contacting us at <u>Kabbage-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA  30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14.**  *In case of Errors or Questions About Your Account Summary*

If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to:  Kabbage MCA Account Inquiries, P.O. Box 77081, Atlanta, GA  30357.  We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

⊙ Your name and email address,

⊙ The dollar amount of the suspected error,

⊙ A description of the error, and

⊙ An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about.  **You remain obligated to make any remaining Total Minimum Monthly Transfer while we investigate.**

---

*Consent to Electronic Disclosure.*  You can access transaction information by visiting www.kabbage.com and logging in.  By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically.  We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site.  To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information.  The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0.  By checking the "Submit" box on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures.  You may request a paper copy of any legally required disclosure by contacting us at Kabbage MCA Paper Disclosure Request, P.O. Box 77081, Atlanta, GA  30357.  You may also withdraw your consent to electronic disclosures by contacting us in the same manner.  If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you.  You agree to provide us with your current e-mail address for notices.  If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the change.

---

This writing and the obligations evidenced or secured hereby are subject to the security interest of Victory Park Management, LLC, as Collateral Agent.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*:  **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application, bill of sale or other document signed in connection with a sale and purchase of Future Receivables hereunder represents your signature on this Agreement.**

Rev.1/22/2014

## Kabbage Merchant Cash Advance Agreement

Advance Amount:  $47,100.00                                          Date:   02/13/2014
Merchant Information
Merchant:   NRO Boston LLC
Owner:   alice indelicato
Marketplaces:   AuthorizeNET, Bigcommerce, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit

This Merchant Cash Advance Agreement ("Agreement") is made by and between

**Kabbage, Inc.** ("we," "us," "our" or "Company") and merchant ("you" or

"Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on

behalf of Merchant ("Owner"), as of the date specified above.

Fees
Transfer Access Denied Fee: Up to $35

## I.  SALE AND PURCHASE OF FUTURE RECEIVABLES

**Section 1.1.** *Sale and Purchase of Future Receivables*. You agree to sell to us, and we agree to purchase from you, all of your

right, title and interest in and to certain future receivables ("Future Receivables"), including the collected proceeds thereof

("Proceeds"), that arise from the obligations of your customers to pay you for goods and services sold or provided by you, which

Future Receivables are to be paid into your commercial transaction account(s), including, but not limited to, (i) your PayPal business

account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"),

or (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively,

as appropriate, your "Bank Account").  You will provide us, at all times during this Agreement, with access to view the activity in your

Business Payment Account, Bank Account, and marketplaces where you do business, and to such other accounts and sales and

shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future

Receivables, your collection of Proceeds and your transfer to us of such Proceeds.  You further agree to (i) promptly and accurately

reflect each sale of Future Receivables to us in your books and records, (ii) promptly collect upon such receivables and (iii)

promptly transfer the collected Proceeds to us (in U.S. dollars) by the Transfer Date (as defined below). **Your obligation to transfer**

**Proceeds to Company only extends to the transfer of proceeds of Future Receivables that are actually collected.  In this**

**Agreement, references to "Proceeds" refer to proceeds of Future Receivables that are actually collected and references to**

**"transfer" refer to the transfer of Proceeds to Company.**

**THIS IS A COMMERCIAL SALE TRANSACTION, <u>NOT</u> A LOAN, AND, WITHOUT LIMITING THE FOREGOING,**
**YOU AGREE NOT TO USE ANY AMOUNT ADVANCED FOR PERSONAL OR HOUSEHOLD PURPOSES**
**AND NOT TO DELIVER PROCEEDS TO US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial

transaction and that the agreement not to use any amount advanced for personal, family or household purposes means and not to

deliver Proceeds to us from any consumer account means that certain important duties imposed upon transactions and

communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will

not apply to any aspect of this commercial transaction.  Merchant and Owner also understand, acknowledge and agree that we may

be unable to confirm whether, for example, the use of any amount advanced or any delivery of Proceeds conforms to this section.

Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our

right to (i) enforce this Agreement, regardless of the purpose for which any amount advanced is, in fact used or (ii) use any remedy

legally available to us in a commercial transaction, even if that remedy would not have been available had any amount advanced been

disbursed for consumer purposes or Proceeds delivered from a consumer account.

You agree to notify us promptly if, with regard to any Business Payment Account or Bank Account, (i) the details of your account

change, (ii) you open a new account or (iii) you close your account.  Furthermore, with regard to information about any marketplace or

other service provider that you provided to us to determine the amount of your future receivables that we will purchase, you agree to

notify us promptly if (i) the details of your account change, (ii) you open a new account or (iii) you close your account.

**Purchase Price. We will pay a discounted purchase price for each Future Receivable sold to us. The amount of discount applied is your "Cost".** Your total Cost will be determined by the date(s) of transfer of Proceeds as set forth below. On the purchase date, we will deliver to you, via your specified Business Payment Account or Bank Account, the applicable purchase price ("Advance") for the specified amount of Future Receivables ("Specified Amount") that you sell to us. **The initial Cost will be calculated based upon the assumption that you will transfer to us Proceeds equal to the Specified Amount before the first monthly anniversary date of sale.** An additional Cost will be applied monthly on each monthly anniversary date of sale if you elect to extend the Transfer Date for certain Proceeds as provided below.

**Extending the Transfer Date; Sale of Additional Receivables.** You may extend the Transfer Date for certain Proceeds up to five (5) months so long as you make certain Minimum Monthly Transfers as specified below. Each month that you elect to delay the transfer of Proceeds, the total applicable Cost for a delayed Future Receivable will increase (and the applicable purchase price for the Future Receivable will decrease). You agree to sell to us additional Future Receivables in an amount equal to the difference between the amount previously paid for a delayed Future Receivable and the applicable adjusted purchase price for such delayed Future Receivable (additional Cost), by your next applicable Transfer Date. We may terminate your option to delay the transfer of Proceeds at any time without notice.

**Cost Schedule.** Costs are applied on each monthly anniversary date that any Proceeds remain untransferred.

| If the Proceeds of a Future Receivable are transferred before: | The applicable total Cost is: | And the Specified Amount of Future Receivables purchased/sold will increase by: |
|---|---|---|
| First Monthly Anniversary Date | 5.00 % | No increase |
| Second Monthly Anniversary Date | 10.00 % | $2,355.00 |
| Third Monthly Anniversary Date | 11.00 % | $2,826.00 |
| Fourth Monthly Anniversary Date | 12.00 % | $3,297.00 |
| Fifth Monthly Anniversary Date | 13.00 % | $3,768.00 |
| Sixth Monthly Anniversary Date | 14.00 % | $4,239.00 |

**Minimum Monthly Transfers.** With respect to each Advance, you agree to make a minimum monthly transfer of Proceeds ("Minimum Monthly Transfer") in the amounts specified below on each scheduled monthly transfer date ("Transfer Date"). Your monthly Transfer Date will be determined when we approve you as a seller and open an account for your business on our books. Your monthly Transfer Date will be the same date each month and will apply to all purchases that we make from you. For any particular Advance, the Minimum Monthly Transfer will be:

| Transfer Date | Minimum Monthly Transfer: |
|---|---|
| First Transfer Date | $10,205.00 |
| Second Transfer Date | $10,205.00 |
| Third Transfer Date | $8,321.00 |
| Fourth Transfer Date | $8,321.00 |
| Fifth Transfer Date | $8,321.00 |
| Sixth Transfer Date | The balance, if any, of proceeds remaining untransferred |

   * Or the balance of Proceeds remaining untransferred if less than the amount shown

You may at any time transfer more than the Minimum Monthly Transfer without penalty.

We will notify you, at least 10 calendar days in advance of each Transfer Date, of the aggregate amount of (i) all current Minimum Monthly Transfers for multiple Advances, plus (ii) any previous Minimum Monthly Transfers remaining, in whole or in part, un-transferred, plus (iii) accrued but unpaid fees (collectively, (i) through (iii) are your "Total Minimum Monthly Transfer"). If you fail to make a transfer of your Total Minimum Monthly Transfer amount on time, you agree that we may assess, as liquidated damages, a **Transfer Access Denied Fee** of **$35** for Total Minimum Monthly Transfers of $100 or more, or **$10** for Total Minimum Monthly Transfers of less than $100. This fee will be waived if (i) collections in the ordinary course are less than the Total Minimum Monthly Transfer amount and (ii) you are not otherwise in breach of this Agreement.

**Section 1.2.** *Merchant's Contractual Covenants and Representations; Further Inquires.*

**Covenants.** You agree:

(i)   Not to use any amount advanced for personal or household purposes and not to deliver Proceeds from any consumer account;

(ii)   To promptly and accurately reflect each sale of Future Receivables to us in your books and records;

(iii)   Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iv)   To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future Receivables, your handling of Proceeds and your transfer to us of Proceeds;

(v)   Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(vi)   With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your future receivables that we will purchase, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vii) To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Advance for the processing of your sales transactions, or otherwise ensure that Proceeds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(viii) To maintain a minimum balance of Proceeds in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(ix)   To collect Future Receivables promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(x)   To transfer Proceeds to us (in U.S. dollars) by the applicable Transfer Date"

(xi)   Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xii) Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which Proceeds will be deposited and not to take any action to cause Future Receivables to be settled or transferred to any account other than the Accounts;

(xiii) Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiv)   Not to take any intentional action that would substantially impair or reduce your generation or collection of receivables adequate to satisfy your obligations under this Agreement without our prior written permission;

(xv) Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a transfer under Section 1.3; and

(xvi)   To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Merchant, Owner and Company acknowledge and agree that Merchant's going bankrupt or out of business (alone) does not constitute a breach of Merchant's Contractual Covenants or other provisions of this Agreement.  If, as the result of market**

DSP 805-317

forces, Merchant's business activity slows and Merchant's inventory of Future Receivables decrease, or if Merchant closes its business after adequate prior notice to Company and a good faith effort to fulfill Merchant's outstanding obligations under this Agreement, no breach of this Agreement shall be deemed to occur, provided that Merchant has not violated any of Merchant's Contractual Covenants or other provisions of this Agreement.  Company is purchasing Future Receivables and Company assumes the risk that Merchant's business may fail or be adversely affected by conditions outside the control of Merchant, provided that Merchant has not breached Merchant's Contractual Covenants or any other provision of this Agreement.

**Representations.**  You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.**  Merchant and Owner authorize Company, its agents and representatives, and any credit reporting agency engaged by Company, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a cash advance or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Company.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.**  Owner personally guarantees the <u>performance</u> of all of the <u>covenants of Merchant</u> in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.  *Transfers*.**

**Automatic Transfer Authorization.  You authorize us to initiate, on each Transfer Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Transfer**; provided, however, that if a Transfer Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day.  Any separate transfers that you make on or before a Transfer Date will not affect this authorization.  You understand that your Total Minimum Monthly Transfer may vary from time to time but will in no event exceed the total Specified Amount outstanding.  We will not be liable for any Cost that you may incur if we are unable to debit your Total Minimum Monthly Transfer under this authorization.  We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit.  Advance or any transfers made directly by you under this Agreement.  Automated Clearing House transactions must comply with the provisions of U.S. law.

**Transfer Failure.**  <u>If a debit is rejected or if you otherwise fail to ensure delivery of any Total Minimum Monthly Transfer when due, you agree that we may</u> (i) terminate your option to extend the transfer of the Proceeds,  (ii) suspend all further automatic debits, in which case you will be responsible for making all further transfers directly and in a timely manner, (iii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for Proceeds and any other amounts due us* and (iv) pursue any and all other remedies available to us.

**Account Maintenance.**  You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient Proceeds to meet each Total Minimum Monthly Transfer obligation.  We may initiate a debit at any time on a Transfer Date, including <u>prior</u> to the time that we open for business on any business day.  Consequently, you understand that Proceeds must be available by the end of the business day <u>prior</u> to the applicable Transfer Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.**  You may terminate this automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Transfer Date, and your termination will be effective

three (3) business days after the date your notice is received by us.  If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call.  <u>Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us</u>.  We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records.  Following the date of any termination of automatic debits by us or by you, you will be responsible for making all further transfers directly and in a timely manner.

**Alternative Transfer.**  If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.**  We do not accept transfers from consumer accounts.  If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account..  You agree that your obligation to transfer Proceeds under this Agreement is not related to any consumer transaction.  There can be no ground for any refund or return.  All deliveries of Proceeds to us are final.  You agree that if you transfer any funds in excess of the Specified Amount sold to us, including any sales of Future Receivables related to your Cost, we may apply any such excess to any outstanding Advance or other obligation you have with us or issue a check to you.

**Other Transfers.**  You may make additional or alternative transfers at any time.  Transfers by postal mail should be sent, postage paid, to the following address:  <u>**Kabbage MCA Transfers, P.O. Box 77073, Atlanta, GA  30357**</u>.  You may also call Customer Service to arrange transfers by overnight delivery, telephone or other acceptable method.  Transfers made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible.  All transfers must be made in good funds by check, money order, automatic transfer from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars.  You are solely responsible for any costs associated with a Transfer.  Transfers received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your Account may be delayed up to five (5) calendar days if a transfer (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one transfer, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Transfers; Disputed Amounts.**  We may accept late or partial transfers without losing any of our rights under this Agreement.  You agree not to send us partial transfers marked "paid in full," "without recourse" or similar language.  If you send such a transfer, we may accept it without losing any of our rights under this Agreement.  **All written communications concerning disputed amounts, including any check or other  instrument that indicates that the transfer constitutes "payment in full" of your transfer or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage MCA Dispute Resolution, P.O. Box 77081, Atlanta, GA  30357.</u>**

**Section 1.4.  Fees.**  In addition to applicable Costs, we may charge such fees and costs, if any, as provided herein for transfer access denied or default.

**Section 1.5.  *Default.*  **You will be in default if any of the following happen:  (i) you fail to make any transfer under this Agreement; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or <u>claim that a debit transaction pursuant to Section 1.3 is unauthorized</u>; (iv) you are in default under any advance, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back

of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.**   Upon default, we reserve the right to terminate your option to extend the transfer date for Proceeds and may demand the immediate transfer of any outstanding undelivered Proceeds (plus applicable fees and Cost(s)).

We may hire or pay someone else to help collect any amount that you or your customers may owe us.  If, upon notice to you, we terminate your role as collection agent for outstanding Future Receivables sold to us because of your default or otherwise, you agree to cooperate with us or any agent that we designate to collect such receivables from your customers by providing timely information and other reasonable assistance.  You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law.  This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post-judgment collection services.

**Notice of Default.**  You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

### Section 1.6. *Arbitration (Agreement to Arbitrate Claims)*.

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed).  Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration.  Streamlined arbitration procedures will be used if available.  If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator.  For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below.  (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act.  If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.)  An arbitration proceeding can decide only your or our Claims.  You cannot join other parties (or consolidate Claims).  Neither you nor we will be permitted to arbitrate claims on a class–wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS.  IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN**

**PRE–ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN.  OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**  Except as set forth below, the arbitrator's decision will be final and binding.  Only a court may decide the validity of items (iii) and (iv) above.  If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void.  You or we can appeal any such holding.  If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force.  An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision.  <u>The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court.  An arbitrator may decide any Claim upon the submission of documents alone.  A party may request a telephonic hearing if permitted by applicable rules.</u>  The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged.  Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration.  You may opt-out of this Arbitration Provision.  If you do so, neither you nor we will have the right to engage in arbitration.**  Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement.  To opt out of this Arbitration Provision, we must receive your written notice of opt-out, <u>within 60 calendar days after we approve your Advance</u>, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA  30357; ATTN: Arbitration.  In your letter, you must give us the following information: Name, Address and Advance number.  The right to opt-out granted here applies solely to this Arbitration Provision, and not to any other provision of this Agreement, or to any other agreement with us.  In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."**  The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) your offer for sale and our acceptance for purchase of Future Receivables, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.**  For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at:  (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, <u>http://www.jamsadr.com</u>, or 1–800–352–5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, <u>websitemail@adr.org</u>, <u>http://www.adr.org</u>, or 1–800–778–7879.  If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration.  Any physical arbitration hearing will be held in the federal judicial district selected by Merchant.  No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration.  Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses.  Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration.  The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner.  For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above.  The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision.  The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds.  Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.**  <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, as amended, notwithstanding any other governing law provision in this Agreement</u>.  The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law.  Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction.  The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three–arbitrator panel administered by the selected arbitration administrator.  The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.**  This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement.  If any portion of this Arbitration Provision (other than the provisions prohibiting class–wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision.  If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II.  REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1.**  *Covenant Representation*.  Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2.**  *Business Information*.  All information (financial and other) provided by or on behalf of Merchant to Company in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects.  Merchant shall furnish Company such information as Company may request from time to time.

**Section 2.3.**  *Reliance on Information*.  Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Company in connection with any decision that Company makes to purchase Future Receivables.

**Section 2.4.**  *Compliance*.  Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of receivables, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (*e.g.*, eBay) applicable to Merchant's business.  Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5.**  *Authorization*.  Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6.**  *Insurance*.  Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Company.

**Section 2.7.**  *Change in Name or Location*.  Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Company and shall not change its place of business.

**Section 2.8.**  *Merchant Not Indebted to Company.*  Neither Merchant nor Owner is a debtor of Company as of the date of this Agreement.

**Section 2.9.**  *Owner.*  Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10.**  *Working Capital Funding.*  Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Future Receivables, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Future Receivables or future credit card or online sales with any party other than Company.

**Section 2.11.**  *Unencumbered Future Receivables.*  Merchant has good, complete and marketable title to all Future Receivables, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests,

equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Company.

**Section 2.12.** *Business Purpose.* Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1.** *Sale of Future Receivables; Protective Security Interest.* Merchant and Company agree that each Advance paid by Company in exchange for Future Receivables evidences a purchase of a Specified Amount and is not intended to be, nor shall it be construed as, a loan or financial accommodation from Company to Merchant. If a transaction between Company and Merchant is deemed a loan or financial accommodation, notwithstanding the intention of the parties, then Merchant grants to Company a continuing security interest, subject only to any prior security interest of the provider of any Business Payment Account or right of setoff of any bank with regard to any Bank Account, if any, in all Future Receivables sold to us. Moreover, Merchant grants to Company, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Company, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2.** *No Right to Repurchase.* Merchant acknowledges and agrees that it has no right to repurchase from Company any Future Receivable sold to Company, and Company may not force Merchant to repurchase any Future Receivable.

**Section 3.3.** *Remedies.* In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Company shall be entitled to all remedies available under law. In the event that Merchant breaches a Merchant Contractual Covenant specified in clauses (vi), (vii) or (viii) of Section 1.2 of this Agreement, Merchant agrees that Company shall be entitled to damages equal to, but not limited to, un-transferred Proceeds pursuant to this Agreement. Merchant hereby agrees that Company may automatically debit such damages from Merchant's Business Payment Account or Bank Account. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Company to proceed first against Merchant before recovering damages from Owner.

**Section 3.4.** *Financing Statements.* Merchant understands and agrees that Company may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to evidence the sale of Merchant's Future Receivables or to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Company as may be necessary to accomplish said filing and authorizes Company to sign Merchant's name to effect the filing or continuation of any such filings. Any UCC-1 financing statements that are filed may state that the sale of Future Receivables by Merchant to Company is intended as a true sale and not an assignment for security.

**Section 3.5.** *Protection of Information.* Except for Confidential Information (as defined below), Merchant and Owner each authorizes Company to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and

Owner hereby waive to the maximum extent permitted by law any claim for damages against Company or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Company as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6.** *Confidentiality*. Merchant understands and agrees that the terms and conditions of the products and services offered by Company, including this Agreement and any other Company documentation (collectively, "Confidential Information") are proprietary and confidential information of Company. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7.** *Transfer and Assignment*. Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8.** *Publicity*. Merchant and Owner authorize Company to use its, his or her name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1.** *Modifications; Amendments*; *Construction.* No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2.** *Notices.* Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, Inc., P.O. Box 77081, Atlanta, GA  30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of our purchase of additional Future Receivables and this Agreement**.

**Section 4.3.** *Waiver; Remedies.* No delay on the part of Company to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4.** *D/B/A's.* Merchant hereby acknowledges and agrees that Company may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Company and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5.** *Binding Effect.* This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Company and their respective successors and permitted assigns.

**Section 4.6.**  *Governing Law.*  **With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Georgia without regard to internal principles of conflict of laws.**  Merchant hereby submits to the jurisdiction of any Georgia state or federal court sitting in Fulton County, at Company's choice.  Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7.**  *Term and Survival.*  This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8.**  *Severability.*  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9.**  *Entire Agreement.*  This Agreement contains the entire agreement and understanding among Merchant, Owner and Company and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10.**  *Jury Trial Waiver.*  THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY.  THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11.**  *Class Action Waiver.*  THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY.  TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT:  (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12.**  *Telephone Monitoring and Recording.*  To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13.**  *Communicating With You and Owner; Consent to Contact by Electronic and Other Means.*  For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Company regarding this Agreement and related commercial transactions.  You agree that we may contact you as provided in this paragraph.  We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Company Privacy Policy in effect from time to time.  No such contact will be deemed unsolicited.  <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may have from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone</u>.  You may withdraw this express written consent at any time by contacting us at <u>Kabbage-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA  30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14.**  *In case of Errors or Questions About Your Account Summary*

If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to:  Kabbage MCA Account Inquiries, P.O. Box 77081, Atlanta, GA  30357.  We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

⊙ Your name and email address,

⊙ The dollar amount of the suspected error,

⊙ A description of the error, and

⊙ An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about.  **You remain obligated to make any remaining Total Minimum Monthly Transfer while we investigate.**

---

*Consent to Electronic Disclosure.*  You can access transaction information by visiting www.kabbage.com and logging in.  By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically.  We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site.  To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information.  The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0.  By checking the "Submit" box on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures.  You may request a paper copy of any legally required disclosure by contacting us at Kabbage MCA Paper Disclosure Request, P.O. Box 77081, Atlanta, GA  30357.  You may also withdraw your consent to electronic disclosures by contacting us in the same manner.  If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you.  You agree to provide us with your current e-mail address for notices.  If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the change.

---

This writing and the obligations evidenced or secured hereby are subject to the security interest of Victory Park Management, LLC, as Collateral Agent.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*:  **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application, bill of sale or other document signed in connection with a sale and purchase of Future Receivables hereunder represents your signature on this Agreement.**

Rev.1/22/2014

## Kabbage Merchant Cash Advance Agreement

Advance Amount:  $13,000.00                                            Date:   03/14/2014
Merchant Information
Merchant:   NRO Boston LLC
Owner:   alice indelicato
Marketplaces:   AuthorizeNET, Bigcommerce, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit

This Merchant Cash Advance Agreement ("Agreement") is made by and between **Kabbage, Inc.** ("we," "us," "our" or "Company") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

Fees
Transfer Access Denied Fee: Up to $35

## I.  SALE AND PURCHASE OF FUTURE RECEIVABLES

**Section 1.1.**  *Sale and Purchase of Future Receivables*.  You agree to sell to us, and we agree to purchase from you, all of your right, title and interest in and to certain future receivables ("Future Receivables"), including the collected proceeds thereof ("Proceeds"), that arise from the obligations of your customers to pay you for goods and services sold or provided by you, which Future Receivables are to be paid into your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), or (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account").  You will provide us, at all times during this Agreement, with access to view the activity in your Business Payment Account, Bank Account, and marketplaces where you do business, and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future Receivables, your collection of Proceeds and your transfer to us of such Proceeds.  You further agree to (i) promptly and accurately reflect each sale of Future Receivables to us in your books and records, (ii) promptly collect upon such receivables and (iii) promptly transfer the collected Proceeds to us (in U.S. dollars) by the Transfer Date (as defined below). **Your obligation to transfer Proceeds to Company only extends to the transfer of proceeds of Future Receivables that are actually collected.  In this Agreement, references to "Proceeds" refer to proceeds of Future Receivables that are actually collected and references to "transfer" refer to the transfer of Proceeds to Company.**

**THIS IS A COMMERCIAL SALE TRANSACTION, <u>NOT</u> A LOAN, AND, WITHOUT LIMITING THE FOREGOING, YOU AGREE NOT TO USE ANY AMOUNT ADVANCED FOR PERSONAL OR HOUSEHOLD PURPOSES AND NOT TO DELIVER PROCEEDS TO US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that the agreement not to use any amount advanced for personal, family or household purposes means and not to deliver Proceeds to us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to any aspect of this commercial transaction.  Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, the use of any amount advanced or any delivery of Proceeds conforms to this section.  Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount advanced is, in fact used or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount advanced been disbursed for consumer purposes or Proceeds delivered from a consumer account.

You agree to notify us promptly if, with regard to any Business Payment Account or Bank Account, (i) the details of your account change, (ii) you open a new account or (iii) you close your account.  Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your future receivables that we will purchase, you agree to

notify us promptly if (i) the details of your account change, (ii) you open a new account or (iii) you close your account.

**Purchase Price. We will pay a discounted purchase price for each Future Receivable sold to us. The amount of discount applied is your "Cost".** Your total Cost will be determined by the date(s) of transfer of Proceeds as set forth below. On the purchase date, we will deliver to you, via your specified Business Payment Account or Bank Account, the applicable purchase price ("Advance") for the specified amount of Future Receivables ("Specified Amount") that you sell to us. **The initial Cost will be calculated based upon the assumption that you will transfer to us Proceeds equal to the Specified Amount before the first monthly anniversary date of sale.** An additional Cost will be applied monthly on each monthly anniversary date of sale if you elect to extend the Transfer Date for certain Proceeds as provided below.

**Extending the Transfer Date; Sale of Additional Receivables.** You may extend the Transfer Date for certain Proceeds up to five (5) months so long as you make certain Minimum Monthly Transfers as specified below. Each month that you elect to delay the transfer of Proceeds, the total applicable Cost for a delayed Future Receivable will increase (and the applicable purchase price for the Future Receivable will decrease). You agree to sell to us additional Future Receivables in an amount equal to the difference between the amount previously paid for a delayed Future Receivable and the applicable adjusted purchase price for such delayed Future Receivable (additional Cost), by your next applicable Transfer Date. We may terminate your option to delay the transfer of Proceeds at any time without notice.

**Cost Schedule.** Costs are applied on each monthly anniversary date that any Proceeds remain untransferred.

| If the Proceeds of a Future Receivable are transferred before: | The applicable total Cost is: | And the Specified Amount of Future Receivables purchased/sold will increase by: |
|---|---|---|
| First Monthly Anniversary Date | 5.00 % | No increase |
| Second Monthly Anniversary Date | 10.00 % | $650.00 |
| Third Monthly Anniversary Date | 11.00 % | $780.00 |
| Fourth Monthly Anniversary Date | 12.00 % | $910.00 |
| Fifth Monthly Anniversary Date | 13.00 % | $1,040.00 |
| Sixth Monthly Anniversary Date | 14.00 % | $1,170.00 |

**Minimum Monthly Transfers.** With respect to each Advance, you agree to make a minimum monthly transfer of Proceeds ("Minimum Monthly Transfer") in the amounts specified below on each scheduled monthly transfer date ("Transfer Date"). Your monthly Transfer Date will be determined when we approve you as a seller and open an account for your business on our books. Your monthly Transfer Date will be the same date each month and will apply to all purchases that we make from you. For any particular Advance, the Minimum Monthly Transfer will be:

| Transfer Date | Minimum Monthly Transfer: |
|---|---|
| First Transfer Date | $2,816.67 |
| Second Transfer Date | $2,816.67 |
| Third Transfer Date | $2,296.67 |
| Fourth Transfer Date | $2,296.67 |
| Fifth Transfer Date | $2,296.67 |
| Sixth Transfer Date | The balance, if any, of proceeds remaining untransferred |

\* Or the balance of Proceeds remaining untransferred if less than the amount shown

You may at any time transfer more than the Minimum Monthly Transfer without penalty.

We will notify you, at least 10 calendar days in advance of each Transfer Date, of the aggregate amount of (i) all current Minimum Monthly Transfers for multiple Advances, plus (ii) any previous Minimum Monthly Transfers remaining, in whole or in part, un-transferred, plus (iii) accrued but unpaid fees (collectively, (i) through (iii) are your "Total Minimum Monthly Transfer"). If you fail to make a transfer of your Total Minimum Monthly Transfer amount on time, you agree that we may assess, as liquidated damages, a **Transfer Access Denied Fee** of **$35** for Total Minimum Monthly Transfers of $100 or more, or **$10** for Total Minimum Monthly Transfers of less than $100. This fee will be waived if (i) collections in the ordinary course are less than the Total Minimum Monthly Transfer amount and (ii) you are not otherwise in breach of this Agreement.

**Section 1.2.** *Merchant's Contractual Covenants and Representations; Further Inquires.*

**Covenants.** You agree:

(i)    Not to use any amount advanced for personal or household purposes and not to deliver Proceeds from any consumer account;

(ii)   To promptly and accurately reflect each sale of Future Receivables to us in your books and records;

(iii)  Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iv)   To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future Receivables, your handling of Proceeds and your transfer to us of Proceeds;

(v)    Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(vi)   With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your future receivables that we will purchase, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vii)  To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Advance for the processing of your sales transactions, or otherwise ensure that Proceeds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(viii) To maintain a minimum balance of Proceeds in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(ix)   To collect Future Receivables promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(x)    To transfer Proceeds to us (in U.S. dollars) by the applicable Transfer Date"

(xi)   Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xii)  Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which Proceeds will be deposited and not to take any action to cause Future Receivables to be settled or transferred to any account other than the Accounts;

(xiii) Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiv)    Not to take any intentional action that would substantially impair or reduce your generation or collection of receivables adequate to satisfy your obligations under this Agreement without our prior written permission;

(xv)   Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a transfer under Section 1.3; and

(xvi)    To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Merchant, Owner and Company acknowledge and agree that Merchant's going bankrupt or out of business (alone) does not constitute a breach of Merchant's Contractual Covenants or other provisions of this Agreement.  If, as the result of market**

**forces, Merchant's business activity slows and Merchant's inventory of Future Receivables decrease, or if Merchant closes its business after adequate prior notice to Company and a good faith effort to fulfill Merchant's outstanding obligations under this Agreement, no breach of this Agreement shall be deemed to occur, provided that Merchant has not violated any of Merchant's Contractual Covenants or other provisions of this Agreement. Company is purchasing Future Receivables and Company assumes the risk that Merchant's business may fail or be adversely affected by conditions outside the control of Merchant, provided that Merchant has not breached Merchant's Contractual Covenants or any other provision of this Agreement.**

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Company, its agents and representatives, and any credit reporting agency engaged by Company, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a cash advance or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Company.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the <u>performance</u> of all of the <u>covenants of Merchant</u> in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Transfers*.

**Automatic Transfer Authorization. You authorize us to initiate, on each Transfer Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Transfer**; provided, however, that if a Transfer Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate transfers that you make on or before a Transfer Date will not affect this authorization. You understand that your Total Minimum Monthly Transfer may vary from time to time but will in no event exceed the total Specified Amount outstanding. We will not be liable for any Cost that you may incur if we are unable to debit your Total Minimum Monthly Transfer under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit. Advance or any transfers made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Transfer Failure.** <u>If a debit is rejected or if you otherwise fail to ensure delivery of any Total Minimum Monthly Transfer when due, you agree that we may</u> (i) terminate your option to extend the transfer of the Proceeds, (ii) suspend all further automatic debits, in which case you will be responsible for making all further transfers directly and in a timely manner, (iii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for Proceeds and any other amounts due us* and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient Proceeds to meet each Total Minimum Monthly Transfer obligation. We may initiate a debit at any time on a Transfer Date, including <u>prior</u> to the time that we open for business on any business day. Consequently, you understand that Proceeds must be available by the end of the business day <u>prior</u> to the applicable Transfer Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate this automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Transfer Date, and your termination will be effective

three (3) business days after the date your notice is received by us.  If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call.  <u>Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us</u>.  We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records.  Following the date of any termination of automatic debits by us or by you, you will be responsible for making all further transfers directly and in a timely manner.

**Alternative Transfer.**  If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.**  We do not accept transfers from consumer accounts.  If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account..  You agree that your obligation to transfer Proceeds under this Agreement is not related to any consumer transaction.  There can be no ground for any refund or return.  All deliveries of Proceeds to us are final.  You agree that if you transfer any funds in excess of the Specified Amount sold to us, including any sales of Future Receivables related to your Cost, we may apply any such excess to any outstanding Advance or other obligation you have with us or issue a check to you.

**Other Transfers.**  You may make additional or alternative transfers at any time.  Transfers by postal mail should be sent, postage paid, to the following address:  <u>**Kabbage MCA Transfers, P.O. Box 77073, Atlanta, GA  30357**</u>.  You may also call Customer Service to arrange transfers by overnight delivery, telephone or other acceptable method.  Transfers made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible.  All transfers must be made in good funds by check, money order, automatic transfer from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars.  You are solely responsible for any costs associated with a Transfer.  Transfers received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your Account may be delayed up to five (5) calendar days if a transfer (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one transfer, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Transfers; Disputed Amounts.**  We may accept late or partial transfers without losing any of our rights under this Agreement.  You agree not to send us partial transfers marked "paid in full," "without recourse" or similar language.  If you send such a transfer, we may accept it without losing any of our rights under this Agreement.  **All written communications concerning disputed amounts, including any check or other  instrument that indicates that the transfer constitutes "payment in full" of your transfer or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to <u>Kabbage MCA Dispute Resolution, P.O. Box 77081, Atlanta, GA  30357.</u>**

**Section 1.4.  Fees.**  In addition to applicable Costs, we may charge such fees and costs, if any, as provided herein for transfer access denied or default.

**Section 1.5.  *Default.***  You will be in default if any of the following happen:  (i) you fail to make any transfer under this Agreement; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or <u>claim that a debit transaction pursuant to Section 1.3 is unauthorized</u>; (iv) you are in default under any advance, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back

of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.**  Upon default, we reserve the right to terminate your option to extend the transfer date for Proceeds and may demand the immediate transfer of any outstanding undelivered Proceeds (plus applicable fees and Cost(s)).

We may hire or pay someone else to help collect any amount that you or your customers may owe us.  If, upon notice to you, we terminate your role as collection agent for outstanding Future Receivables sold to us because of your default or otherwise, you agree to cooperate with us or any agent that we designate to collect such receivables from your customers by providing timely information and other reasonable assistance.  You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law.  This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post-judgment collection services.

**Notice of Default.**  You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

### Section 1.6. *Arbitration (Agreement to Arbitrate Claims)*.

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed).  Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration.  Streamlined arbitration procedures will be used if available.  If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator.  For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below.  (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act.  If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.)  An arbitration proceeding can decide only your or our Claims.  You cannot join other parties (or consolidate Claims).  Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS.  IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN**

**PRE–ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. <u>The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules.</u> The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, <u>within 60 calendar days after we approve your Advance</u>, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA  30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Advance number. The right to opt-out granted here applies solely to this Arbitration Provision, and not to any other provision of this Agreement, or to any other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) your offer for sale and our acceptance for purchase of Future Receivables, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at:  (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1–800–352–5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1–800–778–7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** <u>This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, as amended, notwithstanding any other governing law provision in this Agreement.</u>  The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law.  Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction.  The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three–arbitrator panel administered by the selected arbitration administrator.  The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.**  This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement.  If any portion of this Arbitration Provision (other than the provisions prohibiting class–wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision.  If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II.  REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1.**  *Covenant Representation*.  Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2.**  *Business Information*.  All information (financial and other) provided by or on behalf of Merchant to Company in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects.  Merchant shall furnish Company such information as Company may request from time to time.

**Section 2.3.**  *Reliance on Information*.  Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Company in connection with any decision that Company makes to purchase Future Receivables.

**Section 2.4.**  *Compliance*.  Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of receivables, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (*e.g.*, eBay) applicable to Merchant's business.  Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5.**  *Authorization*.  Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6.**  *Insurance*.  Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Company.

**Section 2.7.**  *Change in Name or Location*.  Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Company and shall not change its place of business.

**Section 2.8.**  *Merchant Not Indebted to Company.*  Neither Merchant nor Owner is a debtor of Company as of the date of this Agreement.

**Section 2.9.**  *Owner.*  Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10.**  *Working Capital Funding.*  Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Future Receivables, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Future Receivables or future credit card or online sales with any party other than Company.

**Section 2.11.**  *Unencumbered Future Receivables.*  Merchant has good, complete and marketable title to all Future Receivables, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests,

equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Company.

**Section 2.12.  *Business Purpose.***  Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.  Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III.  ADDITIONAL TERMS

**Section 3.1.  *Sale of Future Receivables; Protective Security Interest.***  Merchant and Company agree that each Advance paid by Company in exchange for Future Receivables evidences a purchase of a Specified Amount and is not intended to be, nor shall it be construed as, a loan or financial accommodation from Company to Merchant.  If a transaction between Company and Merchant is deemed a loan or financial accommodation, notwithstanding the intention of the parties, then Merchant grants to Company a continuing security interest, subject only to any prior security interest of the provider of any Business Payment Account or right of setoff of any bank with regard to any Bank Account, if any, in all Future Receivables sold to us.  Moreover, Merchant grants to Company, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Company, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire:  (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2.  *No Right to Repurchase.***  Merchant acknowledges and agrees that it has no right to repurchase from Company any Future Receivable sold to Company, and Company may not force Merchant to repurchase any Future Receivable.

**Section 3.3.  *Remedies.***  In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Company shall be entitled to all remedies available under law.  In the event that Merchant breaches a Merchant Contractual Covenant specified in clauses (vi), (vii) or (viii) of Section 1.2 of this Agreement, Merchant agrees that Company shall be entitled to damages equal to, but not limited to, un-transferred Proceeds pursuant to this Agreement.  Merchant hereby agrees that Company may automatically debit such damages from Merchant's Business Payment Account or Bank Account.  The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Company to proceed first against Merchant before recovering damages from Owner.

**Section 3.4.  *Financing Statements.***  Merchant understands and agrees that Company may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to evidence the sale of Merchant's Future Receivables or to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above.  Merchant agrees to cooperate with Company as may be necessary to accomplish said filing and authorizes Company to sign Merchant's name to effect the filing or continuation of any such filings.  Any UCC-1 financing statements that are filed may state that the sale of Future Receivables by Merchant to Company is intended as a true sale and not an assignment for security.

**Section 3.5.  *Protection of Information*.**  Except for Confidential Information (as defined below), Merchant and Owner each authorizes Company to disclose to any third party information concerning Merchant's and Owner's business conduct.  Merchant and

Owner hereby waive to the maximum extent permitted by law any claim for damages against Company or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Company as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6.   *Confidentiality*.**  Merchant understands and agrees that the terms and conditions of the products and services offered by Company, including this Agreement and any other Company documentation (collectively, "Confidential Information") are proprietary and confidential information of Company.  Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6.  The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7.   *Transfer and Assignment*.**  Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person.  Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you.  Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8.   *Publicity*.**  Merchant and Owner authorize Company to use its, his or her name in a listing of clients and in advertising and marketing materials.

## IV.  MISCELLANEOUS

**Section 4.1.   *Modifications; Amendments*; *Construction*.**  No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected.  The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement.  For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2.   *Notices*.**  Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically.  Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail.  Notice to you will be sent to your last known address in our records.  Notice to any of you will be deemed notice to all of you.  Notice to us may be sent to Kabbage, Inc., P.O. Box 77081, Atlanta, GA  30357.  You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding.  You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court.  **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us.  You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction.  This indemnity will survive termination of our purchase of additional Future Receivables and this Agreement**.

**Section 4.3.   *Waiver; Remedies*.**  No delay on the part of Company to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right.  The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4.   *D/B/A's*.**  Merchant hereby acknowledges and agrees that Company may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Company and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5.   *Binding Effect*.**  This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Company and their respective successors and permitted assigns.

**Section 4.6.** *Governing Law.* **With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Georgia without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Georgia state or federal court sitting in Fulton County, at Company's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7.** *Term and Survival.* This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8.** *Severability.* In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9.** *Entire Agreement.* This Agreement contains the entire agreement and understanding among Merchant, Owner and Company and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10.** *Jury Trial Waiver.* THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11.** *Class Action Waiver.* THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12.** *Telephone Monitoring and Recording.* To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13.** *Communicating With You and Owner; Consent to Contact by Electronic and Other Means.* For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Company regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Company Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. <u>You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may have from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone</u>. You may withdraw this express written consent at any time by contacting us at <u>Kabbage-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA  30357</u> and telling us specifically what address or telephone number not to use.

**Section 4.14.** *In case of Errors or Questions About Your Account Summary*

If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to:  Kabbage MCA Account Inquiries, P.O. Box 77081, Atlanta, GA  30357.  We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

⊙ Your name and email address,

⊙ The dollar amount of the suspected error,

⊙ A description of the error, and

⊙ An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about.  **You remain obligated to make any remaining Total Minimum Monthly Transfer while we investigate.**

---

*Consent to Electronic Disclosure.*  You can access transaction information by visiting www.kabbage.com and logging in.  By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically.  We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site.  To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information.  The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0.  By checking the "Submit" box on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures.  You may request a paper copy of any legally required disclosure by contacting us at Kabbage MCA Paper Disclosure Request, P.O. Box 77081, Atlanta, GA  30357.  You may also withdraw your consent to electronic disclosures by contacting us in the same manner.  If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you.  You agree to provide us with your current e-mail address for notices.  If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the change.

---

This writing and the obligations evidenced or secured hereby are subject to the security interest of Victory Park Management, LLC, as Collateral Agent.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*:  **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application, bill of sale or other document signed in connection with a sale and purchase of Future Receivables hereunder represents your signature on this Agreement.**

Rev.1/22/2014

# Kabbage Merchant Cash Advance Agreement

**Advance Amount:** $18,700.00                                                                                                 Date:   04/11/2014

**Merchant Information**
**Merchant:** NRO Boston LLC
**Owner:** alice indelicato                                                    **Fees**
**Marketplaces:** AuthorizeNET, Bigcommerce, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit        **Transfer Access Denied Fee: Up to $35**

This Merchant Cash Advance Agreement ("Agreement") is made by and between **Kabbage, Inc.** ("we," "us," "our" or "Company") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

## I.  SALE AND PURCHASE OF FUTURE RECEIVABLES

**Section 1.1.  Sale and Purchase of Future Receivables.**  You agree to sell to us, and we agree to purchase from you, all of your right, title and interest in and to certain future receivables ("Future Receivables"), including the collected proceeds thereof ("Proceeds"), that arise from the obligations of your customers to pay you for goods and services sold or provided by you, which Future Receivables are to be paid into your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), or (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account").  You will provide us, at all times during this Agreement, with access to view the activity in your Business Payment Account, Bank Account, and marketplaces where you do business, and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future Receivables, your collection of Proceeds and your transfer to us of such Proceeds.  You further agree to (i) promptly and accurately reflect each sale of Future Receivables to us in your books and records, (ii) promptly collect upon such receivables and (iii) promptly transfer the collected Proceeds to us (in U.S. dollars) by the Transfer Date (as defined below).  **Your obligation to transfer Proceeds to Company only extends to the transfer of proceeds of Future Receivables that are actually collected.  In this Agreement, references to "Proceeds" refer to proceeds of Future Receivables that are actually collected and references to "transfer" refer to the transfer of Proceeds to Company.**

**THIS IS A COMMERCIAL SALE TRANSACTION, <u>NOT</u> A LOAN, AND, WITHOUT LIMITING THE FOREGOING, YOU AGREE NOT TO USE ANY AMOUNT ADVANCED FOR PERSONAL OR HOUSEHOLD PURPOSES AND NOT TO DELIVER PROCEEDS TO US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that the agreement not to use any amount advanced for personal, family or household purposes means and not to deliver Proceeds to us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to any aspect of this commercial transaction.  Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, the use of any amount advanced or any delivery of Proceeds conforms to this section.  Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount advanced is, in fact used or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount advanced been disbursed for consumer purposes or Proceeds delivered from a consumer account.

You agree to notify us promptly if, with regard to any Business Payment Account or Bank Account, (i) the details of your account change, (ii) you open a new account or (iii) you close your account.  Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your future receivables that we will purchase, you agree to notify us promptly if (i) the details of your account change, (ii) you open a new account or (iii) you close your account.

**Purchase Price.  We will pay a discounted purchase price for each Future Receivable sold to us.  The amount of discount applied is your "Cost".**  Your total Cost will be determined by the date(s) of transfer of Proceeds as set forth below.  On the purchase date, we will deliver to you, via your specified Business Payment Account or Bank Account, the applicable purchase price ("Advance") for the specified amount of Future Receivables ("Specified Amount") that you sell to us.  **The initial Cost will be calculated based upon the assumption that you will transfer to us Proceeds equal to the Specified Amount before the first monthly anniversary date of sale.**  An additional Cost will be applied monthly on each monthly anniversary date of sale if you elect to extend the Transfer Date for certain Proceeds as provided below.

**Extending the Transfer Date; Sale of Additional Receivables.**  You may extend the Transfer Date for certain Proceeds up to five (5) months so long as you make certain Minimum Monthly Transfers as specified below.  Each month that you elect to delay the transfer of Proceeds, the total applicable Cost for a delayed Future Receivable will increase (and the applicable purchase price for the Future Receivable will decrease).  You agree to sell to us additional Future Receivables in an amount equal to the difference between the amount previously paid for a delayed Future Receivable and the applicable adjusted purchase price for such delayed Future Receivable (additional Cost), by your next applicable Transfer Date.  We may terminate your option to delay the transfer of Proceeds at any time without notice.

**Cost Schedule.**  Costs are applied on each monthly anniversary date that any Proceeds remain untransferred.

| If the Proceeds of a Future Receivable are transferred before: | The applicable total Cost is: | And the Specified Amount of Future Receivables purchased/sold will increase by: |
| --- | --- | --- |
| First Monthly Anniversary Date | 5.00 % | No increase |
| Second Monthly Anniversary Date | 10.00 % | $935.00 |
| Third Monthly Anniversary Date | 11.00 % | $1,122.00 |
| Fourth Monthly Anniversary Date | 12.00 % | $1,309.00 |
| Fifth Monthly Anniversary Date | 13.00 % | $1,496.00 |
| Sixth Monthly Anniversary Date | 14.00 % | $1,683.00 |

**Minimum Monthly Transfers.**  With respect to each Advance, you agree to make a minimum monthly transfer of Proceeds ("Minimum Monthly Transfer") in the amounts specified below on each scheduled monthly transfer date ("Transfer Date").  Your monthly Transfer Date will be determined when we approve you as a seller and open an account for your business on our books.  Your monthly Transfer Date will be the same date each month and will apply to all purchases that we make from you.  For any particular Advance, the Minimum Monthly Transfer will be:

| Transfer Date | Minimum Monthly Transfer: |
| --- | --- |
| First Transfer Date | $4,051.67 |
| Second Transfer Date | $4,051.67 |
| Third Transfer Date | $3,303.67 |
| Fourth Transfer Date | $3,303.67 |
| Fifth Transfer Date | $3,303.67 |
| Sixth Transfer Date | The balance, if any, of proceeds remaining untransferred |

\* Or the balance of Proceeds remaining untransferred if less than the amount shown

You may at any time transfer more than the Minimum Monthly Transfer without penalty.

We will notify you, at least 10 calendar days in advance of each Transfer Date, of the aggregate amount of (i) all current Minimum Monthly Transfers for multiple Advances, plus (ii) any previous Minimum Monthly Transfers remaining, in whole or in part, un-transferred, plus (iii) accrued but unpaid fees (collectively, (i) through (iii) are your "Total Minimum Monthly Transfer").  If you fail to make a transfer of your Total Minimum Monthly Transfer amount on time, you agree that we may assess, as liquidated damages, a

**DSP 805-339**

**Transfer Access Denied Fee** of **$35** for Total Minimum Monthly Transfers of $100 or more, or **$10** for Total Minimum Monthly Transfers of less than $100.  This fee will be waived if (i) collections in the ordinary course are less than the Total Minimum Monthly Transfers amount and (ii) you are not otherwise in breach of this Agreement.

**Section 1.2.  *Merchant's Contractual Covenants and Representations; Further Inquires.***

**Covenants.**  You agree:

(i)   Not to use any amount advanced for personal or household purposes and not to deliver Proceeds from any consumer account;

(ii)   To promptly and accurately reflect each sale of Future Receivables to us in your books and records;

(iii)   Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

(iv)   To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your generation and collection of Future Receivables, your handling of Proceeds and your transfer to us of Proceeds;

(v)   Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

(vi)   With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your future receivables that we will purchase, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

(vii)   To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Advance for the processing of your sales transactions, or otherwise ensure that Proceeds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

(viii)   To maintain a minimum balance of Proceeds in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

(ix)   To collect Future Receivables promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

(x)   To transfer Proceeds to us (in U.S. dollars) by the applicable Transfer Date"

(xi)   Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

(xii)   Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which Proceeds will be deposited and not to take any action to cause Future Receivables to be settled or transferred to any account other than the Accounts;

(xiii)   Not to sell, dispose, convey or otherwise transfer your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

(xiv)   Not to take any intentional action that would substantially impair or reduce your generation or collection of receivables adequate to satisfy your obligations under this Agreement without our prior written permission;

(xv)   Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a transfer under Section 1.3; and

(xvi)   To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Merchant, Owner and Company acknowledge and agree that Merchant's going bankrupt or out of business (alone) does not constitute a breach of Merchant's Contractual Covenants or other provisions of this Agreement.  If, as the result of market forces, Merchant's business activity slows and Merchant's inventory of Future Receivables decrease, or if Merchant closes its business after adequate prior notice to Company and a good faith effort to fulfill Merchant's outstanding obligations under this Agreement, no breach of this Agreement shall be deemed to occur, provided that Merchant has not violated any of Merchant's Contractual Covenants or other provisions of this Agreement.  Company is purchasing Future Receivables and Company assumes the risk that Merchant's business may fail or be adversely affected by conditions outside the control of Merchant, provided that Merchant has not breached Merchant's Contractual Covenants or any other provision of this Agreement.**

**Representations.**  You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.**  Merchant and Owner authorize Company, its agents and representatives, and any credit reporting agency engaged by Company, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a cash advance or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Company.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.**  Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.  *Transfers.***

**Automatic Transfer Authorization.  You authorize us to initiate, on each Transfer Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Transfer**; provided, however, that if a Transfer Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day.  Any separate transfers that you make on or before a Transfer Date will not affect this authorization.  You understand that your Total Minimum Monthly Transfer may vary from time to time but will in no event exceed the total Specified Amount outstanding.  We will not be liable for any Cost that you may incur if we are unable to debit your Total Minimum Monthly Transfer under this authorization.  We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit.  Advance or any transfers made directly by you under this Agreement.  Automated Clearing House transactions must comply with the provisions of U.S. law.

**Transfer Failure.**  If a debit is rejected or if you otherwise fail to ensure delivery of any Total Minimum Monthly Transfer when due, you agree that we may (i) terminate your option to extend the transfer of the Proceeds,  (ii) suspend all further automatic debits, in which case you will be responsible for making all further transfers directly and in a timely manner, (iii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for Proceeds and any other amounts due us* and (iv) pursue any and all other remedies available to us.

**Account Maintenance.**  You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient Proceeds to meet each Total Minimum Monthly Transfer obligation.  We may initiate a debit at any time on a Transfer Date, including prior to the time that we open for business on any business day.  Consequently, you understand that Proceeds must be available by the end of the business day prior to the applicable Transfer Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**DSP 805-340**

**Terminating or Disputing Authorization; Stopping Payment.** You may terminate this automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Transfer Date and your termination may be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by us or by you, you will be responsible for making all further transfers directly and in a timely manner.

**Alternative Transfer.** If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept transfers from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account.. You agree that your obligation to transfer Proceeds under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All deliveries of Proceeds to us are final. You agree that if you transfer any funds in excess of the Specified Amount sold to us, including any sales of Future Receivables related to your Cost, we may apply any such excess to any outstanding Advance or other obligation you have with us or issue a check to you.

**Other Transfers.** You may make additional or alternative transfers at any time. Transfers by postal mail should be sent, postage paid, to the following address: **Kabbage MCA Transfers, P.O. Box 77073, Atlanta, GA 30357.** You may also call Customer Service to arrange transfers by overnight delivery, telephone or other acceptable method. Transfers made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All transfers must be made in good funds by check, money order, automatic transfer from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a Transfer. Transfers received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your Account may be delayed up to five (5) calendar days if a transfer (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one transfer, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Transfers; Disputed Amounts.** We may accept late or partial transfers without losing any of our rights under this Agreement. You agree not to send us partial transfers marked "paid in full," "without recourse" or similar language. If you send such a transfer, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the transfer constitutes "payment in full" of your transfer or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage MCA Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**

**Section 1.4.** *Fees.* In addition to applicable Costs, we may charge such fees and costs, if any, as provided herein for transfer access denied or default.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any transfer under this Agreement; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to this Section 1.3 is unauthorized; (iv) you are in default under any advance, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we reserve the right to terminate your option to extend the transfer date for Proceeds and may demand the immediate transfer of any outstanding undelivered Proceeds (plus applicable fees and Cost(s)).

We may hire or pay someone else to help collect any amount that you or your customers may owe us. If, upon notice to you, we terminate your role as collection agent for outstanding Future Receivables sold to us because of your default or otherwise, you agree to cooperate with us or any agent that we designate to collect such receivables from your customers by providing timely information and other reasonable assistance. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post-judgment collection services.

**Notice of Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, or you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a classwide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE**

Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt-out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Advance, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Advance number. The right to opt-out granted here applies solely to this Arbitration Provision, and not to any other provision of this Agreement, or to any other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) your offer for sale and our acceptance for purchase of Future Receivables, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1‑800‑352‑5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1‑800‑778‑7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three‑arbitrator panel administered by the selected arbitration administrator. The panel will reconsider de novo (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class‑wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1.** *Covenant Representation*. Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2.** *Business Information*. All information (financial and other) provided by or on behalf of Merchant to Company in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Company such information as Company may request from time to time.

**Section 2.3.** *Reliance on Information*. Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Company in connection with any decision that Company makes to purchase Future Receivables.

**Section 2.4.** *Compliance*. Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of receivables, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (*e.g.*, eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5.** *Authorization*. Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6.** *Insurance*. Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Company.

**Section 2.7.** *Change in Name or Location.* Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Company and shall not change its place of business.

**Section 2.8.** *Merchant Not Indebted to Company.* Neither Merchant nor Owner is a debtor of Company as of the date of this Agreement.

**Section 2.9.** *Owner.* Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10.** *Working Capital Funding.* Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Future Receivables, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Future Receivables or future credit card or online sales with any party other than Company.

**Section 2.11.** *Unencumbered Future Receivables.* Merchant has good, complete and marketable title to all Future Receivables, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Company.

**Section 2.12.** *Business Purpose.* Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1.** *Sale of Future Receivables; Protective Security Interest.* Merchant and Company agree that each Advance paid by Company in exchange for Future Receivables evidences a purchase of a Specified Amount and is not intended to be, nor shall it be construed as, a loan or financial accommodation from Company to Merchant. If a transaction between Company and Merchant is deemed a loan or financial accommodation, notwithstanding the intention of the parties, then Merchant grants to Company a continuing security interest, subject only to any prior security interest of the provider of any Business Payment Account or right of setoff of any bank with regard to any Bank Account, if any, in all Future Receivables sold to Company. Moreover, Merchant grants to Company, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Company, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2.** *No Right to Repurchase.* Merchant acknowledges and agrees that it has no right to repurchase from Company any Future Receivable sold to Company, and Company may not force Merchant to repurchase any Future Receivable.

**Section 3.3.** *Remedies.* In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Company shall be entitled to all remedies available under law. In the event that Merchant breaches a Merchant Contractual Covenant specified in clauses (vi), (vii) or (viii) of Section 1.2 of this Agreement, Merchant agrees that Company shall be entitled to damages equal to, but not limited to, un-transferred Proceeds pursuant to this Agreement. Merchant hereby agrees that Company may automatically debit such damages from Merchant's Business Payment Account or Bank Account. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Company to proceed first against Merchant before recovering damages from Owner.

**Section 3.4.** *Financing Statements.* Merchant understands and agrees that Company may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to evidence the sale of Merchant's Future Receivables or to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Company as may be necessary to accomplish said filing and authorizes Company to sign Merchant's name to effect the filing or continuation of any such filings. Any UCC-1 financing statements that are filed may state that the sale of Future Receivables by Merchant to Company is intended as a true sale and not an assignment for security.

**Section 3.5.** *Protection of Information.* Except for Confidential Information (as defined below), Merchant and Owner each authorizes Company to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Company or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Company as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6.** *Confidentiality.* Merchant understands and agrees that the terms and conditions of the products and services offered by Company, including this Agreement and any other Company documentation (collectively, "Confidential Information") are proprietary and confidential information of Company. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7.** *Transfer and Assignment.* Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8.** *Publicity.* Merchant and Owner authorize Company to use its, his or her name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1.** *Modifications; Amendments; Construction.* No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2.** *Notices.* Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, Inc., P.O. Box 77081, Atlanta, GA  30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of our purchase of additional Future Receivables and this Agreement.**

**Section 4.3.** *Waiver; Remedies.* No delay on the part of Company to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4.** *D/B/A's.* Merchant hereby acknowledges and agrees that Company may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Company and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5.** *Binding Effect.* This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Company and their respective successors and permitted assigns.

**Section 4.6.** *Governing Law.* **With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Georgia** without regard to internal principles of conflict of laws. Merchant hereby submits to the jurisdiction of any Georgia state or federal court sitting in Fulton County, at Company's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7.   *Term and Survival.***  This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms, suggests survival shall so survive the satisfaction of such obligations, including signatures, dispute resolution and interpretation thereby.

**Section 4.8.   *Severability.***  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9.   *Entire Agreement.***  This Agreement contains the entire agreement and understanding among Merchant, Owner and Company and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10.   *Jury Trial Waiver.***  THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY.  THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11.   *Class Action Waiver.***  THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY.  TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT:  (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12.   *Telephone Monitoring and Recording.***  To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13.   *Communicating With You and Owner; Consent to Contact by Electronic and Other Means.***  For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Company regarding this Agreement and related commercial transactions.  You agree that we may contact you as provided in this paragraph.  We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Company Privacy Policy in effect from time to time.  No such contact will be deemed unsolicited.  You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may have from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone.  You may withdraw this express written consent at any time by contacting us at Kabbage-Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA  30357 and telling us specifically what address or telephone number not to use.

**Section 4.14.   *In case of Errors or Questions About Your Account Summary***

If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to:  Kabbage MCA Account Inquiries, P.O. Box 77081, Atlanta, GA  30357.  We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

▪ Your name and email address,

▪ The dollar amount of the suspected error,

▪ A description of the error, and

▪ An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about.  **You remain obligated to make any remaining Total Minimum Monthly Transfer while we investigate.**

---

**Consent to Electronic Disclosure.**  You can access transaction information by visiting www.kabbage.com and logging in.  By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically.  We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site.  To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information.  The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0.  By checking the "Submit" box on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures.  You may request a paper copy of any legally required disclosure by contacting us at Kabbage MCA Paper Disclosure Request, P.O. Box 77081, Atlanta, GA  30357.  You may also withdraw your consent to electronic disclosures by contacting us in the same manner.  If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you.  You agree to provide us with your current e-mail address for notices.  If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the change.

---

This writing and the obligations evidenced or secured hereby are subject to the security interest of Victory Park Management, LLC, as Collateral Agent.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner:***  **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application, bill of sale or other document signed in connection with a sale and purchase of Future Receivables hereunder represents your signature on this Agreement.**

Rev.1/22/2014

DSP 805-344

# EXHIBIT D

DSP 805-345

**Loan Amount: $2,899.99**                                 **Date: May 06, 2014**

| | |
|---|---|
| **Merchant Information** | **Lender: Celtic Bank** |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit** | |

**(Replacing MCAA of 02/11/2014 of the original amount of $5,800.00)**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

## I. BUSINESS LOAN

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based upon the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $58.00 |
| Second Monthly Anniversary Date | $58.00 |
| Third Monthly Anniversary Date | $58.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
|---|---|
| First Payment Due Date | $1,024.67* |
| Second Payment Due Date | $1,024.67* |
| Third Payment Due Date | $1,024.65* |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

1. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

2. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

3. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

4. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other

accounts and sales and shipping data as we have deemed necessary and appropriate;

5.  With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

6.  To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

7.  To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

8.  To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

9.  To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

10. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

11. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

12. Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

13. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

14. Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

15. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

DSP 805-348

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization;** Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with**

other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kalamata Business Loan Dispute Resolution, P.O. Box 7288, Atlanta, GA 30357

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration

DSP 805-350

organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties or consolidate Claims. Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

Case 1:11-cv-11578-GAO Document 44-43 Filed 09/23/19 Page 352 of 413

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an

appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or

DSP 805-352

future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights

and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations hereunder are nevertheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND

DSP 805-354

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

---

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your

current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing us at least five days before that effective date of the change.

Case 1:17-cv-11976-GAO Document 44-43 Filed 09/23/19 Page 357 of 413

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner*: You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.4/29/2014

DSP 805-356

**Loan Amount: $8,666.66**                 **Date: May 06, 2014**
**Merchant Information**
**Account Number: 27791**
**Merchant: NRO Boston LLC**
**Owner: alice indelicato**
**Marketplaces: AuthorizeNET, Bigcommerce, ACH, ACH, ACH, Twitter, GoogleAnalytics, Intuit**
**(Replacing MCAA of 03/14/2014 of the original amount of $13,000.00)**

**Lender: Celtic Bank**
          **Salt Lake City, Utah**
**Fees**
**Late Fee: Up to $100**
**Returned Payment Fee: Up to $20**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

### I. BUSINESS LOAN

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based upon the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $130.00 |
| Second Monthly Anniversary Date | $130.00 |
| Third Monthly Anniversary Date | $130.00 |
| Fourth Monthly Anniversary Date | $130.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
|---|---|
| First Payment Due Date | $2,296.67* |
| Second Payment Due Date | $2,296.67* |
| Third Payment Due Date | $2,296.67* |
| Fourth Payment Due Date | $2,296.65* |

\* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree to:

1. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

2. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

3. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

DSP 805-358

4. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

5. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

6. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

7. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

8. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

9. To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

10. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

11. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

12. Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

13. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

14. Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

15. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization;** Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications**

concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in

accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, they either may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the

arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of any such cost relating to an

Case 1:17-cv-11976-GAO   Document 14-43   Filed 09/23/19   Page 364 of 413

appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or

commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of a loan, lending or the sale or purchase of credits against Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell, transfer, assign, or otherwise convey our interest in this Agreement and any payment(s) due us. Our rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT
ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY
CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY
LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW
OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST
THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL
NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH
PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER
PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR
PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR
OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR
REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and
for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other
Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or
representative of Merchant or Owner, collectively and individually, for purposes of communications
between you and Bank regarding this Agreement and related commercial transactions. You agree that we
may contact you as provided in this paragraph. We may contact you for any lawful reason, including for
the collection of amounts owed to us and for the offering of products or services to Merchant in
compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed
unsolicited. You specifically agree that we may (i) contact you at any address (including email) or
telephone number (including wireless cellular telephone or ported landline telephone number) as you may
provide to us from time to time, even if you asked to have your number added to any state or federal do-
not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic
mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices
which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw
this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of
Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or
telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your
Account Summary is wrong, or if you need more information about an item on your Account Summary,
write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA
30357. We must hear from you no later than 60 days after we sent you the first Account Summary on
which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make
any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com
and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement
and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will
provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access,
view and retain electronic disclosures on our web site, you must have a computer with Internet access
and either a printer connected to your computer to print disclosures/notices or sufficient hard drive
space available to save the information. The minimum software requirements include browser software
that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit"
button on your application, you acknowledge that you are able to access our website
(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper
copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure
Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic

disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

***Electronic Signature of Merchant/Owner*****: You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.4/29/2014

| | |
|---|---|
| **Loan Amount: $10,000.00** | **Date: May 06, 2014** |
| **Merchant Information** | **Lender: Celtic Bank** |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit** | |
| **(Replacing MCAA of 01/05/2014 of the original amount of $30,000.00)** | |

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

## I. BUSINESS LOAN

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based upon the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $300.00 |
| Second Monthly Anniversary Date | $300.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
|---|---|
| First Payment Due Date | $5,300.00* |
| Second Payment Due Date | $5,300.00* |

\* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

1. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

2. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

3. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

4. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

5. With regard to information about any marketplace or other service provider that you provided to us

DSP 805-369

to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider change, or you open a new account or you close your account

6. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

7. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

8. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

9. To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

10. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

11. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

12. Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

13. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

14. Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

15. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3.** *Payments.*

**Automatic Payment Authorization.** You authorize us to initiate, on each Payment Due Date, an **automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a

Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization;** Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason,

we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in

DSP 805-373

court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one

Case 1:17-cv-11976-GAO Document 44-43 Filed 09/23/19 Page 375 of 413

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions,

conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

DSP 805-375

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients, and in advertising and marketing materials.

Case 1:17-cv-01976-GAO   Document 44-43   Filed 09/23/19   Page 377 of 413

# IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT

DSP 805-376

ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

By checking the "Submit" box in your application, you acknowledge receipt of this Agreement,
state that you have read and agreed to its terms and conditions, and agree to receive disclosures
electronically.

*Electronic Signature of Merchant/Owner*: You each acknowledge and agree that any electronic or
digital signature provided by telephone, on any application or other document signed in
connection with your account represents your signature on this Agreement.

Rev.4/29/2014

**Kabbage Business Loan Agreement**

| | |
|---|---|
| **Loan Amount: $15,583.33** | **Date: May 06, 2014** |
| **Merchant Information** | **Lender: Celtic Bank** |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit** | |

**(Replacing MCAA of 04/11/2014 of the original amount of $18,700.00)**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

## I. BUSINESS LOAN

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based upon the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $187.00 |
| Second Monthly Anniversary Date | $187.00 |
| Third Monthly Anniversary Date | $187.00 |
| Fourth Monthly Anniversary Date | $187.00 |
| Fifth Monthly Anniversary Date | $187.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
|---|---|
| First Payment Due Date | $4,051.67* |
| Second Payment Due Date | $3,303.67* |
| Third Payment Due Date | $3,303.67* |
| Fourth Payment Due Date | $3,303.67* |
| Fifth Payment Due Date | $3,303.65* |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

1. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

2. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

3. To take all steps necessary to provide us with access to view the activity in your Business Payment

Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate for the purpose of monitoring your business activity and finances;

4. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other accounts and sales and shipping data as we have deemed necessary and appropriate;

5. With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

6. To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

7. To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

8. To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

9. To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

10. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

11. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

12. Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

13. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

14. Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

15. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.

Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this

Agreement, specifically including the Merchant Contractual Covenants above. (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected equal to the Specified Amount sold to Company.)

### Section 1.3. *Payments.*

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization;** Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial

DSP 805-382

payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full" (with or without "accruals," or similar language). If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357.**

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively,

("Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as arbitration administrator, you or we may substitute another arbitration or arbitration

Case 1:17-cv-11974-GAO   Document 44-43   Filed 09/23/19   Page 385 of 413

organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties (or consolidate Claims). Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal

judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises

a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and otherwise. Cv. the 1976 upon after termination of the relationship between the parties.

Case 1:17-cv-11976-GAO Document 44-43 Filed 09/23/19 Page 388 of 413

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations, however, are nonetheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN

PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

---

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website

(www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan – Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.**

Rev.4/29/2014

DSP 805-389

| | |
|---|---|
| **Loan Amount: $23,550.00** | **Date: May 06, 2014** |
| **Merchant Information** | **Lender: Celtic Bank** |
| **Account Number: 27791** | **Salt Lake City, Utah** |
| **Merchant: NRO Boston LLC** | **Fees** |
| **Owner: alice indelicato** | **Late Fee: Up to $100** |
| **Marketplaces: AuthorizeNET, Bigcommerce,** | **Returned Payment Fee: Up to $20** |
| **ACH, ACH, ACH, Twitter, GoogleAnalytics,** | |
| **Intuit** | |

**(Replacing MCAA of 02/13/2014 of the original amount of $47,100.00)**

This Business Loan Agreement ("Agreement") is made by and between **Celtic Bank** ("we," "us," "our" or "Bank") and merchant ("you" or "Merchant"), along with the principal shareholder, partner, member or other owner of Merchant who submitted the Application on behalf of Merchant ("Owner"), as of the date specified above.

## I. BUSINESS LOAN

**Section 1.1. *Business Loan.*** You agree to borrow, and we agree to lend to you, the amount set forth above. You promise to repay this Loan, plus Costs (as defined below), plus all other amounts that may become due us under this Agreement, according to the payment schedule set forth below. You will provide us, at all times during this Agreement, with sufficient access to view the activity in (a) your commercial transaction account(s), including, but not limited to, (i) your PayPal business account, the details of which you have provided to us (individually and collectively, as appropriate, your "Business Payment Account"), (ii) one or more designated business checking accounts, the details of which you have provided to us (individually and collectively, as appropriate, your "Bank Account"), (b) the marketplace(s) where you do business, and (c) such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances. You agree to repay us in U.S. dollars.

**THIS IS A COMMERCIAL LOAN. YOU AGREE NOT TO USE ANY PORTION OF THE AMOUNT LOANED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES AND NOT TO REPAY US FROM ANY CONSUMER ACCOUNT.**

Merchant and Owner each understand, acknowledge and agree that Merchant is entering into this Agreement as a commercial transaction and that your agreement not to use any portion of the amount loaned for personal, family or household purposes and not to repay us from any consumer account means that certain important duties imposed upon transactions and communications for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law, will not apply to any aspect of this transaction. Merchant and Owner also understand, acknowledge and agree that we may be unable to confirm whether, for example, any particular use of any amount loaned or any particular payment conforms to this section. Merchant and Owner understand, acknowledge and agree that a breach by Merchant of the provisions of this section will not affect our right to (i) enforce this Agreement, regardless of the purpose for which any amount loaned is in fact used, or (ii) use any remedy legally available to us in a commercial transaction, even if that remedy would not have been available had any amount loaned been disbursed for consumer purposes or payment delivered from a consumer account.

You agree to notify us promptly if (i) the details of your Business Payment Account or Bank Account change, (ii) you open any new account that is similar or (iii) you close your Business Payment Account or Bank Account or any similar account. Furthermore, with regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, you agree to notify us promptly if (i) the details of your account with any such marketplace or other service provider change, (ii) you open a new account with any such marketplace or other service provider or (iii) you close your account with any such marketplace or other service provider.

**Term.** This Loan has a six (6) month term. Monthly payments are due as set forth in the payment schedule below.

**Cost.** We will impose an interest charge ("Cost") for each month or partial month that any portion of your Loan remains outstanding based upon the original Loan amount. You may avoid additional Cost by repaying your outstanding balance in full at any time without penalty. We may continue to impose additional Cost at the same rate after maturity.

**Cost Schedule.**

| If you repay your loan in full before: | Your anticipated (total) Cost will be: |
|---|---|
| First Monthly Anniversary Date | $471.00 |
| Second Monthly Anniversary Date | $471.00 |
| Third Monthly Anniversary Date | $471.00 |

**Minimum Monthly Payments.** You agree to make minimum monthly payments (each a "Minimum Monthly Payment") in the amounts specified below on each scheduled monthly payment due date ("Payment Due Date") shown on your monthly statement. The Minimum Monthly Payment for this Loan will be:

| Payment Due Date | Scheduled Minimum Monthly Payment: |
|---|---|
| First Payment Due Date | $8,321.00* |
| Second Payment Due Date | $8,321.00* |
| Third Payment Due Date | $8,321.00* |

* Or all amounts due under this Agreement if less than the amount shown

You may at any time pay more than the Minimum Monthly Payment without penalty. Any amounts due under this Agreement and remaining unpaid on the final scheduled Payment Due Date are due on that date.

**Total Minimum Monthly Payment.** We will notify you, at least 10 calendar days in advance of each Payment Due Date, of the aggregate amount of (i) all current Minimum Monthly Payments for multiple Loans, plus (ii) any previous Minimum Monthly Payments remaining, in whole or in part, unpaid, plus (iii) billed but unpaid fees [collectively, (i) through (iii) are your "Total Minimum Monthly Payment"]. See Section 1.3 (Payments) below.

**Late Fee.** If you fail to pay your Total Minimum Monthly Payment amount on time, you agree that we may assess a Late Fee of:

- **$10** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $35 but less than $500;

- **$35** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $500 but less than $5,000;

- **$100** if your aggregate outstanding balance of all outstanding Loans is equal to or greater than $5000.

**Application of Payments.** Payments received will be applied first to billed Late Fees and Returned Payment Fees, then to loans in order of posting with the oldest loan first, then the second oldest loan, and so on. With respect to any particular loan, payment will be applied first to billed Cost, then to unbilled Cost and finally to principal. Any amount received in excess of your Total Minimum Payment due will be applied first to any unbilled Late Fees and Returned Payment Fees, then to your remaining principal balances in order, beginning with the oldest loan first, then the second oldest loan and so on. Any payment in excess of the Total Minimum Monthly Payment due does not relieve you of your obligation to make your next scheduled Total Minimum Monthly Payment.

**Section 1.2. Merchant's Contractual Covenants and Representations; Further Inquires.**

**Covenants.** You agree:

1. Not to use any amount loaned for personal, family or household purposes and not to repay us from any consumer account;

2. Not to materially change the nature of the business that you conduct from the type of business originally disclosed to us in connection with this Agreement and, unless we are adequately notified in advance, to conduct your business substantially in accordance with past practices;

3. To take all steps necessary to provide us with access to view the activity in your Business Payment Account, Bank Account and marketplaces where you do business and to such other accounts and sales and shipping data as we deem necessary and appropriate, for the purpose of monitoring your business activity and finances;

4. Not to reduce or remove, or cause anyone to reduce or remove, our access, once granted, to your Business Payment Account, Bank Account, marketplaces where you do business and such other

accounts and sales and shipping data as we have deemed necessary and appropriate;

5.  With regard to information about any marketplace or other service provider that you provided to us to determine the amount of your Loan, to notify us promptly if the details of your account with such marketplace or other service provider changes, you open a new account or you close your account

6.  To use your Business Payment Account in a volume consistent with the level of transactions you processed through such account(s) when you received your Loan, or otherwise ensure that funds sufficient to satisfy your obligations under this Agreement are deposited into your Bank Account;

7.  To maintain a minimum balance in your Business Payment Account or Bank Account, as appropriate (as required by Section 1.3 below);

8.  To collect on your sales promptly, in compliance with all applicable federal, state and local laws, rules and regulations and consistent with your past collection practices;

9.  To make payments to us (in U.S. dollars) on the applicable Payment Due Date"

10. Not to take any action to discourage the use of your Business Payment Account and not to permit any event to occur that could have an adverse effect on the use, acceptance or authorization of your Business Payment Account for the purchase of services and/or products by your customers;

11. Not to open a new account other than the Business Payment Account or Bank Account (collectively, the "Accounts") into which your sales will be deposited and not to take any action to cause future sales to be settled or paid to any account other than the Accounts;

12. Not to sell, dispose, convey or otherwise payment your business or assets without our express prior written consent and the prior payment or assumption of all of your obligations under this Agreement pursuant to documentation reasonably satisfactory to us;

13. Not to take any intentional action that would substantially impair or reduce your generation or collection of accounts receivable adequate to satisfy your obligations under this Agreement without our prior written permission;

14. Not to terminate your authorization of scheduled debits in Section 1.3, stop payment on any debit authorized pursuant to Section 1.3, claim that a debit transaction pursuant to Section 1.3 is unauthorized, or seek a refund, return, chargeback or dispute of a credit card transaction related to a payment under Section 1.3; and

15. To notify us promptly if, with regard to any Business Payment Account or Bank Account, the details of your account change, you open a new account or you close your account.


Collectively, the preceding items (i) through (xv) are your "Merchant Contractual Covenants".

**Representations.** You represent that as of the date of this Agreement (i) you have no present intention to close or cease operating your business, in whole or in part, temporarily or permanently, (ii) you are solvent and not contemplating any insolvency or bankruptcy proceeding, (iii) during the four (4) months preceding the date hereof, neither Merchant nor any Owner has discussed with or among Merchant's management, counsel, or any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Merchant and no such action or proceeding has been filed or is pending, and (iv) no eviction or foreclosure is pending or threatened against Merchant.

**Further Inquiries.** Merchant and Owner authorize Bank, its agents and representatives, and any credit reporting agency engaged by Bank, to (i) request information about and investigate Merchant and Owner and any references given or any other statements or data obtained from or about Merchant or Owner for the purpose of this Agreement and (ii) pull credit reports, whether in connection with Merchant's application for a loan or at any time thereafter for so long as Merchant and/or Owner continue to have any obligation owed to Bank.

**Owner's Personal Guarantee of Merchant's Performance of Merchant Contractual Covenants.** Owner personally guarantees the performance of all of the covenants of Merchant in this Agreement, specifically including the Merchant Contractual Covenants above.  (Owner does not absolutely guarantee that sufficient future receivables will be generated or Proceeds collected to equal the Specified Amount sold to Company.)

**Section 1.3. *Payments.***

**Automatic Payment Authorization. You authorize us to initiate, on each Payment Due Date, an automatic electronic debit from your Business Payment Account or Bank Account, as appropriate, in the amount of the Total Minimum Monthly Payment;** provided, however, that if a Payment Due Date falls on a Saturday, Sunday or holiday, then the debit may be initiated on the next business day. Any separate payments that you make on or before a Payment Due Date will not affect this authorization. You understand that your Total Minimum Monthly Payment may vary from time to time but will in no event exceed the total outstanding Loans. We will not be liable for any fees or Costs that you may incur if we are unable to debit your Total Minimum Monthly Payment under this authorization. We also are not responsible for any fees imposed on you by the provider of any Business Payment Account or Bank Account as the result of any authorized debit or any payments made directly by you under this Agreement. Automated Clearing House transactions must comply with the provisions of U.S. law.

**Payment Failure.** If a debit is rejected or if you otherwise fail to pay your Total Minimum Monthly Payment when due, you agree that we may (i) terminate further automatic debits, in which case you will be responsible for making all further payments directly and in a timely manner, (ii) *debit your Business Payment Account and Bank Account, at any time and from time to time, for any amounts due us until paid in full,* (iii) subject to any right to notice of default and right to cure required by state law (which you agree to waive to the greatest extent possible), declare all outstanding Loans immediately due and payable and (iv) pursue any and all other remedies available to us.

**Account Maintenance.** You agree to maintain in your Business Payment Account or Bank Account, as appropriate, sufficient funds to meet each Total Minimum Monthly Payment obligation. We may initiate a debit at any time on a Payment Due Date, including prior to the time that we open for business on any business day. Consequently, you understand that funds must be available by the end of the business day prior to the applicable Payment Due Date and maintained in your Business Payment Account or Bank Account until the debit is processed.

**Terminating or Disputing Authorization;** Stopping Payment. You may terminate your automatic electronic debit authorization by notifying us in writing at least three (3) or more business days before a scheduled Payment Due Date, and your termination will be effective three (3) business days after the date your notice is received by us. If you call us, we may ask you to send your request in writing to us within 14 calendar days of your call. Terminating this automatic debit authorization, stopping payment on a scheduled debit or claiming that a debit transaction pursuant to this Section 1.3 is unauthorized is an event of default under this Agreement; as a result, we may initiate manually one or more debits to your Business Payment Account or Bank Account, at any time and from time to time, for all amounts due us. We may modify or terminate automatic debiting for any reason by notifying you in writing at your last known address in our records. Following the date of any termination of automatic debits by you or by us, you will be responsible for making all further payments directly and in a timely manner. Alternative Payment. If for any reason we are unable to initiate an electronic debit, you agree that we may prepare and deposit a remotely created check in the same amount.

**Credit Card Transactions.** We do not accept payments from consumer accounts. If you choose to provide a credit card number as back-up funding for your Business Payment Account, you agree to waive any right of chargeback or dispute as to any commercial transaction involving us and your Business Payment Account. You agree that your obligation to pay under this Agreement is not related to any consumer transaction. There can be no ground for any refund or return. All payments to us are final. You agree that we may apply any credit balance to any outstanding Loan or other obligation you have with us or issue a check to you.

**Other Payments.** You may make additional or alternative payments at any time. Payments by postal mail should be sent, postage paid, to the following address: Kabbage Business Loan Payments, P.O. Box 77073, Atlanta, GA 30357. You may also call Customer Service to arrange payments by overnight delivery, telephone or other acceptable method. Payments made to any other address than as specified by us may result in a delay in processing and/or crediting for which we will not be responsible. All payments must be made in good funds by check, money order, automatic payment from an account at an U.S. institution offering such service, or other instrument, in U.S. dollars. You are solely responsible for any costs associated with a payment. Payments received after 5:00 p.m. (ET) on any day will be credited on the next day. Credit to your account may be delayed up to five (5) calendar days if a payment (a) is not received at the above address, (b) is not made in U.S. dollars drawn on a U.S. financial institution located in the U.S., (c) contains more than one payment, or (d) includes staples, paper clips, tape, a folded check, or correspondence of any type.

**Acceptance of Late and Partial Payments; Disputed Amounts.** We may accept late or partial payments without losing any of our rights under this Agreement. You agree not to send us partial payments marked "paid in full," "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement. **All written communications concerning disputed amounts, including any check or other instrument that indicates that the payment constitutes "payment in full" of your payment or fee obligations or that is tendered with**

other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Kabbage Business Loan Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357

**Section 1.4.** *Returned Payment Fee.* If a payment is rejected, returned or dishonored, for any reason, we may assess a **Returned Payment Fee** in the amount of **$20**, which fee will be in addition to any Late Fee that may be due.

**Section 1.5.** *Default.* You will be in default if any of the following happen: (i) you fail to make any payment under this Agreement when due; (ii) you break any promise you have made to us, or you fail to comply with or to perform any term, obligation, covenant, or condition under this Agreement; (iii) you terminate your automatic scheduled debit authorization, stop payment on any authorized debit pursuant to Section 1.3 or claim that a debit transaction pursuant to Section 1.3 is unauthorized; (iv) you are in default under any loan, security agreement, or any other agreement, in favor of any other party to whom you owe debt that may affect any of your property or your ability to perform your obligations under this Agreement; (v) any representation or statement made or furnished to us by you or on your behalf is false or misleading either now or at the time made or furnished; (vi) a material change occurs in your ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (vii) you liquidate or dissolve, or enter into any consolidation merger, partnership, joint venture or other combination without our prior written consent; (viii) you sell any assets except in the ordinary course of your business as now conducted, or sell, lease, assign or transfer any substantial part of your business or fixed assets or any property or other assets necessary for the continuance of your business as now conducted, including, without limitation, the selling of any property or other assets accompanied by the leasing back of the same; (ix) any guaranty of performance given to us ceases to be in full force and effect or is declared to be null and void; or the validity or enforceability thereof is contested in a judicial proceeding; or Owner denies that Owner has any further liability under such guaranty; or Owner defaults in any provision of any guaranty, or any financial information provided by Owner is false or misleading; (x) if you are a sole proprietorship, the Owner dies; if you are a trust, a trustor dies; if you are a partnership, any general or managing partner dies; if you are a corporation, any principal officer or 10.00% or greater shareholder dies; if you are a limited liability company, any managing member dies; if you are any other form of business entity, any person(s) directly or indirectly controlling ten percent (10.00%) or more of the ownership interests of such entity dies; (xi) any creditor tries to take any of your property on or in which we have a lien or security interest; (xii) a judgment is entered against you or Owner in the aggregate amount of $250 or more that is not satisfied within thirty (30) days or stayed pending appeal; (xiii) an involuntary lien is attached to any of your or Owner's assets or property and not satisfied within thirty (30) days or stayed pending appeal; or (xiv) any of the events described in this default section occurs with respect to Owner.

**Our Rights Upon Default.** Upon default, we may demand the immediate payment of all amounts owed us

We may hire or pay someone else to help collect any amount that you may owe us. You agree to pay any collection, arbitration, court costs incurred by us or other sums provided or allowed by law. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses for bankruptcy proceedings, civil actions, arbitration proceedings, declaratory actions or other filings or proceedings, and efforts to modify or vacate any automatic stay or injunction, appeals, and any anticipated post- judgment collection services.

**Notice of Merchant or Owner Default.** You agree to furnish to us, immediately upon becoming aware of the existence of any condition or event which with the lapse of time or failure to give notice would constitute an event of default under this Agreement, written notice specifying the nature and period of the existence of such condition or event and any action which you are taking or propose to take with respect thereto.

**Section 1.6.** *Arbitration (Agreement to Arbitrate Claims).*

Except as otherwise stated below, any Claim (as defined below) will be resolved by binding arbitration pursuant to (a) this Arbitration Provision and (b) the code of procedure of the national arbitration organization to which the Claim is referred (as in effect when the Claim is filed). Claims will be referred to either Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. Streamlined arbitration procedures will be used if available. If a selection by us of one of these organizations is unacceptable to you, you have the right, within 30 days after you receive notice of our election, to select the other organization listed to serve as arbitration administrator. For purposes of this Arbitration Provision, "Claim" means any claim, dispute or controversy (whether in contract, tort, or otherwise) past, present or future, (collectively, "Claims") as further described below. (If for any reason a selected organization cannot, will not or ceases to serve as an arbitration administrator, you or we may substitute another arbitrator or arbitration organization that uses a similar code of procedure and is mutually acceptable to both parties, in accordance with Section 5 of the Federal Arbitration Act. If both parties cannot agree on an arbitration organization, then either party may ask a court of competent jurisdiction to appoint a qualified arbitration

organization.) An arbitration proceeding can decide only your or our Claims. You cannot join other parties or consolidate Claims. Neither you nor we will be permitted to arbitrate claims on a class-wide (that is, on other than an individual) basis.

**Small Claims Court Option.** All parties, including related third parties, shall retain the right to seek adjudication of an individual (and not class or representative) Claim in a small claims tribunal in the county of your residence for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal (including claims transferred by the small claims tribunal to another court) shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**SIGNIFICANCE OF ARBITRATION; LIMITATIONS AND RESTRICTIONS. IN ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO (i) HAVE A COURT OR JURY DECIDE THE CLAIM BEING ARBITRATED, (ii) ENGAGE IN PRE-ARBITRATION DISCOVERY (THAT IS, THE RIGHT TO OBTAIN INFORMATION FROM THE OTHER PARTY) TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT, (iii) PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS IN A CLASS ACTION, IN COURT OR IN ARBITRATION, RELATING TO ANY CLAIM SUBJECT TO ARBITRATION OR (iv) JOIN OR CONSOLIDATE CLAIMS OTHER THAN YOUR OWN OR OUR OWN. OTHER RIGHTS AVAILABLE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.** Except as set forth below, the arbitrator's decision will be final and binding. Only a court may decide the validity of items (iii) and (iv) above. If a court holds that items (iii) or (iv) are limited, invalid or unenforceable, then this entire Arbitration Provision will be null and void. You or we can appeal any such holding. If a court holds that any other part(s) of this Arbitration Provision (other than items (iii) and (iv)) are invalid, then the remaining parts of this Arbitration Provision will remain in force. An arbitrator will decide all other issues pertaining to arbitrability, validity, interpretation and enforceability of this Arbitration Provision. The decision of an arbitrator is as enforceable as any court order and may be subject to very limited review by a court. An arbitrator may decide any Claim upon the submission of documents alone. A party may request a telephonic hearing if permitted by applicable rules. The exchange of non-privileged information relevant to any Claim, between the parties, is permitted and encouraged. Either party may submit relevant information, documents or exhibits to the arbitrator for consideration in deciding any Claim.

**Right to Opt-Out of Arbitration. You may opt-out of this Arbitration Provision. If you do so, neither you nor we will have the right to engage in arbitration.** Opting out of this Arbitration Provision will have no effect on any of the other provisions in this Agreement. To opt out of this Arbitration Provision, we must receive your written notice of opt-out, within 60 calendar days after we approve your Loan, at Account Services Dispute Resolution, P.O. Box 77081, Atlanta, GA 30357; ATTN: Arbitration. In your letter, you must give us the following information: Name, Address and Loan number. The right to opt-out granted here applies solely to this Arbitration Provision and this Agreement, and not to any other provision of this Agreement or to any other Loan or other agreement with us. In the event of a dispute over whether you have provided a timely opt-out notice, you must provide proof of delivery.

**Broad Meaning of "Claims."** The term "Claims" in this Arbitration Provision is to be given the broadest possible meaning and includes (by way of example and without limitation) Claims arising from or relating to (i) this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection of your obligations arising from this Agreement, (v) advertisements, promotions or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, including any Claims regarding information obtained by us from, or reported by us to, credit reporting agencies or others, (vi) Claims between you and us or our parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement and (vii) Claims regarding the validity, enforceability or scope of this Arbitration Provision or this Agreement including but not limited to whether a given claim or dispute is subject to arbitration.

**Arbitration Procedure and Costs.** For a copy of relevant codes of procedure, to file a Claim or for other information about JAMS and AAA, write them, visit their web site or call them at: (i) for JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, info@jamsadr.com, http://www.jamsadr.com, or 1-800-352-5267; or (ii) for AAA, 1633 Broadway, 10th Floor, New York, NY 10019, websitemail@adr.org, http://www.adr.org, or 1-800-778-7879. If either party fails to submit to arbitration following a proper demand to do so, that party will bear the costs and expenses, including reasonable attorneys' fees, incurred by the party compelling arbitration. Any physical arbitration hearing will be held in the federal judicial district selected by Merchant. No matter which party initiates the arbitration, we will advance or reimburse filing fees and other costs or fees of arbitration. Each party will initially be responsible for its own attorneys', experts' and witness fees and related costs and expenses. Unless prohibited by law, the arbitrator may, applying applicable law, award fees, costs and reasonable attorneys' fees and expenses to the party who substantially prevails in the arbitration. The allocation of fees and costs relating to an

appeal in arbitration will be handled in the same manner. For an explanation and schedule of the fees that may apply to an arbitration proceeding, please contact the organizations at the addresses above. The appropriate fee schedule in effect from time to time is hereby incorporated by reference into this Arbitration Provision. The cost of arbitration may be higher or lower than the cost of bringing a Claim in court, depending upon the nature of the Claim and how the arbitration proceeds. Having more than one Claim and holding a physical arbitration hearing can increase the cost of arbitration.

**Governing Law for Arbitration.** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., as amended, notwithstanding any other governing law provision in this Agreement. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA, in which case any party can appeal the award to a three-arbitrator panel administered by the selected arbitration administrator. The panel will reconsider *de novo* (that is, without deference to the ruling of the original arbitration) any aspect of the initial award requested by the appealing party.

**Continued Effect of Arbitration Provision.** This Arbitration Provision will continue to govern any Claims that may arise without regard to any termination or cancellation of this Agreement. If any portion of this Arbitration Provision (other than the provisions prohibiting class-wide arbitration, joinder or consolidation) is deemed invalid or unenforceable under the FAA, it will not invalidate the remaining portions of this Arbitration Provision. If a conflict or inconsistency arises between the code of procedures of the selected arbitration administrator and this Arbitration Provision, this Arbitration Provision will control.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Each of Merchant and Owner represents, warrants and covenants the following as of the date hereof and at all times during the term of this Agreement:

**Section 2.1. Covenant Representation.** Merchant shall comply with each of the Merchant Contractual Covenants as set forth herein.

**Section 2.2. Business Information.** All information (financial and other) provided by or on behalf of Merchant to Bank in connection with the execution of or pursuant to this Agreement and during the term of this Agreement is and will be true, accurate and complete in all respects. Merchant shall furnish Bank such information as Bank may request from time to time.

**Section 2.3. Reliance on Information.** Merchant and Owner acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Owner either as of the date hereof or hereafter has been and may continue to be relied upon by Bank in connection with any decision that Bank makes to extend additional time to repay or to loan you future funds.

**Section 2.4. Compliance.** Merchant is in compliance with any and all federal, state and local laws and regulations and rules and regulations relating to (i) the operation of Merchant's business, including the collection of accounts receivable, and (ii) the provider of the Business Payment Account and Bank Account and any online sales channels (e.g., eBay) applicable to Merchant's business. Merchant possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5. Authorization.** Merchant and Owner have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6. Insurance.** Merchant shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Bank.

**Section 2.7. Change in Name or Location.** Merchant does not and shall not conduct Merchant's business under any name other than as disclosed to Bank and shall not change its place of business.

**Section 2.8. Merchant Not Indebted to Bank.** Neither Merchant nor Owner is a debtor of Bank as of the date of this Agreement.

**Section 2.9. Owner.** Owner shall cause Merchant to fulfill each of Merchant's covenants hereunder.

**Section 2.10. Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves Merchant's accounts receivable, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Merchant's accounts receivable or

future credit card or online sales with any party other than Bank.

**Section 2.11. Unencumbered Accounts Receivable.** Merchant has good, complete and marketable title to all of its accounts receivable, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Bank.

**Section 2.12. Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes. Merchant's Business Payment Account and Bank Account are each specifically designated as business purpose accounts and are each used solely for sales of goods and or services sold or rendered by Merchant and not used for personal, family or household purposes.

## III. ADDITIONAL TERMS

**Section 3.1. Security Interest.** Merchant grants to Bank, to secure Merchant's performance under this Agreement, a continuing first lien security interest, unless otherwise agreed in writing by Bank, in the following property of Merchant, wherever found, that Merchant now owns or shall acquire: (a) all tangible and intangible personal property of Merchant, including, all accounts, deposit accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, investment property (including certificated and uncertificated securities, securities accounts, securities entitlements, commodity contracts and commodity accounts), letter of credit rights, commercial tort claims and as-extracted collateral (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Georgia); (b) all patents, patent applications, trademarks, trade names, service marks, logos, copyrights, and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") and U.S. Copyright Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP; and (c) all accessions, attachments, accessories, parts, supplies and replacements, products, proceeds and collections with respect to the items described in (a) and (b) above, as those terms are defined in Article 9 of the UCC and all records and data relating thereto.

**Section 3.2. Financing Statements.** Merchant understands and agrees that Bank may at anytime file one or more (i) UCC-1 financing statements, lien entry form or other document to perfect, amend or continue any interest granted in Section 3.1 above and (ii) assignments with USPTO and/or U.S. Copyright Office to perfect any security interest in IP described above. Merchant agrees to cooperate with Bank as may be necessary to accomplish said filing and authorizes Bank to sign Merchant's name to effect the filing or continuation of any such filings.

**Section 3.3. Remedies.** In the event that any representation or warranty of Merchant or Owner contained in this Agreement is not true, accurate and complete, or in the event of a breach of any of the covenants contained in this Agreement, including the Merchant Contractual Covenants, Bank shall be entitled to all remedies available under law. The obligation of Owner in Section 2.9 of this Agreement is primary and unconditional and Owner waives any right to require Bank to proceed first against Merchant before recovering damages from Owner.

**Section 3.4. [Reserved]**

**Section 3.5. Protection of Information.** Except for Confidential Information (as defined below), Merchant and Owner each authorize Bank to disclose to any third party information concerning Merchant's and Owner's business conduct. Merchant and Owner hereby waive to the maximum extent permitted by law any claim for damages against Bank or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Bank as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.6. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Bank, including this Agreement and any other Bank documentation (collectively, "Confidential Information") are proprietary and confidential information of Bank. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 3.6. The foregoing covenants of Merchant shall exist for the duration of the relationship of the parties and, with respect to all Confidential Information, that comprises a Trade Secret (under Georgia law) for so long as such information continues to constitute a Trade Secret and, otherwise, for three (3) years after termination of the relationship between the parties.

**Section 3.7. Transfer and Assignment.** Without prior notice or approval by you, we reserve the right to sell or transfer all or any portion of our interest in this Agreement to another entity or person. Your rights

and obligations under this Agreement belong solely to you and may not be transferred or assigned by you. Your obligations hereunder are nevertheless binding upon you and your heirs, legal representatives, successors, and assigns.

**Section 3.8. Publicity.** Merchant and Owner authorize Bank to use Merchant's or Owner's name in a listing of clients and in advertising and marketing materials.

## IV. MISCELLANEOUS

**Section 4.1. Modifications; Amendments; Construction.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, "including" shall mean "including, without limitation."

**Section 4.2. Notices.** Except as otherwise provided in this Agreement, any notice provided under this Agreement must be in writing but may be provided electronically. Notices will be deemed given when properly addressed and deposited in the U.S. mail, postage prepaid, First Class mail; delivered in person; or sent by registered mail; by certified mail; by nationally recognized overnight courier; or by electronic mail. Notice to you will be sent to your last known address in our records. Notice to any of you will be deemed notice to all of you. Notice to us may be sent to Kabbage, P.O. Box 77081, Atlanta, GA 30357. You agree to notify us immediately if you change your name, your postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on your account or information that you provide to us, or if any of you dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. You agree that a notice of incompetence is not effective unless issued by a court having jurisdiction and we receive notice and instruction from the court. **Notwithstanding the above, we may, at our option, accept other evidence of incompetence acceptable to us. You agree to indemnify and hold us harmless from and against any and all claims relating to acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.**

**Section 4.3. Waiver; Remedies.** No delay on the part of Bank to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4. D/B/A's.** Merchant hereby acknowledges and agrees that Bank may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Bank and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Merchant, Owner, Bank and their respective successors and permitted assigns.

**Section 4.6. Governing Law. With the exception of Section 1.17 above (which is to be governed exclusively by the FAA), this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Utah without regard to internal principles of conflict of laws.** Merchant hereby submits to the jurisdiction of any Utah state or federal court sitting in Salt Lake County, Utah, at Bank's choice. Merchant hereby waives any claim that an action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions of which this Agreement is a part may not be enforced in or by any of the above-named courts.

**Section 4.7. Term and Survival.** This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that any Section that, by its terms suggests survival beyond termination hereof, shall so survive until the natural expiration thereof.

**Section 4.8. Severability.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.9. Entire Agreement.** This Agreement contains the entire agreement and understanding among Merchant, Owner and Bank and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein.

**Section 4.10. Jury Trial Waiver.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND

DSP 805-398

**Section 4.11. Class Action Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**Section 4.12. Telephone Monitoring and Recording.** To ensure that you receive quality service and for training purposes, you agree that we may select phone calls for monitoring and/or recording.

**Section 4.13. Communicating With You and Owner; Consent to Contact by Electronic and Other Means.** For purposes of this Section 4.13, "you" means Merchant, Owner and any agent or representative of Merchant or Owner, collectively and individually, for purposes of communications between you and Bank regarding this Agreement and related commercial transactions. You agree that we may contact you as provided in this paragraph. We may contact you for any lawful reason, including for the collection of amounts owed to us and for the offering of products or services to Merchant in compliance with our Bank Privacy Policy in effect from time to time. No such contact will be deemed unsolicited. You specifically agree that we may (i) contact you at any address (including email) or telephone number (including wireless cellular telephone or ported landline telephone number) as you may provide to us from time to time, even if you asked to have your number added to any state or federal do-not-call registry; (ii) use any means of communication, including, but not limited to, postal mail, electronic mail, telephone or other technology, to reach you; (iii) use automatic dialing and announcing devices which may play recorded messages; and (iv) send text messages to your telephone. You may withdraw this express written consent at any time by contacting us at Kabbage Business Loan—Withdrawal of Express Consent, P.O. Box 77081, Atlanta, GA 30357 and telling us specifically what address or telephone number not to use.

**Section 4.14. In case of Errors or Questions About Your Account Summary** If you think your Account Summary is wrong, or if you need more information about an item on your Account Summary, write as soon as possible to: Kabbage Business Loan Account Inquiries, P.O. Box 77081, Atlanta, GA 30357. We must hear from you no later than 60 days after we sent you the first Account Summary on which the error or problem appeared.

In your letter, please give us the following information:

- Your name and email address,

- The dollar amount of the suspected error,

- A description of the error, and

- An explanation of why you believe there is an error.

If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**

Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your

current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new
address by writing us at least five days before the effective date of the change.

Case 1:17-cv-11976-GAO  Document 44-43  Filed 09/23/19  Page 401 of 413

**By checking the "Submit" box in your application, you acknowledge receipt of this Agreement,
state that you have read and agreed to its terms and conditions, and agree to receive disclosures
electronically.**

*Electronic Signature of Merchant/Owner*: **You each acknowledge and agree that any electronic or
digital signature provided by telephone, on any application or other document signed in
connection with your account represents your signature on this Agreement.**

Rev.4/29/2014

**DSP 805-400**

# EXHIBIT E

**CONVERSION OF MCAA OBLIGATIONS TO LOANS:** By accepting this new Kabbage Business Loan, you also (i) agree to amend any outstanding Kabbage Merchant Cash Advance Agreements that you have with us so that you will owe one or more new Kabbage Business Loans from Celtic Bank, Salt Lake City, Utah (one new loan for each outstanding MCAA balance), (ii) ask that Celtic Bank approve a new loan and deliver the proceeds of such loan to Kabbage, Inc. to satisfy each outstanding MCAA obligation, (iii) authorize Celtic Bank to enroll you in the bank's automatic payment plan to repay your loans with funds from the Bank Account you specified in connection with your MCAA and (iv) authorize Kabbage, Inc. to share any information that it has about you with Celtic Bank. The opening balance of each loan will equal the outstanding undelivered Future Receivables and Proceeds, plus any other amounts due on the corresponding MCAA obligation. Celtic Bank will be your new creditor. You will receive a separate Kabbage Business Loan Agreement for each new loan. *NOTE: The terms and conditions of the new loan agreement slightly differ from your old MCAA. As reflected in the terms above, the new loan agreement contains a new late fee provision, a new returned payment fee provision and a new personal guarantee of repayment. The new loan agreement is governed by Utah law.*

Rev.4/18/2014

DSP 805-402

# EXHIBIT F

DSP 805-403





# EXHIBIT G



# EXHIBIT H

DSP 805-407



# EXHIBIT I

DSP 805-409



# EXHIBIT J

